2018-1180; 2018-1181

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

adidas AG,

*Appellant,*

v.

Nike, Inc.

*Appellee.*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
in Nos. IPR2016-00921 and IPR2016-00922

# APPELLANT'S OPENING BRIEF

Mitchell G. Stockwell
Vaibhav P. Kadaba
Tiffany L. Williams
Michael T. Morlock
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(404) 815-6500
(404) 815-6555
mstockwell@kilpatricktownsend.com
wkadaba@kilpatricktownsend.com
tiwilliams@kilpatricktownsend.com
mmorlock@kilpatricktownsend.com

*Counsel for Appellant*

# CERTIFICATE OF INTEREST

Counsel for adidas AG certifies the following:

1. The full name of every party represented by us is:

**adidas AG**

2. The name of the real party in interest represented by us is:

**Same.**

3. Parent corporations and publicly held companies that own 10% or more of the stock in the party:

**None.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**None.**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

**14-1719 Nike, Inc. v. adidas AG (Chen)**
**IPR2013-00067 adidas AG v. Nike, Inc.**

Date: February 26, 2018

/s/Mitchell G. Stockwell
Mitchell G. Stockwell

## STATEMENT OF RELATED CASES

Appellant adidas AG is not aware of any other appeal from the *inter partes* reviews of U.S. Patent Nos. 7,814,598 or 8,266,749 before this or any other appellate court.

U.S. Patent No. 7,347,011 is related to both U.S. Patent Nos. 7,814,598 and 8,266,749, and is subject to *inter partes* review in *adidas AG v. Nike, Inc.*, IPR2013-00067. A Final Written Decision was mailed on April 28, 2014. The Federal Circuit remanded the proceeding to the Board in *Nike, Inc. v. adidas AG*, Case No. 2014–1719; 812 F.3d 1326 (Fed. Cir. 2016).

## TABLE OF ABBREVIATIONS

| Abbreviation | Explanation |
|---|---|
| adidas | Appellant adidas AG (Petitioner below) |
| Nike | Appellee Nike, Inc. (Patent Owner below) |
| Board | Patent Trial & Appeal Board, United States Patent & Trademark Office |
| POSITA | Person of Ordinary Skill in the Relevant Art at the Time of the Invention |
| The ‘598 Patent | U.S. Patent No. 7,814,598 to Dua *et al*. |
| The ‘749 Patent | U.S. Patent No. 8,266,749 to Dua *et al*. |
| The Challenged Patents | The ‘598 Patent and the ‘749 Patent |
| Nishida | U.S. Patent No. 5,345,638 to Nishida. |
| Reed | U.S. Patent No. 3,985,003 to Reed. |
| Holden Declaration | Declaration of Lenny M. Holden, submitted as Exhibit 1003 in support of the Petitions. |
| Unitary Construction Claims | Claims 4 and 11 of the ‘598 Patent and dependent claims 11 and 21 of the ‘749 Patent. |

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTEREST ........................................................................i

STATEMENT OF RELATED CASES ........................................................ ii

TABLE OF ABBREVIATIONS ............................................................... iii

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR APPEAL ...........................2

STATEMENT OF THE FACTS ................................................................3

I. The Challenged Patents .................................................................3

II. Summary of the Prior Art ..............................................................5

  A. Reed ...........................................................................................5

  B. Nishida.........................................................................................7

III. Summary of Arguments Presented by adidas.......................................9

  A. Level of Ordinary Skill in the Art. .................................................9

  B. Reed and Nishida Disclose all Claim Elements and there was a Motivation to Combine. ....................................................10

IV. Summary of the Board's Findings.....................................................13

  A. The Board Adopted adidas's Level of Ordinary Skill in the Art. ........................................................................................13

  B. The Board Expressly Found or Nike did not Dispute that the Prior Art Disclosed the Subject Matter of All but the Unitary Construction Claims. ...................................................................14

  C. The Board Found Reed was Analogous Art and Rejected Nike's Arguments Regarding the Scope of Reed. ..............................19

D. Despite the Board's Claim Construction and Findings on Reed, it Found No Motivation to Combine and Inoperability as to the Combination Proposed for the Unitary Construction Claims. .......... 20

SUMMARY OF ARGUMENT .......... 23

ARGUMENT .......... 27

I. Standard of Review .......... 27

II. Reed and Nishida are Properly Combined to Render the Challenged Claims Obvious as a Matter of Law. .......... 28

A. The Board's Conclusion is Legally Improper Based on its Own Findings and Claim Construction. .......... 29

1. The *Graham* Factors Uniformly Confirm Obviousness as a Matter of Law. .......... 29

2. The Board Erred as a Matter of Law in Failing to Find Obviousness of Claims 1-3, 5-10, and 12-13 of the '598 Patent and Claims 1-9 and 12-19 of the '749 Patent. .......... 32

B. The Board's Conclusion of Non-Obviousness is Based on a Legally and Factually Flawed Reading of the Record. .......... 35

III. Substantial Evidence does not Support the Board's Conclusion of no Motivation to Combine. .......... 40

A. Mr. Holden's Unrebutted Testimony Explains the Motivation to Combine Reed and Nishida. .......... 41

B. Nishida Discloses a Layered Design that does not Preclude Combination with Reed. .......... 44

C. The Board's Criticism of Mr. Holden's Testimony is Misplaced. .......... 47

D. The Level of Skill in the Art Confirms Obviousness .......... 50

IV. The Board's Analysis of the Unitary Construction Claims is Legally and Factually Erroneous. ....................51

A. The Combination Resulted in Designs with a Unitary Construction. ....................52

B. The Board's Motivation Analysis is Improper Under its Own Construction and Unsupported by the Record. ....................54

C. The Board's Operability Findings are Legally and Factually Flawed. ....................57

1. The Combination is Operable and Renders Obvious the Subject Matter of the Unitary Construction Claims. ....................57

2. Unsupported Attorney Argument is Legally Insufficient to Show Inoperability. ....................59

3. The Combination does not Render Reed Unsuitable for its "Fundamental Purpose." ....................61

4. The Board's Unsupported Interpretation of Reed Cannot Support a Finding of Inoperability. ....................63

V. The Concurrence Cannot Salvage the Judgement Below. ....................65

CONCLUSION ....................66

CERTIFICATE OF SERVICE ....................67

CERTIFICATE OF COMPLIANCE ....................68

# TABLE OF AUTHORITIES

## Cases

*Allied Erecting and Dismantling Co., Inc. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016).....57

*ClassCo, Inc. v. Apple, Inc.*,
838 F.3d 1214 (Fed. Cir. 2016).....27

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017).....40

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017)..... 50, 62, 65

*Dickinson v. Zurko*,
527 U.S. 150 (1999).....28

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006).....51

*EWP Corp. v. Reliance Universal Inc.*,
755 F.2d 898 (Fed. Cir. 1985).....39

*Falko-Gunter Falkner v. Inglis*,
448 F.3d 1357 (Fed. Cir. 2006).....28

*Graham v. John Deere Co. of Kan. City*,
383 U.S. 1 (1966).....29

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
640 F. App'x 951 (Fed. Cir. 2016).....42

*Icon Health & Fitness, Inc. v. Strava, Inc.,*
849 F.3d 1034 (Fed. Cir. 2017).....61

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012)..... 39, 50, 65

*In re Chevalier*,
500 Fed. App'x 932 (Fed. Cir. 2013).....33

*In re Davis*,
1994 WL 146837 (Fed. Cir. 1994)........................................................................39

*In re Etter*,
756 F.2d 852 (Fed. Cir. 1985)............................................................................61

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997)..........................................................................61

*In re Magnum Oil Tools International, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016)..........................................................................38

*In re Pacer Tech.*,
338 F.3d 1348 (Fed. Cir. 2003)..........................................................................27

*In re Paulsen*, 30 F.3d 1475 (Fed. Cir. 1994).......................................................46

*In re Samour*,
571 F.2d 559 (CCPA 1978) ..............................................................................46

*In re Sang Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002).................................................................. 28, 40

*In re Thrift*,
298 F.3d 1357 (Fed. Cir. 2002)..........................................................................40

*In re Tzipori*,
316 Fed. App'x. 975 (Fed. Cir. 2008).................................................................51

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016)..........................................................................27

*In re Young*,
927 F.2d 588 (Fed. Cir. 1991)............................................................................39

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
637 F.3d 1314 (Fed. Cir. 2011)..........................................................................31

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005)..........................................................................61

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012).................................................................. 29, 51

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......................................................................... 42, 43, 51

*Leapfrog Enters., Inc. v. Fisher–Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007)..........................................................................35

*Microsoft Corp. v. B.E. Tech., LLC*,
No. IPR2014-00039, 2015 WL 1735100 (PTAB Mar. 31, 2015) .......................60

*Navico Inc. v. ITC*,
696 F. App'x 989 (Fed. Cir. 2017) ....................................................................59

*Nike, Inc. v. adidas AG*,
812 F.3d 1326 (Fed. Cir. 2016)..........................................................................43

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986)..........................................................................60

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
587 F.3d 1324 (Fed. Cir. 2009)...................................................................... 34, 41

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)..........................................................................59

*Plantronics, Inc. v. Aliph, Inc.*,
724 F.3d 1343 (Fed. Cir. 2013)..........................................................................41

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015)............................................................................28

*Rothman v. Target Corp.*,
556 F.3d 1310 (Fed. Cir. 2009)..........................................................................51

*Samsung Elecs. Co., Ltd. v. Image Processing Techs. LLC*,
No. IPR2017-00357, 2017 WL 2304442 (PTAB May 25, 2017) .......................60

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
264 F.3d 1344 (Fed. Cir. 2001)..........................................................................43

*SAS Inst., Inc. v. ComplementSoft, LLC*,
825 F.3d 1341 (Fed. Cir. 2016)...................................................................... 27, 38

*Silergy Corp. v. Monolithic Power Sys., Inc.*,
No. IPR2015-00803, 2015 WL 5453162 (PTAB Sept. 11, 2015)........................60

*Smith & Nephew, Inc. v. Rea*,
721 F.3d 1371 (Fed. Cir. 2013)..............................................................40

*Teva Pharms. USA v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)..............................................................................27

*Tokai Corp. v. Easton Enter., Inc.*,
632 F.3d 1358 (Fed. Cir. 2011)..............................................................51

*Unigene Labs., Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011)..............................................................29

*Unwired Planet, LLC v. Google Inc.*,
841 F.3d 995 (Fed. Cir. 2016)................................................................44

**Statutes**

37 C.F.R. § 90.3 ..........................................................................................1

**Other Authorities**

28 U.S.C. § 1295(a)(4)................................................................................1

35 U.S.C. § 103 ...........................................................................................2

35 U.S.C. § 319 ...........................................................................................1

5 U.S.C. § 706(2)(A)-(D)............................................................................27

5 U.S.C. § 706(2)(E) ..................................................................................27

MPEP § 2141.02(VI) ..................................................................................39

## STATEMENT OF JURISDICTION

This is an appeal from the Final Written Decisions in IPR2016-00921 and IPR2016-00922. The Board issued its Final Written Decisions on October 19, 2017. On November 13, 2017, adidas filed its notices of appeal, which were docketed on November 15, 2017, and consolidated on November 30, 2017. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4), 35 U.S.C. § 319, and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES PRESENTED FOR APPEAL

This case is about the Board's decision that adidas did not establish that the challenged claims of the '598 Patent and the '749 Patent are invalid as obvious under 35 U.S.C. § 103. The issues presented are:

1. Whether the Board erred in determining that adidas did not establish that a POSITA would combine the teachings of Reed and Nishida to achieve the methods of the challenged claims.
2. Whether the Board erred in determining that, with respect to claims 4 and 11 of the '598 Patent and claims 11 and 21 of the '749 Patent, the combination of Reed and Nishida would render Reed inoperable or unsuitable for its intended purpose.

## STATEMENT OF THE FACTS

### I. The Challenged Patents

The Challenged Patents recite the same disclosure and generally describe a method for manufacturing an article of footwear with a textile upper. Appx804-823; Appx2151-2171.

adidas requested that the Board cancel claims 1-13 of the '598 Patent, including independent claims 1 and 9. Appx221. Independent claim 1 of the '598 Patent recites:

> 1. A method of manufacturing an article of footwear, the method comprising steps of:
> mechanically-manipulating a yarn with a circular knitting machine to form a cylindrical textile structure;
> removing at least one textile element from the textile structure;
> incorporating the textile element into an upper of the article of footwear.

Appx823, 11:43-50. Independent claim 9 of the '598 Patent recites a similar method to claim 1, but it requires "a wide-tube circular knitting machine to form a textile structure having an outline of at least one textile element." Appx823, 12:21-28.

adidas also requested that the Board cancel claims 1-9, 11-19, and 21 of the '749 Patent. Appx277. Independent claim 1 of the '749 Patent recites:

> 1. A method of manufacturing an article of footwear, the method comprising:
> simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted

> texture that differs from a knitted texture in the surrounding knitted textile structure;
>
> removing the knitted textile element from the surrounding knitted textile structure;
>
> incorporating the knitted textile element into the article of footwear.

Appx2170, 11:43-52. Independent claim 13 of the '749 Patent recites a similar method, but requires "the first knitted textile element located within a first portion of the knitted textile structure, the second knitted textile element located within a second portion of the knitted textile structure," and "varying at least one of the types of stitches or the types of yarns in the knitted textile structure to impart a texture to the first and second knitted textile elements different from a texture of the knitted textile structure extending between the first and second portions." Appx2170, 12:27-43.

As to the dependent claims, the Board separately analyzed the "Unitary Construction Claims," which were dependent claims 4 and 11 of the '598 Patent and dependent claims 11 and 21 of the '749 Patent. Claim 11 of the '749 Patent is representative and is reproduced below:

> 11. The method of claim 1, wherein simultaneously knitting a textile element with a surrounding textile structure includes forming the knitted textile element to include a first area and a second area with a unitary construction, the first area being formed of a first stitch configuration, and the second area being formed of a second stitch configuration that is different from the first stitch configuration to impart varying textures to a surface of the knitted textile element.

Appx2170, 11:14-21. The textile element of unitary construction is, per claim 1, "incorporated … into the article of footwear." For example, the specification explains that such a textile element 40, as shown in Figure 8, has "various edges 41a-44d [that] are joined together to form seams 51-54," which Figures 4 and 5 illustrate result in a shoe upper. Appx809; Appx811; Appx820, 6:67-48; Appx2156; Appx2158; Appx2167, 6:47-48.

## II. Summary of the Prior Art

### A. Reed

Reed is prior art to the Challenged Patents. Appx1329-1339. Reed describes a method of manufacturing a textile element, which can be incorporated into any type of garment worn by men, women, and children, including stockings and hosiery. Appx1335, 1:33-35; Appx1215, ¶94.

Reed explains that the use of circular knitting machines in the garment industry was historically limited to making tubular, knitted garments, such as ladies stockings, sweaters, and other garments, wherein the entire knitted fabric was used as a unit to form one surface of a finished garment. Appx1335, 1:33-44; Appx1215, ¶94. With the advent of computerized programming for knitting machines, "an era of unlimited pattern potential began." Appx1335, 1:45-48; Appx1215-1216, ¶95. "Computer electronic knitting brought about the possibilities of making patterns and designs of up to three million stitches

(previously approximately 50,000 was maximum). With this system, patterns and designs are possible that before could not be made." Appx1335, 1:50-55; Appx1215-1216, ¶95. Reed's invention aimed for "reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Appx1335, 1:58-59, 2:23-25; *see also* Appx1215-1216, ¶94-95.

Reed describes that "an electronic circular double knitting machine [can be] programmed to simultaneously knit two concentric tubes, one on the dial set of needles and a second on the cylinder set of needles." Appx1335, 1:58-61. That machine can be "additionally programmed to interconnect the two concentric tubes by a knit interlock stitch to form the outline of the design of a garment." Appx1335, 1:61-64. The two tubes can be interconnected using either knitting or seaming. Appx1335, 1:64-66 ("The resulting knitted structure will have two layers of single fabric *knitted or seamed together* in the shape of the desired garment…." (emphasis added)). Reed describes embodiments that use "interknitting" to knit together fabric as it is produced. *See* Appx1336, 3:66-68 ("By simultaneously knitting and interknitting the two layers, a step is saved by producing a section of garment which is prelined."); *see also* Appx1337, 5:42-47; Appx1227-1230, ¶114-117.

Using these methods, Reed thus describes a preseamed embodiment, in which the garment is created with a seam in one process and another embodiment, referred to herein as "unseamed," in which garment segments are produced. As to the latter, Reed describes producing elements, such as garment segments, that are severed from the tubular structure and then later seamed together using standard practices to form the garment. Appx1337, 6:10-17; Appx1336, 3:61-63; Appx1221-1222, ¶105.

**B. Nishida**

Nishida is prior art to the Challenged Patents. Appx1358-1367. Nishida describes knitting a shoe upper in the form of a layout. Appx1363, 1:10-13. Specifically, "Nishida … contemplates that the method of producing knitted textiles for shoe uppers can be performed with any 'conventional textile process …' such as 'weaving and/or knitting and/or embroidering.'" Appx1210, ¶78 (quoting Appx1364, 3:5-9).

Nishida also teaches layouts having multiple layers that are knit together. Nishida explains that its layouts can be produced at the same time as the production of the web of material and can be "knitted in two or more layers." Appx1364, 3:66-68; *see also* Appx1358, Abstract.

The layouts may be divided into different individual parts or areas, which differ from one another, such as being of another material style and/or by being of

different fibers or yarns. Appx1364, 3:15-26. The various areas of the layouts can also vary with respect to the type of knit. Appx1365, 5:63-6:2. Nishida's Fig. 2, reproduced below, shows these constructions with varied knit configurations.




Appx1360.

Nishida aimed to improve the efficiency of manufacturing uppers using a "conventional textile process," including knitting. Appx1363, 1:40-47; Appx1364, 3:6-12; Appx1210, ¶78. For example, Nishida describes the advantages of time saving and reducing the costs of materials needed to produce the uppers, and also aimed to reduce the amount of cutting waste, such as by having "individual patterns or partial patterns already … produced directly in the production of the web of material in the desired shoe size, *by which the cutting waste can be still further limited*, since the individual patterns or partial patterns in the provided size

can directly adjoin one another." Appx1363, 2:27-33 (emphasis added); *see also* Appx1358, Abstract.

## III. Summary of Arguments Presented by adidas.

adidas requested that the Board cancel claims 1-13 of the '598 Patent and claims 1-9, 11-19, and 21 of the '749 Patent as obvious in view of the combination of Reed and Nishida. Appx221; Appx277. adidas relied on expert testimony from Mr. Holden, who had been in the shoe business for almost 40 years. Appx1175, ¶5; Appx1324-1326. Mr. Holden "worked in almost every aspect of design, development, operations, commercialization, quality control, and supply chain." Appx1175, ¶7. He was "responsible for the design, development, operations, commercialization, quality control, and supply chain of footwear products." Appx1175, ¶7.

### A. Level of Ordinary Skill in the Art.

adidas argued that there was a relatively high level of ordinary skill in the art at the time of filing. Appx221-22; Appx278. Mr. Holden confirmed that a POSITA would have "at least a few years of experience in the footwear industry, a broad understanding of shoemaking, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) the available and varied ranges of typical construction methods within a product cycle; and (4) the

functional requirements of footwear and the range of material choices available." Appx9 (emphasis omitted, citing Appx221-222); Appx59 (citing Appx278); *see also* Appx1184-1186, ¶32-36.

### B. Reed and Nishida Disclose all Claim Elements and there was a Motivation to Combine.

adidas showed that the combination of Reed and Nishida discloses each and every element of the challenged claims. adidas provided detailed analysis and mapped each claim element to corresponding disclosure in either or both of Reed or Nishida. *See* Appx223-242; Appx279-302. This analysis was confirmed by the Holden Declaration (Appx1213-1242, ¶87-138), which included detailed claim charts mapping the Challenged Claims to Reed and Nishida. *See* Appx1283-1291, Appendix A; Appx1300-1311, Appendix C.

adidas explained that a POSITA would be motivated to combine Reed and Nishida. Appx225-227; Appx281-283. The references themselves confirmed as much, as did the Holden Declaration. Appx1239-1242, ¶131-138. As Mr. Holden explained "a person of ordinary skill in the relevant art would certainly have been motivated to modify Reed's method to include the additional features described by Nishida to produce a textile element for use in a shoe upper, as well as to produce a shoe incorporating such a textile element." Appx1242, ¶136. "[T]he POSITA's motivation for combining Reed with Nishida is based on taking Reed's improvements in knitting technology that are applicable to all garments, and

extending those improvements to shoe uppers, as described in Nishida." Appx534; Appx566.

Reed explains how its system can be used "to form all types of garments worn by men, women and children." Appx1337, 5:56-57. Reed includes an explicit reference to the fact that footwear items, such as stockings, were conventionally knit with circular knitting machines. Appx1335, 1:33-44. Mr. Holden concluded that these references "would have suggested to a person of ordinary skill in the relevant art … that Reed's process could be used to form all types of articles of clothing including footwear." Appx225 (citing Appx1239-1240, ¶131); Appx282. Because a POSITA would understand that the systems disclosed in Reed could be used to form footwear, a POSITA would also understand that Reed's process could be used to "form[] textile elements to be incorporated into footwear as described in Nishida." Appx226 (citing Appx1240, ¶132); Appx282.

A further motivation to combine Reed and Nishida stemmed from the teaching in both references that costs may be reduced by using advanced knitting technology. Appx226; Appx283 (citing Appx1241-1242, ¶134-135). Mr. Holden explained that "Reed and Nishida are directed to reducing costs associated with producing textile elements using the latest advances in knitting technology." Appx1241, ¶134. One of Reed's objectives was to "provide a method of reducing

the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Appx1335, 2:22-25. Similarly, one of Nishida's advantages was the ability to reduce the amount of cutting waste in shoe manufacturing. Appx1241-1242, ¶135 (citing Appx1363, 2:27-33 ("It is of further advantage … that the individual patterns or partial patterns already can be produced directly in the production of the web of material in the desired shoe size, by which the cutting waste can be still further limited….")).

Such cost reduction also extended to labor savings and faster design changes provided by computerized operations. Nishida explains that rapid changes to designs were possible "[w]ith the use of program-controlled web of material production devices [because] after a one-time creation of the program, the size of the layout corresponding to the shoe size, the woven or knitted type of individual areas or contours, the type of fiber or yarn and/or the color can be selected almost at will." Appx1241-1242, ¶135 (quoting Appx1363, 2:40-45). Such methods could be used with any configuration or design. Appx1364, 4:52-55 ("As already indicated, any sizes and different upper designs can be produced by computer-controlled programs, starting from corresponding basic patterns."). Reed provides similar advantages, such as "'reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine,'" as Mr. Holden confirmed. Appx1241, ¶134 (quoting Appx1335, 2:22-25).

adidas also explained that Reed and Nishida are analogous prior art references. Both references "are directed to methods of simultaneously forming textile elements within a surrounding textile structure using programmable and/or computerized single needle selection technology, removing the textile elements, and incorporating the textile elements into a wearable item." Appx226 (citing Appx1240, ¶133); Appx282. As Mr. Holden explains, both Reed and Nishida are directed to using similar computerized knitting machines. Appx1240, ¶133; Appx1335, 2:24-25; Appx1363, 2:40-41.

Thus, adidas demonstrated that this combination "is nothing more than combining 'prior art elements according to known methods to yield predictable results' and/or the 'use of known techniques to improve similar devices (methods, or products) in the same way.'" Appx227 (quoting Appx1242, ¶137 (citations and modifications omitted)); Appx283.

## IV. Summary of the Board's Findings.

The Board sided with adidas on every issue other than whether there was a motivation to combine Reed and Nishida and the operability of the combination as to the Unitary Construction Claims.

### A. The Board Adopted adidas's Level of Ordinary Skill in the Art.

Nike argued that adidas "provide[d] a conclusory description of what it contends is the level of ordinary skill," and "concede[d] the level of ordinary skill

was low." Appx405; Appx473-474. The Board disagreed and specifically adopted adidas's proposal for the level of ordinary skill in the art. Appx11; Appx61. Thus, in accordance with the Board's findings, the level of ordinary skill in the art here is a person having "at least a few years of experience in the footwear industry, *a broad understanding of shoemaking*, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) *the available and varied ranges of typical construction methods within a product cycle*; and (4) the functional requirements of footwear and the range of material choices available." Appx9 (emphasis original); Appx59.

### B. The Board Expressly Found or Nike did not Dispute that the Prior Art Disclosed the Subject Matter of All but the Unitary Construction Claims.

The Board found that Reed and Nishida disclose every limitation of at least the challenged independent claims. *See* Appx23-24; Appx73-76.

As to the independent claims of the '598 Patent, Nike did not dispute that all limitations of those claims were in the prior art. The Board's findings illustrated below confirm as much.

| '598 Patent Claims 1 and 9 | The Board's Findings |
|---|---|
| [1 and 9] A method of manufacturing an article of footwear, the method comprising steps of: | "Petitioner has shown that Reed alone, as well as the combined teachings of Reed and Nishida, teach or suggest a method of manufacturing an article of footwear." Appx23. |
| [1A] mechanically-manipulating a yarn with a circular knitting machine to form a cylindrical textile structure;<br><br>[9A] mechanically-manipulating a yarn with a wide-tube circular knitting machine to form a textile structure having an outline of at least one textile element; | "Reed teaches not only a circular knitting machine, but also a wide-tube circular knitting machine." Appx24. |
| [1B] removing at least one textile element from the textile structure;<br><br>[9B] removing the textile element from the textile structure; | "Petitioner has shown that the teachings of Reed or Nishida, alone or combined, teach or suggest this limitation of the independent claims." Appx24. |

| '598 Patent Claims 1 and 9 | The Board's Findings |
|---|---|
| [1C] incorporating the textile element into an upper of the article of footwear.<br><br>[9C] incorporating the textile element into an upper of the article of footwear. | We agree that Nishida teaches "the step of '*incorporating* the textile element *into* an upper of the article of footwear.'" Appx24. |

Nike argued that one element of independent claim 1 of the '749 Patent was missing. The Board rejected this argument and found each element of the independent claims disclosed in the prior art, as illustrated below.

| '749 Patent Claims 1 and 13 | The Board's Findings |
|---|---|
| [1 and 13] A method of manufacturing an article of footwear, the method comprising: | "Petitioner has shown that Reed alone, as well as the combined teachings of Reed and Nishida, teach or suggest a method of manufacturing an article of footwear." Appx73. |
| [1A] simultaneously knitting a textile element with a surrounding textile structure, | "[W]e determine that either Reed or Nishida teaches 'simultaneously knitting a textile element with a surrounding textile structure' and 'the first knitted textile element located |

| '749 Patent Claims 1 and 13 | The Board's Findings |
| --- | --- |
| [13A] knitting a first textile element and a second textile element simultaneously with knitting a surrounding textile structure, the first knitted textile element located within a first portion of the knitted textile structure, the second knitted textile element located within a second portion of the knitted textile structure, | within a first portion of the knitted textile structure,' as recited in independent claims 1 and 13, respectively." Appx74-75. |
| [1B] the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure;<br><br>[13B] varying at least one of the types of stitches or the types of yarns in the knitted textile structure to impart a texture to the first and second knitted textile elements different from a texture | "We determine that either Reed or Nishida teaches this second part of the limitations of independent claims 1 and 13." Appx75. |

| '749 Patent Claims 1 and 13 | The Board's Findings |
|---|---|
| of the knitted textile structure extending between the first and second portions; | |
| [1C] removing the knitted textile element from the surrounding knitted textile structure;<br><br>[13C] removing the first and second knitted textile elements from the knitted textile structure; | "The method of claim 1 further comprises the step of 'removing the knitted textile element from the surrounding knitted textile structure.' …. Petitioner has shown that the teachings of Reed or Nishida, alone or in combination, teach or suggest this limitation of the independent claims." Appx76. |
| [1D] incorporating the knitted textile element into the article of footwear.<br><br>[13D] incorporating at least one of the first and second knitted textile elements into the article of footwear. | "We agree that Nishida teaches 'the step of '*incorporating* the knitted textile element *into* the article of footwear.'" Appx76. |

As to the dependent claims, Nike argued Nishida did not teach forming apertures by omitting stitches, per dependent claim 6 of the '598 Patent. The Board rejected Nike's argument. Appx26 ("we are persuaded that Nishida teaches the formation of apertures and that forming apertures by omitting stiches was a well-known technique."). Nike did not otherwise dispute adidas's showing that the prior art taught each element of dependent claims 2-3, 5, 7-8, 10, and 12-13 of the '598 Patent. Appx437-447. Similarly, with respect to the '749 Patent, Nike did not dispute that each element of dependent claims 2-9, 12, and 14-19 was taught by the prior art. Appx504-514.

Thus, the Board made explicit factual findings that the prior art disclosed each and every element of the independent claims of the '598 and '749 Patents, as well as disputed dependent claim 6. Except as to the Unitary Construction Claims, Nike did not dispute the presence of the elements of the other dependent claims.

### C. The Board Found Reed was Analogous Art and Rejected Nike's Arguments Regarding the Scope of Reed.

Nike argued that Reed was not analogous art. The Board ruled otherwise, finding that "Reed is directed to the manufacture of all types of garments, including footwear…." Appx17; Appx67. The Board thus found that adidas established "that Reed is analogous art to the challenged claims." Appx17; Appx67.

adidas relied upon Reed's unseamed embodiments in every phase of the proceeding, including the Petitions (Appx234-235; Appx236-237; Appx293; Appx296; Appx298 (all citing or quoting Appx1336, 3:61-65); Mr. Holden's expert declaration (Appx1221-1222, ¶105; Appx1229-1230, ¶117); adidas's Replies (Appx542; Appx560-561); and during oral argument (Appx643, ll. 6-11; Appx645, ll. 17-21; Appx1829-1832; Appx1859; Appx1874). Nike, accordingly, never argued that adidas relied only on Reed's disclosure of preseamed embodiments, and instead argued that Reed's discussion of the "present invention" limited Reed's scope to preseamed embodiments. The Board rejected that argument. Appx32; Appx83-84.

### D. Despite the Board's Claim Construction and Findings on Reed, it Found No Motivation to Combine and Inoperability as to the Combination Proposed for the Unitary Construction Claims.

The Board interpreted all but the Unitary Construction Claims to cover either pre-seamed or unseamed garments or garment sections. Appx35 ("we further are persuaded that the scope of challenged claims 1-3, 5-10, 12, and 13 is broad enough to encompass methods related to both pre-seamed and unseamed garments and garment sections."); Appx87 ("we further are persuaded that the scope of challenged claims 1-9 and 12-19 is broad enough to encompass methods related to both pre-seamed and unseamed garments and garment sections.").

By contrast, as to the Unitary Construction Claims (claims 4 and 11 of the '598 Patent and claims 11 and 21 of the '749 Patent), the Board reasoned that each of these claims "recite[s] 'a unitary construction,' which 'is intended to express a configuration *wherein portions of a textile element are not joined together by seams or other connections*.'" Appx35 (emphasis original, quoting Appx820, 6:43–46); Appx86-87. The Board thus interpreted those claims "to recite a textile element having areas of different textures, but without seams." Appx35; Appx86-87. Notably, the Board's interpretation did not exclude knitting a textile element with unitary construction and then incorporating that textile element into a shoe upper through a seaming operation. Indeed, the specification makes plain that, although seams are not present within the two areas forming the textile element of unitary construction, "the various edges [of that element] are joined together to form seams" that create the shoe upper, as depicted in Figures 4-5 and 8. Appx2156; Appx2158; Appx2167, 6:47-48.

Despite the Board's construction, adidas's reliance on Reed's unseamed embodiments, and the Board's finding that Reed was not limited to pre-seamed embodiments, the Board found adidas had insufficiently explained how or why a person of ordinary skill in the art would combine these two references. Appx34-39; Appx85-90. The Board stated that "[n]either Petitioner nor its declarant, Mr. Holden addresses the fact that each of the relied upon embodiments of Reed

teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming." Appx36; Appx87.

The Board included no discussion as to how these points impacted the independent claims or the vast majority of dependent claims. The Board instead cited testimony of Mr. Holden as to whether he had considered how a skilled artisan "would create a preseamed and preformed footwear upper on a circular knitting machine" (Appx36; Appx87-88), and then linked that testimony solely to the Unitary Construction Claims. Specifically, the Board noted that the evidence "and, in particular, Mr. Holden's testimony, is deficient with respect to the limitations recited in claims 4 and 11, in that it fails to offer any explanation why a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve a method in which seams of the kind taught by Reed apparently are prohibited." Appx37; Appx88-89 ("Petitioner's evidence, and, in particular, Mr. Holden's testimony, is deficient with respect to the limitations recited in claims 11 and 21, in that it fails to offer any explanation why a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve a method in which seams of the kind taught by Reed apparently are prohibited.").

Finally, the Board separately found that, as to the Unitary Construction Claims, modifying Reed to include a design that did not use seams "would require the alteration of the principles of operation of Reed or would render Reed

inoperable for its intended purpose." Appx40; Appx91-92. Because those claims "are interpreted to describe 'a unitary construction,' which does not include seams," the Board found that "'a unitary construction' does not *appear* to read on Reed's pre-seamed, finished garment or garment section." Appx40; Appx91 (emphasis added). Thus, as to the Unitary Construction Claims, the Board found that "Petitioner's proposed combination of the teachings of Reed and Nishida would render Reed either inoperable or unsuitable for its intended purpose." Appx42; Appx93.

## SUMMARY OF ARGUMENT

The Board's conclusion of non-obviousness is based on a fundamental legal error. With regard to all but the Unitary Construction Claims, the Board correctly applied the *Graham* factors and found that they all weigh toward obviousness. Yet the Board found adidas did not establish a motivation to combine Reed and Nishida. The Board improperly placed an almost talismanic importance on Reed's discussion of "pre-seaming," relying on this disclosure alone to find no reason to combine Reed and Nishida. This is legal error.

In these proceedings the Board already found that Reed discloses *both* pre-seamed and unseamed embodiments. The Board also found that Nishida disclosed unseamed embodiments. Thus, it is legally flawed to suggest that Reed's discussion of pre-seaming prevents combination with Nishida. This error is

extended because the Board also found that all claims, other than the Unitary Construction Claims, cover *both* pre-seamed and unseamed embodiments. Thus, even if Reed were limited to pre-seaming, this still would not prevent a finding of obviousness.

The Board attempts to support the erroneous interpretation above by suggesting that "each of the embodiments of Reed, relied upon by Petitioner, describes the pre-seaming of garments or sections of garments *before* their removal from the cylindrical textile structure." This is likewise erroneous. *First*, it cannot be disputed that adidas relied on Reed's disclosure of "form[ing] sections of a garment to be assembled in the regular manner" (Appx1336, 3:61-65) in every phase of the proceeding, including the Petitions, the Holden Declaration, and the Replies.[1] *Second*, it is legally improper to pick and choose the disclosure of a prior art reference, as the Board does here. *Third*, the Board itself found that all but the Unitary Construction Claims cover *both* pre-seamed and unseamed garments. Thus, even if the Board improperly limits its analysis to only the pre-seamed embodiments of Reed, those embodiments would still meet the scope of nearly all the Challenged Claims.

---

[1] *See, e.g.*, Appx234-235; Appx236-237; Appx293; Appx296; Appx298; Appx1221-1222, ¶105; Appx1229-1230, ¶117; Appx529-530; Appx540-543 Appx560-562; Appx572-574; Appx579 (all citing or quoting Appx1336, 3:61-65).

As adidas explains, a POSITA would be motivated to combine Reed and Nishida. The Board acknowledged that Reed discloses knitting footwear. adidas relies on Nishida for its disclosure of incorporating the knitted footwear component into an article of footwear, e.g., a shoe upper. The combination of Reed and Nishida is simple common sense, using the system taught by Reed to knit a shoe-upper, as is taught by Nishida. Nishida contemplates all types of designs, thus the combination does not require that Reed knit a complicated shoe-upper. And the claims do not specify a type of footwear, thus a simple slipper would suffice.

adidas provided detailed factual testimony explaining how and why a POSITA would combine Reed and Nishida. Both Reed and Nishida describe (1) using computer implemented knitting to produce footwear, (2) the versatility of computer implemented knitting, and (3) that a goal of computer implemented knitting is to reduce waste. adidas provides expert testimony explaining how each of these motivates the combination of Reed and Nishida. This testimony stands unrebutted as Nike chose not to submit any expert testimony and instead supports its positions with only attorney argument.

That Reed and Nishida would be combined is further suggested by the high level of ordinary skill in the art. The Board found that a POSITA would have, *inter alia*, "a *broad understanding of shoemaking*, and an understanding of … *the available and varied ranges of typical construction methods within a product*

*cycle*." Appx9 (emphasis original); Appx59. These are exactly the skills required to modify the computer controlled knitting machines described by Reed to produce footwear of the type described in Nishida. This is particularly important here, where the combination requires only a basic step of shoe construction, "incorporating the textile element into the upper of a shoe." There is no evidence in the record to suggest that a POSITA would not, or could not, combine these two references in this way.

In coming to its findings the Board improperly discounts Mr. Holden's unrebutted expert testimony. The Board criticizes Mr. Holden because he could not remember whether his declaration addressed certain questions. This finding is erroneous. The issues the Board suggests Mr. Holden did not consider are irrelevant given the Board's own broad interpretation of Reed and the claims. And even if the questions were relevant, Mr. Holden's declaration speaks for itself, regardless of whether he remembered every issue it addressed.

The Board's operability findings are likewise flawed. The Board improperly found the combination inoperable based on mere attorney argument, despite unrebutted expert testimony explaining the motivations to combine Reed and Nishida. The Board further ignored its own construction when it addressed the Unitary Construction Claims. And the Board compounded this error by suggesting

that Reed is limited to a narrow "fundamental purpose" despite finding that Reed broadly discloses both pre-seamed and unseamed garments.

The Board's conclusions are legally and factually erroneous and should be either reversed or remanded for further consideration.

## ARGUMENT

### I. Standard of Review

"IPR proceedings are formal administrative adjudications subject to the procedural requirements of the Administrative Procedure Act ('APA')." *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016). Under the APA, the reviewing court shall set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

Questions of law are reviewed *de novo*. *Teva Pharm. USA v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015). This Court reviews "the Board's ultimate obviousness determination *de novo* and underlying factual findings for substantial evidence." *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1218 (Fed. Cir. 2016) (quoting *In re Varma*, 816 F.3d 1352, 1359 (Fed. Cir. 2016)); *see also* 5 U.S.C. § 706(2)(E). Substantial evidence is "more than a mere scintilla" of evidence and "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (citation omitted).

As the Supreme Court confirmed, the "substantial evidence" standard is not "simply rubber-stamping agency fact finding." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). This Court has likewise reaffirmed that "substantial evidence review 'requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion.'" *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) (quoting *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006)). In *Princeton*, this Court remanded a trademark opposition matter for the Board's failure "to make the relevant factual findings based on all of the evidence of record," including a proffered survey. 786 F.3d at 971; *see also In re Sang Su Lee*, 277 F.3d 1338, 1344-45 (Fed. Cir. 2002) ("The Board's findings must extend to all material facts and must be documented on the record, lest the haze of so-called expertise acquire insulation from accountability.").

## II. Reed and Nishida are Properly Combined to Render the Challenged Claims Obvious as a Matter of Law.

The Board's finding that adidas failed to establish that a person of ordinary skill in the art would combine Reed and Nishida is based on an erroneous application of controlling law and is contradicted by its own claim construction.

### A. The Board's Conclusion is Legally Improper Based on its Own Findings and Claim Construction.

Obviousness is resolved by application of the *Graham* factors. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966). Each of these is a factual inquiry. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). This Court "examine[s] the legal conclusion of obviousness *de novo* to see whether it is correct in light of the factual findings." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012) (internal citation, quotations, and modifications omitted).

#### 1. The *Graham* Factors Uniformly Confirm Obviousness as a Matter of Law.

The Board committed legal error by finding facts that plainly weighed in favor of obviousness, yet still concluding that the claims were non-obvious. The Board's factual findings on the *Graham* factors, as well as its claim construction, confirm, as a matter of law, the obviousness of claims 1-3, 5-10, and 12-13 of the '598 Patent and claims 1-9 and 12-19 of the '749 Patent.

***Scope and Content of the Prior Art:*** The Board explicitly found "that Reed is analogous art to the challenged claims," and even found that "Reed is directed to the manufacture of all types of garments, including footwear…." Appx17; Appx67. Similarly, with regard to Nishida, the Board rejected Nike's arguments that it was limited to methods described in the German Patent. Appx33; Appx84.

These findings alone strongly supported obviousness, but the Board went further in rejecting Nike's argument. The Board found that "the scope of Reed's teachings is broader than what Reed specifically refers to as the present invention and encompasses the conventional methods involving superimposing two preexisting panels of material, forming a garment into those preexisting panels, cutting the shaped garment from the two preexisting panels, and then seaming the two cutouts together to create the final garment." Appx32 (citations, quotations, and modifications omitted); Appx83-84. In other words, the Board found that Reed taught forming a garment, cutting it out and then seaming the cutouts together to create the final garment – exactly the kind of post-cutting seaming activity that Nishida itself taught. This factual finding weighed toward obviousness.

***Differences Between the Claimed Subject Matter and the Prior Art***: The Board made explicit factual findings that the prior art disclosed each and every element of the independent claims of the '598 and '749 Patents, as well as disputed dependent claim 6. Appx23-24; Appx26; Appx73-76. Except as to the Unitary Construction Claims, Nike did not otherwise dispute the presence of the elements of the other dependent claims. Moreover, as to all but the Unitary Construction Claims, the Board expressly construed those claims "to encompass methods related to both pre-seamed and unseamed garments and garment sections." Appx35;

Appx87. Thus, as to claims 1-3, 5-10, and 12-13 of the '598 Patent and claims 1-9 and 12-19 of the '749 Patent, there were no differences from the prior art and this factor weighed toward obviousness.

***The Level of Skill in the Art***: The Board adopted adidas's proposed level of ordinary skill in the art, such that a skilled artisan had "at least a few years of experience in the footwear industry, *a broad understanding of shoemaking*, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) *the available and varied ranges of typical construction methods within a product cycle*; and (4) the functional requirements of footwear and the range of material choices available." Appx9 (emphasis original); Appx59. This higher level of skill in the art further weighs toward a finding of obviousness. *Innovention Toys, LLC v. MGA Entm't, Inc*., 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill generally favors a determination of nonobviousness, and thus the patentee, while a higher level of skill favors the reverse." (citation omitted)). The Board acknowledged that Mr. Holden exceeds this level of skill in the art and that he testified from the view of a POSITA. Appx30; Appx81-82. Nike did not submit any expert testimony. Thus, Mr. Holden's opinions as a POSITA stood unrebutted and this factor weighed toward obviousness.

***Objective Evidence***: "The record lacks arguments or evidence of secondary considerations." Appx16; Appx66. Thus, this factor weighed toward obviousness or was, at worst, neutral.

#### 2. The Board Erred as a Matter of Law in Failing to Find Obviousness of Claims 1-3, 5-10, and 12-13 of the '598 Patent and Claims 1-9 and 12-19 of the '749 Patent.

The factual findings, and claim constructions the Board made confirmed obviousness under the *Graham* factors. The Board's only basis to decline to find claims 1-3, 5-10, and 12-13 of the '598 Patent and claims 1-9 and 12-19 of the '749 Patent obvious was finding that Petitioner did not sufficiently establish a motivation to combine Reed and Nishida. Appx34-39; Appx85-90. Notably, the Board did not dispute the accuracy of each of adidas's proposed motivations to combine. Appx34-35; Appx86. Rather, the Board stated "none of these reasons or any other reason identified by Petitioner addresses the differences between Reed and Nishida, specifically pre-seaming." Appx34-35; Appx86. But, for these claims, such a conclusion was flawed as a matter of law.

The Board construed the non-Unitary Construction Claims to encompass both preseamed and unseamed garments and garment sections. Appx35; Appx87; *see also* Appx40; Appx91. That construction *necessarily* means that there was simply no reason to consider or address any "preseaming" differences between Reed and Nishida. The Board erred as a matter of law in suggesting otherwise.

Under the Board's construction, these claims encompassed "methods related to both preseamed and unseamed garments and garment sections." Appx35; Appx87. It was perfectly acceptable to use Reed's methods – even those related to producing preseamed garments – to produce a textile element for incorporation into an upper of an article of footwear, a limitation the Board agreed Nishida teaches. Appx24; Appx76. It was irrelevant whether Nishida was limited to unseamed embodiments. Nishida is simply cited as a field of use, *i.e.*, using the methods described in Reed to produce an upper for incorporation into a shoe. Appx226-227; Appx283. The combination, given the breadth of the claims, required only evidence of a suggestion of extending Reed to production of an upper, and nothing in the claims required accounting for preseaming.

Where the claims were neutral as to preseamed or unseamed garments or garments segments, the legally proper question on motivation was simply whether there was motivation to use Reed's methods to make a shoe upper, such as described in Nishida. *In re Chevalier*, 500 F. App'x 932, 934 (Fed. Cir. 2013) ("[I]n a case such as this where each of the elements of the claim are known to the art, the obviousness inquiry requires a finding that the combination of known elements was obvious to a person with ordinary skill in the art."). The record shows motivations for such a basic combination, which the Board did not rule

against. Further, the Board's finding that Reed teaches knitting footwear (Appx17; Appx67), confirms the obviousness of the combination.

Here there is an express motivation to combine Reed and Nishida. Reed explains: "[t]he present invention uses an electronic circular double knitting machine programmed to *simultaneously knit two concentric tubes* … and additionally programmed to *interconnect the two concentric tubes* by a knit interlock stitch …." Appx1335, 1:58-64 (emphasis added). Nishida describes an almost identical embodiment in which "material can be woven or *knitted in two or more layers* or can be especially thick or additionally embroidered." Appx1364, 3:67-4:1 (emphasis added). The Holden declaration explicitly cites to *both* of these embodiments in support of why the two references would be combined. Appx1240, ¶133 (citing Appx1335, 1:58-64; Appx1364, 3:59-4:5). This testimony stands unrebutted.

Further, Mr. Holden explains, a POSITA would be motivated to use Reed's design to manufacture shoes at least because Reed describes using its knitting system to produce footwear. Appx1239-1240, ¶131-132. This combination, which merely extends a system used to make footwear to knit an upper for such footwear, is nothing more than common sense, which cannot legally be ignored. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (obviousness inquiry may include "common sense available to the person of ordinary skill in the

art that do not necessarily require explication in any reference or expert opinion"); *Leapfrog Enters., Inc. v. Fisher–Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007).

Given the Board's findings on: (1) the scope of the claims, (2) the broad scope of the prior art, and (3) the relatively high skill in the art, it is unfathomable how a POSITA would not have found it obvious to form an upper for an article of footwear that is knitted according to Reed, whether preseamed or not. Nishida explains that its disclosure is not limited to the designs shown in its Figures, and that it can be used to produce a "basic" design. Appx1364, 4:54-55. All that is required is using the system of Reed to produce a footwear upper, as is taught by Nishida. Appx226-227; Appx283. There is simply no basis to suggest that POSITA would not be motivated to produce such a design using the method described in Reed.

### B. The Board's Conclusion of Non-Obviousness is Based on a Legally and Factually Flawed Reading of the Record.

The Board found that Reed broadly discloses both preseamed and unseamed embodiments. Appx32; Appx83-84. Yet, the Board found that there was no motivation to combine because adidas allegedly relied only on Reed's preseamed embodiments. Appx32-33 ("Petitioner relies only on the embodiments of Reed's invention that are directed to preseamed garments *and* to preseamed sections of garments." (emphasis original)); Appx84. The Board stated that "[n]either Petitioner nor its declarant, Mr. Holden addresses the fact that each of the relied

upon embodiments of Reed teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming." App36; Appx87; *see also* Appx33; Appx85. These findings are fatally flawed because the Board overlooked (1) Reed's disclosure that show further seaming *after* garments segments are cut from the cylindrical structures, (2) the teachings in Nishida that the layout can be knitted together in more than one layer *before* it is cut from the surrounding textile element, and (3) adidas's actual arguments.

Indeed, the Board found that "Reed's teaching[] is broader than what Reed specifically refers as the 'present invention' and encompasses 'the conventional methods involv[ing] superimposing two preexisting panels of material, forming a garment into those preexisting panels, cutting the shaped garment from the two preexisting panels, and then seaming the two cutouts together to create the final garment.'" Appx32 (citations omitted); Appx84. Mr. Holden testified that Reed discloses "panels of a garment having a substantially planar configuration after removal from the surrounding circular knitted textile structure, which are then *sewn together in a conventional manner* to form a complete garment." Appx1221-1222, ¶105 (emphasis original). Mr. Holden's analysis cites to the very disclosure in Reed that the Board found discloses conventional methods. Appx1221-1222, ¶105 ("Reed explains 'if the present process is used to preform an exterior decorative fabric having a lining or innerlining or interfacing attached thereto, *the*

*severed sections must be assembled and seamed by standard practices*.'" (emphasis added, quoting Appx1337, 6:10-17)). Reed similarly discloses that "[i]f the two tubes 12 and 14 are knitted of two different fibers, the knitted structure may form sections of a garment to be *assembled in the regular manner*." Appx1336, 3:61-63 (emphasis added). And this is again cited in the Holden Declaration. Appx1221-1222, ¶122. As Mr. Holden explained "Reed also recognizes that the severed sections may be 'assembled and seamed by standard practices.'" Appx1233, ¶105 (quoting Appx1337, 6:12-13; citing Appx1336, 3:61-4:3); *see also* Appx1229-1230, ¶117 (quoting Appx1336, 3:61-4:9).

adidas relied on this evidence in its arguments to the Board. *See* Appx542 (citing Appx1221-1222, ¶105; Appx1337, 6:10-17); Appx560-561. adidas explained that "Reed also describes embodiments in which these interconnected outlines can be used to 'form sections of a garment to be assembled in the regular manner.'" Appx529 (quoting Appx1336, 3:61-63); Appx560-561. The Petition even cites directly to the embodiment of Reed where a "knitted structure … form[s] sections of a garment to be assembled in the regular manner." Appx1336, 3:61-63. This embodiment is cited and quoted throughout the Petitions. *See* Appx234-235; Appx236-237; Appx293; Appx296; Appx298 (all citing or quoting Appx1336, 3:61-65). And at Oral Argument adidas directed the Board to Reed's disclosure of preseamed and unseamed garments. *See* Appx645, ll. 17-21

("JUDGE ARPIN: Counsellor, are you then saying that only the seamed garment meets these limitations? MR. STOCKWELL: I'm saying that either would meet these limitations. It does not matter. The issue of whether it's seamed or pre-seamed doesn't matter…."); *see also* Appx643, ll. 6-11; Appx1829-1832; Appx1859; Appx1874.

There is no colorable basis to find that adidas "relie[d] only on the embodiments of Reed's invention that are directed to preseamed garments *and* to preseamed sections of garments." Appx32-33; Appx84. Even Nike did not argue that adidas limited its analysis to pre-seamed embodiments. The Board's finding to the contrary is legally improper and factually flawed. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."); *SAS*, 825 F.3d at 1351.

Furthermore, Mr. Holden included express citations to Reed's disclosure of a method of knitting a textile structure, in the form of two tubes, on a circular knitting machine, without seaming the tubes together. "The present invention uses an electronic circular knitting machine *programmed* to simultaneously knit two concentric tunes, one on the dial set of needles and a second on the cylinder set of needles and additionally *programmed* to interconnect the two concentric tubes by a knit interlock stitch to form the outline of the desired garment." Appx1335, 1:58-

64 (emphasis added, cited at Appx1240, ¶133). This statement clearly shows the breadth of Reed's teaching encompasses a method of forming two concentric tubes that can be further programmed to knit the two layers together, and that such structures can be severed and later seamed together to form complete garments.

adidas repeatedly referenced these embodiments throughout the proceeding. It is legally improper for the Board to ignore these embodiments in its analysis. "'[A]ll of the relevant teachings of the cited references must be considered in determining what they fairly teach to one having ordinary skill in the art.'" *In re Davis*, 1994 WL 146837, *3 (Fed. Cir. 1994) (quoting *In re Mercier*, 515 F.2d 1161, 1165 (CCPA 1975); *see also EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) ("A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." (emphasis original)); *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012) (same); *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991). Even the Patent Office's own regulations confirm that "prior art reference[s] must be considered in [their] entirety." MPEP § 2141.02(VI).

At a minimum, the Board's outright misstatement of the disclosure of Reed and failure to consider adidas's reliance on that disclosure violates the requirements of the APA and governing precedent, which requires this Court to

remand to the Board for further findings. *Lee*, 277 F.3d at 1344; *In re Thrift*, 298 F.3d 1357, 1366 (Fed. Cir. 2002) (vacating and remanding where "the *Chenery* rule is implicated because the Board failed to provide an adequate ground" for its decision); *Smith & Nephew, Inc. v. Rea*, 721 F.3d 1371, 1380 (Fed. Cir. 2013).

The Court should reverse the Board's decision. However, at a minimum, given that all of the fact-finding related to the four *Graham* factors falls in favor of adidas, this Court should remand the matter to the Board for it to consider the full disclosures of Reed on which adidas relied to prove its obviousness case.

**III. Substantial Evidence does not Support the Board's Conclusion of no Motivation to Combine.**

This Court has reversed the fact finder's conclusion of lack of motivation before. *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 903 (Fed. Cir. 2017) ("Based on the record before us, there is only one permissible factual finding—a skilled artisan would be motivated to combine the prior-art references… There is no substantial evidence to the contrary."). The same result applies here; there is no substantial evidence to support the theory that Nishida cannot be combined with Reed. To the contrary, the record confirms that a POSITA would use Reed's system to produce a footwear upper as taught by Nishida.

### A. Mr. Holden's Unrebutted Testimony Explains the Motivation to Combine Reed and Nishida.

"[M]otivation to combine may be found explicitly or implicitly in market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (quoting *Perfect Web*, 587 F.3d at 1328–29). The Board committed legal error in ignoring these principles.

Reed and Nishida provide an express motivation to combine. Each reference discusses knitting in multiple layers. Appx1335, 1:58-64 (The "knitting machine programmed to *simultaneously knit two concentric tubes* … and additionally programmed to *interconnect the two concentric tubes* by a knit interlock stitch …." (emphasis added)); Appx1364, 3:67-4:1 ("material can be woven or *knitted in two or more layers* or can be especially thick or additionally embroidered." (emphasis added)). These two embodiments are almost identical, providing an express motivation to combine. The Holden declaration explicitly cites to *both* of these embodiments in support of why the two references would be combined. Appx1240, ¶133 (citing both Appx1335, 1:58-64 and Appx1364, 3:59-4:5).

Notwithstanding the express motivation to combine Reed and Nishida, the Holden Declaration explained that a POSITA would be motivated to combine Reed and Nishida for multiple additional reasons. Appx1241-42, ¶134-37. "[T]he Board cannot ignore [the] long-established principle here, … it must give due deference to the understanding of those skilled in art, and assess whether that skilled artisan would view prior art references and expect their combination to successfully achieve a particular result." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 640 F. App'x 951, 962 (Fed. Cir. 2016).

"[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). This is the case here. As Mr. Holden explains, Reed's design may be used with all types of garments, and includes an explicit reference to footwear items, such as stockings. Appx1239-1240, ¶131-132; Appx1335, 1:33-34; Appx1337, 5:56-57. That disclosure motivates a designer to combine Reed with a footwear reference, like Nishida. Appx1239-1240, ¶131. The combination is no more than applying Nishida's teaching of using knitting to produce a footwear upper, to Reed's technique for knitting footwear. Appx1240, ¶132

"[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420. Here, "there is no question that skilled artisans knew of the desire to reduce waste when producing wearable, knitted shoe uppers because that problem is expressly recognized in Nishida." *Nike, Inc. v. adidas AG*, 812 F.3d 1326, 1338 (Fed. Cir. 2016). Reducing waste is certainly a proper motivation to combine prior art references. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp*., 264 F.3d 1344, 1355 (Fed. Cir. 2001) (skilled artisan motivated to make a "cheaper, faster, and more convenient method"). Both Reed and Nishida are directed to reducing costs or cutting waste. Appx1335, 2:22-31 ("[a]nother object of the present invention is to provide a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine"); Appx1363, 2:27-33 ("[i]t is of further advantage … that the individual patterns or partial patterns already can be produced directly in the production of the web of material in the desired shoe size, by which the cutting waste can be still further limited…."). As Mr. Holden explains, the prospect of increased efficiency and less waste provides a further motivation to combine the two references. Appx1241, ¶134.

"For [a] technique's use to be obvious, the skilled artisan need only be able to recognize, based on her background knowledge, its potential to improve the

device and be able to apply the technique." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1003 (Fed. Cir. 2016). Both Reed and Nishida are directed to computer controlled knitting methods and devices and praise the ability to quickly change designs because of this computer control. Appx1364, 4:15-18; Appx1335, 2:24-25. Thus, as Mr. Holden explains, modifying the knitting process to produce a shoe upper is nothing more than changing the machine programming. Appx1240, ¶133-135; Appx2068, ll. 11-19.

Reed encourages such a modification, stating that "[t]he types of program used to form the final product is to be varied with the imagination of the programmer, as well as the type of product which may be formed." Appx1337, 6:22-25. Reed's versatility of its design plainly encourages modification. Appx1337, 5:54-55; Appx1335, 2:24-25. Similarly, Nishida explains that its method can be used with any configuration or design. Appx1364, 4:52-55.

Mr. Holden's testimony explaining the motivations to combine stands unrebutted. The Board recognized that Mr. Holden exceeded the level of ordinary skill in the art, and that he testified as a POSITA. Appx30; Appx81-82. It was improper for the Board to ignore or severely discount this unrebutted testimony.

### B. Nishida Discloses a Layered Design that does not Preclude Combination with Reed.

Even if Reed were limited to preseamed embodiments (which it is not), Nishida is not so narrow as to preclude combination with Reed. The Board found

that "Nishida does not teach preseaming," as described by Reed. Appx34; Appx85; *see also* Appx33 ("The teachings of Nishida, relied upon by Petitioner, do not teach pre-seaming and, instead, teach the seaming of the upper layout *after* its removal from the web of material."); Appx85. But the Board's overly narrow interpretation of Nishida ignored Nishida's multi-layer embodiment.

Nishida explains that its design can be used for knitting in multiple layers, specifically, that its design can be used to produce a "multilayer" layout and that a "sole part" is then attached to the layout. Appx1358, Abstract ("a web of material (1) is used to produce layouts (2) by different production measures, such as different styles, yarn material, color, material thickness, single layer or multilayer type of material or the like, at the same time with the production of web of material (1), and with a sole part attached to the layout."); *see also* Appx1364, 3:67-4:1 ("the material can be woven or knitted in two or more layers or can be especially thick or additionally embroidered."). Because Nishida describes (i) a multilayer layout and (ii) that the sole part is attached to the layout, the layers forming the layout must also be attached. Nishida even confirms that "[t]he layout is cut from the web as a unit with the sole part and processed into a shoe part …." Appx1358, Abstract.

Mr. Holden testified that Nishida's "outline, I believe, is the web of material again, which can either be a singular layer or a layer that is knitted and has

multiple pieces to it and then you're cutting out based on that – that – the form or the pattern." Appx2062-2063, 168:25-169:4. Thus, the multilayer layout is knit together, before being removed from the web of material. This is almost identical to the two layer embodiment that Reed describes as interknitted because the two layers in Reed are also connected.

"[A] prior art reference must be 'considered together with the knowledge of one of ordinary skill in the pertinent art.'" *In re Paulsen*, 30 F.3d 1475, 1480–81 (Fed. Cir. 1994) (quoting *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)). That Nishida suggests a layered design of the type disclosed in Reed is further supported by Mr. Holden's testimony. Appx1225-1226, ¶110-111. During Mr. Holden's cross-examination he explained that the circular outlay of Reed is comparable to the web of materials in Nishida. Appx2057, ll. 15-20 ("A. … [Nishida] is talking about a pattern that you are cutting out a web of materials, which can be done on a circular -- so I can point to Reed and show you that skirt, which is a pattern, in that circular outlay, which is the web of materials.").

Mr. Holden also explained that Nishida alludes to multiple types of production, including the circular knitting process described in Reed. Appx2053-2054, 159:24-160:2 ("A. Again, [Nishida] talks about knitting. It does not specifically, but it alludes to, I believe, the circular knitting process, and certainly the knitting process."); *see also* Appx 2055, ll. 6-9 ("I believe that there is allusion

to the process of knitting, certainly circular knitting, but it does not use that specific language.").

The Board erred by ignoring the unrebutted testimony of Mr. Holden regarding how a POSITA would read Nishida in finding that adidas did not establish a motivation to combine Reed and Nishida.

### C. The Board's Criticism of Mr. Holden's Testimony is Misplaced.

The Board states that "[g]iven the language of the claims, our interpretation of that language, and the teachings of Reed and Nishida, we find Petitioner's arguments and evidence, especially Mr. Holden's testimony, insufficient and unpersuasive." Appx38; Appx90. The Board interpreted most claims to cover preseamed and unseamed embodiments and made explicit findings that the prior art disclosed each and every element of the independent claims and disputed dependent claim 6. Except as to the Unitary Construction Claims, Nike did not otherwise dispute the presence of the elements of the other dependent claims. Appx23-24; Appx26; Appx73-76. Thus, the Board's only possible basis to support its ultimate conclusion is Mr. Holden's cross-examination testimony.

The Board plainly took Mr. Holden's testimony out of context, stating that Mr. Holden testified during deposition "that he had not been asked to nor had he considered how the teachings of these references could be combined." Appx36; Appx87-88. The actual snippet of testimony from Mr. Holden on which the

Board's misplaced criticism is grounded is set forth in its decisions. Appx36; Appx87-88 (quoting Appx2046-2047, 152:22–153:13).

There are multiple flaws with the Board's citation of Mr. Holden's testimony that he "did not recall," being asked to consider the narrow question asked. Even aside from the fact that depositions are not memory tests, the Board's characterization of such "I don't recall" testimony cannot support its sweeping conclusion that Mr. Holden "had not been asked to nor had he considered how the teachings of these references could be combined." Appx36; Appx87-88. That is particularly true given Mr. Holden's declaration confirms his opinions on motivations to combine the references (Appx1239-1242, ¶131-138) and the Board's acknowledgement of those particular motivations without specific critique.

More critically, the Board's reliance on this snippet of testimony was deeply flawed and reflects its apparent confusion over the scope of the Unitary Construction Claims. The question asked whether Mr. Holden considered how to create "a *preseamed and preformed* footwear upper on a circular knitting machine." Appx36; Appx87-88. But none of the claims included such requirements, and Mr. Holden testified as much. Appx2055-2056, 161:13-162:4.

The Board's own rulings confirm this. The non-Unitary Construction claims are neutral to preseaming both in terms of the garment itself and sections thereof. As to the Unitary Construction Claims, the Board's construction required only that

the two differing areas of the textile element be created without seams. Appx35; Appx87. But knitting such a textile element does not result in a "preformed" shoe upper. It simply results in one textile element of a shoe upper that, per the independent claims, is "incorporated" into the shoe upper in a manner that the specification makes plain requires seaming. Appx820, 6:42-46; Appx2167, 6:42-46.

Additionally, Mr. Holden's proposed modification was not creating "a *preseamed and preformed* footwear upper on a circular knitting machine." Rather, Mr. Holden proposed "modify[ing] Reed's method to include the additional features described by Nishida to produce a textile element for use in a shoe upper, as well as to produce a shoe incorporating such a textile element." Appx1242, ¶136. This does not require producing an upper that is both "pre-seamed and preformed." It simply required producing the textile element and then incorporating it, such as via seaming, into a shoe upper – processes that both Nishida and Reed disclosed and the Challenged Patents expressly discussed.

Indeed, the Board itself found that Reed is not limited to preseamed embodiments. Appx32; Appx83-84. Thus, there was nothing in the references that even required Mr. Holden to contemplate creating "a preseamed and preformed footwear upper." To the contrary, Mr. Holden's testimony evidences his consideration regarding how and why a POSITA would combine Reed and

Nishida. As one example, Mr. Holden explained how Reed's skirt is formed from a pattern in a circular outlay, and that circular outlay corresponds to a "web of materials" as is contemplated by Nishida. Appx2057, ll. 12-20. He further testified that Nishida discloses knitting and "alludes to … the circular knitting process" as is contemplated by Reed. Appx2053-2054, 159:24-160:21.

There was simply no basis for the Board to conclude that Mr. Holden did not consider a motivation to combine the two prior art references. The Board acknowledged that Reed was not limited to only preseamed embodiments. Appx32; Appx83-84. The Board's misplaced focus on a *preseamed and preformed* embodiment had nothing to do with the actual combination proposed and was legal error in light of the requirement that "[a] reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1349 (Fed. Cir. 2017) (quoting *Applied Materials*, 692 F.3d at 1298) ); *Belden*, 805 F.3d at 1076.

### D. The Level of Skill in the Art Confirms Obviousness.

The Board properly found that the appropriate level of ordinary skill in the art is relatively high, including, *inter alia*, "at least a few years of experience in the footwear industry, *a broad understanding of shoemaking*, and an understanding of … *the available and varied ranges of typical construction methods within a*

*product cycle*." Appx9 (emphasis original); Appx59. These are exactly the skills required to adapt the versatile machine described by Reed (Appx1337, 5:54-55) to produce a design, which, given the scope of the claims, can be very simple, and incorporate it into footwear as Nishida teaches. Appx1239-1242, ¶131-138.

The high level of skill in the art here enables a POSITA to combine Reed and Nishida. "The level of skill in the art is important to obviousness analysis because a more skilled artisan will have more general knowledge on which to rely in combining teachings from multiple references." *In re Tzipori*, 316 F. App'x. 975, 982 (Fed. Cir. 2008); *Kinetic*, 688 F.3d at 1366; *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1370 (Fed. Cir. 2006).

That is particularly true here, in a predictable art area. "As the Supreme Court recognized in *KSR*, the nature of the mechanical arts is such that 'identified, predictable solutions' to known problems may be within the technical grasp of a skilled artisan." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011) (quoting *KSR*, 550 U.S. at 421); *Rothman v. Target Corp.*, 556 F.3d 1310, 1319 (Fed. Cir. 2009).

## IV. The Board's Analysis of the Unitary Construction Claims is Legally and Factually Erroneous.

As to the Unitary Construction Claims, the Board found an absence of motivation to combine Reed and Nishida and that the combination proposed would, in its view, be inoperable as to the Unitary Construction Claims. Appx39-

42; Appx92-93. These findings are both legally erroneous and unsupported by substantial evidence.

### A. The Combination Resulted in Designs with a Unitary Construction.

The Board summarized adidas's arguments regarding why both Reed and Nishida disclose each element of the Unitary Construction Claims. Appx26-29; Appx77-80. The Board did not address whether the proposed combination discloses the limitations of the Unitary Construction Claims. It does.

adidas offered several alternative combinations of Reed and Nishida that resulted in a design with a unitary construction. One combination involved simply extending Reed's methods to produce a shoe upper. A second combination involved using Nishida's disclosures of unitary construction to produce a shoe upper on Reed's circular knitting machine.

As to the first combination, adidas showed that Reed disclosed a textile element of unitary construction and Reed could be modified to produce such textile elements for use in a shoe upper. Appx28; Appx79. Reed describes that the two circular knitted tubes may comprise different textures. Appx1227-1230, ¶114-117. Reed describes that one "example where two different fibers are used to make the inner and outer tubing would be in the foundation garment industry, where the inner fabric could be cotton or other soft fibers and the outer fabric would be lycra or elasticized yarns." Appx1229-1230, ¶117 (quoting Appx1336, 4:3-4:9). Reed

further describes "interknitting" these two different types of fabric to connect them *without a seam*. Appx1229-1230, ¶117 ("By simultaneously knitting and interknitting the two layers, a step is saved by producing a section of garment which is prelined." (quoting Appx1336, 3:66-68)).

Notably, Reed explains how these interknitted stitches can be used to "interconnect the two concentric tubes." Appx1217-1218, ¶98 ("an electronic circular double knitting machine may be … programmed to interconnect the two concentric tubes by a knit interlock stitch…." (quoting Appx1335, 1:58-64")). Reed distinguishes interknitting from seaming, noting that the layers of fabric may be "knitted *or* seamed together in the shape of the desired garment…." Appx1335, 1:64-66 (emphasis added); *see also* Appx528-530; Appx560-562. Thus, Reed discloses interconnecting two types of fabric that have different textures, without a seam, meeting the Board's construction. Programming Reed to use the technique described to make a shoe upper, as described in Nishida, rendered the subject matter of the Unitary Construction Claims obvious. Appx1240-1242, ¶133-137.

As to the combination, adidas pointed to the motivation for programming Reed's circular knit machine to implement the unitary construction techniques disclosed in Nishida. Appx27-29; Appx77-80; Appx1240-1242, ¶133-137. Nishida produced a design in which interconnected areas are produced from different materials and thus have different textures. Nishida teaches that "the

layout corresponding to the shoe size, the woven or knitted type of individual areas or contours, the type of fiber or yarn and/or the color can be selected almost at will." Appx1363, 2:42-45. Nishida further describes using different knitting types at different locations. Appx1364, 3:43-49. Mr. Holden testified that Nishida's discussion of varying yarn types within the layout discloses different textures. Appx2076, 182:20-25; Appx1364, 3:15-18. Thus, Nishida discloses "a textile element having areas of different textures, but without seams," as is required by the Board's construction. Appx35; Appx87.

The Board did not find that these two proposed combinations would fail to result in the limitations of the Unitary Construction Claims. Instead, it simply found insufficient explanation of the motivation to make the proposed combinations. The Board's motivation analysis contradicted both its claim construction and was unsupported by substantial evidence.

### B. The Board's Motivation Analysis is Improper Under its Own Construction and Unsupported by the Record.

The Board faulted adidas's motivation analysis for the Unitary Construction Claims for relying on only "the general arguments presented in connection with independent claims 1 and 9" and found such arguments insufficient "[g]iven the language of the claims, our interpretation of that language," the references and Mr. Holden's testimony. Appx38; Appx90. But this was error in view of its own construction of the claims and the record.

The Board's construction of the Unitary Construction Claims does not exclude *seams all together, i.e.*, it does not require an entire shoe upper that is seamless. Nor could it, as the claim language says only that "the textile element … include[s] a first area and a second area with a unitary construction." Appx823, 11:58-12:2, 11:33-36; Appx2170, 12:14-18; Appx2171, 13:5-14:2. These claims simply require textile element *with two areas* of different texture that are coupled "without seams." Appx35; Appx87. This can be achieved by varying the stitch type or yarn while knitting the textile element, which is taught by both Reed and Nishida. Once formed, the independent claims make plain that such an element is then incorporated into the upper or the footwear. *See, e.g.*, Appx823, 11:49-50; Appx2170, 11:51-52. So too does the specification, which notes that, although seams are not present within the two areas forming the textile element of unitary construction, "the various edges [of that element] are joined together to form seams," as depicted in Figures 4-5 and 8. Appx2156; Appx2158; Appx2167, 6:47-48.

The Board fundamentally erred in failing to apply this construction when evaluating the combination of Reed and Nishida against the Unitary Construction Claims. Rather, the Board appeared to apply a *de facto* construction that requires an *entire shoe upper* be produced without seams. The Board claimed that adidas failed to explain why a skilled artisan "would combine the teachings of Reed and

Nishida to achieve a method in which seams of the kind taught by Reed *apparently are prohibited*." Appx37 (emphasis added); Appx89. But the claim language and construction does not prohibit either of the proposed combinations adidas advanced. The construction does not exclude Reed's method of interknitting two layers into a single textile element that is used to form a shoe upper. Nor does it exclude using Reed's methods to implement Nishida's textile element of varying yarns and areas and then assemble same into a shoe upper.

It was error for the Board to interpret the Unitary Construction Claims to exclude all seams. That error alone is enough to reverse and remand. But, additionally, the Board's suggestion that Mr. Holden did not detail how or why Reed and Nishida would be combined is simply wrong. As detailed above, Mr. Holden explained *why* a POSITA would combine Reed and Nishida, both describe (1) using computer implemented knitting to produce footwear, (2) the versatility of computer implemented knitting, and (3) that a goal of computer implemented knitting is to reduce waste. *See* Appx1239-1242, ¶131-137. Mr. Holden further explained *how* Reed can be modified by Nishida in view of both reference's discussion of versatility (Appx1364, 4:15-18; Appx1335, 2:24-25, 2:40-45) and "the improvements in single needle selection that allows for specific control over stitch configurations in different parts of the upper." Appx1241, ¶133-135; Appx2068, ll. 11-19.

### C. The Board's Operability Findings are Legally and Factually Flawed.

The Board's findings on inoperability were legally flawed. As a matter of law, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference, but rather whether a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (citations and quotations omitted). Likewise, the Board's reliance on attorney argument was legally insufficient to rule otherwise. Finally, its conclusion was plainly inconsistent with its finding that Reed was not limited to preseaming and adidas's reliance on more than just preseaming embodiments of Reed.

#### 1. The Combination is Operable and Renders Obvious the Subject Matter of the Unitary Construction Claims.

There is no basis to suggest that the combination of Reed and Nishida would render Reed inoperable. As explained above, both Reed and Nishida disclose designs with a unitary construction. adidas proposed merely "modify[ing] Reed's method to include the additional features described by Nishida to produce a textile element for use in a shoe upper." Appx1242, ¶136. This modification is nothing

more than knitting a footwear upper on a device that the Board found can be used to knit footwear. Appx17; Appx67.

Even if Reed did not already disclose interconnecting two types of fabric without a seam (which it does), there is nothing about the proposed modification that would render Reed inoperable. Indeed, Reed touts the "degree of versatility of the present method as well as the freedom of design that is possible." Appx1337, 5:54-55; Appx1335, 2:24-25. Reed even explains that its design can produce "patterns and designs of up to three million stitches …. Patterns and designs are possible that before could not be made." Appx1335, 1:52-55. Nishida explains that it can be used to produce any design, not only complex designs. Appx1364, 4:52-55. This is encouraged within Reed. Appx1337, 6:22-25 ("[t]he types of program used to form the final product is to be varied with the imagination of the programmer, as well as the type of product which may be formed."). And Mr. Holden provided unrebutted expert testimony that a POSITA would be motivated to modify Reed as taught by Nishida. Appx1239-1242, ¶131-138.

There is simply no basis to conclude that a versatile system, of the type taught by Reed, would be rendered inoperable by producing a design in which two sections with a different texture are interconnected without a seam. That is particularly true where Reed teaches the versatility of designs and stitches, and the process of interknitting, as described above. Appx1335, 1:58-59, 2:23-25.

### 2. Unsupported Attorney Argument is Legally Insufficient to Show Inoperability.

The Board's reason for declining to invalidate the Unitary Construction Claims is based on Nike's unsupported attorney argument that the combination of Reed and Nishida would be inoperable. Appx39-42; Appx90-93. It was legally incorrect for the Board to overlook evidence presented by adidas in favor of attorney argument.

While adidas bears the ultimate burden of persuasion on establishing invalidity, the initial burden of production on inoperability falls to Nike. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) ("[O]nce a challenger has presented a *prima facie* case of invalidity, the patentee has the burden of going forward with rebuttal evidence."). Argument that a combination is inoperable had to be supported by rebuttal evidence. *Navico Inc. v. ITC*, 696 F. App'x 989, 998 (Fed. Cir. 2017) (rejecting arguments of inoperability where "[n]othing suggests that combining Betts and Tucker would produce a system unable to produce sidescan or downscan images. On the contrary, the evidence suggests the combined system would be capable of producing both images."); *see also Pfizer*, 480 F.3d at 1360 ("[E]ven though a patentee never *mus*t submit evidence to support a conclusion by a judge or jury that a patent remains valid, once a challenger introduces evidence that might lead to a conclusion of invalidity—what we call a *prima facie* case—the patentee 'would be well advised to introduce

evidence sufficient to rebut that of the challenger.'" (quoting *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986)).

Nike merely advanced attorney argument on operability. But that is insufficient under the law. The Board routinely finds that mere attorney argument is insufficient to establish inoperability. *See, e.g.*, *Samsung Elecs. Co., Ltd. v. Image Processing Techs. LLC*, No. IPR2017-00357, 2017 WL 2304442, at *8 (PTAB May 25, 2017) ("Apart from mere attorney argument that includes directing us to disparate portions of Gilbert and Brady, the record before us does not include sufficient or credible evidence that Gilbert's tracking system would become inoperable if modified to include the teachings of Brady."); *Microsoft Corp. v. B.E. Tech., LLC*, No. IPR2014-00039, 2015 WL 1735100, at *13 (PTAB Mar. 31, 2015); *Silergy Corp. v. Monolithic Power Sys., Inc.*, No. IPR2015-00803, 2015 WL 5453162, at *11 (PTAB Sept. 11, 2015).

Nike presented no expert testimony on this point. Nor do the references suggest that they could not be combined. Rather, as explained above, Reed's disclosure of interconnecting two concentric tubes (Appx1335, 1:58-64) and Nishida's discussion of knitting in two or more layers (Appx1364, 3:59-4:5) provides an express motivation to combine. Appx1240, ¶133 (citing both Appx1335, 1:58-64 and Appx1364, 3:59-4:5).

The only evidence Nike could muster is the misconstrued cross-examination of Mr. Holden. Appx615-617; Appx618-620. As explained above, this criticism was misplaced. Thus, the evidence presented by adidas, and detailed above, stands unrebutted. Nike's "[u]nsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005); *see also In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997); *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017).

**3. The Combination does not Render Reed Unsuitable for its "Fundamental Purpose."**

The Board further erred by finding that the combination would render Reed unsuitable for its "fundamental purpose," "to produce pre-seamed, finished garments or sections of garments." Appx39; Appx91. This is error. *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole.").

*First*, the Board's conclusion is diametrically opposed to its earlier finding that "the scope of Reed's teachings is broader than what Reed specifically refers to as the present invention and encompasses the conventional methods involving superimposing two preexisting panels of material, forming a garment into those

preexisting panels, cutting the shaped garment from the two preexisting panels, and then seaming the two cutouts together to create the final garment.'" Appx32 (citations, quotations, and modifications omitted); Appx83-84. *Second*, for the reasons noted above, it was error for the Board to ignore Reed's explicit teachings of unseamed embodiments. *CRFD*, 876 F.3d at 349.

The Board's identification of Reed's "fundamental purpose" comes from one of Reed's Objects of the Invention. Appx1335, 2:17-40. Yet the Board ignores Reed's other Objects of the Invention, many of which confirm that Reed could be modified by Nishida. For example, Reed states: "[a]nother object of the present invention is to provide a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Appx1335, 2:23-25. And "another object is to provide a method for producing a plurality of garments formed about the circumference of a knitted tube." Appx1335, 2:29-31. Neither of these objects of Reed's invention would be impacted by combination with Nishida. Indeed, Mr. Holden cites to *both* as providing *motivation* for combining Reed and Nishida. Appx1241, ¶134 (citing Appx1335, 2:22-31).

There is an express motivation to combine Reed and Nishida and unrebutted expert testimony explaining why a POSITA would combine them. All that is required is using the system of Reed, which already teaches producing footwear, to

produce a different type of footwear, as is taught by Nishida. Appx226-227; Appx283. And Nishida does not require its design to be highly complex. Appx1364, 4:54-55. There was no basis for the Board's conclusion that the combination renders Reed unsatisfactory for its intended purpose.

#### 4. The Board's Unsupported Interpretation of Reed Cannot Support a Finding of Inoperability.

The Board's last point in support of its operability finding was "we do not find that Reed teaches that cuts are taught inside the outline to remove the seam from the garment section." Appx41; Appx93. As explained below, this finding is unsupported by substantial evidence and is, in any event, irrelevant to operability of two of the combinations adidas proposed that would render obvious the Unitary Construction Claims.

Reed's Figure 1 shows "garments 16, 18 and 20 are outlined by a plurality of interconnecting knitted stitches 22 and 24." Appx1336, 3:8-9. Reed explains that "interconnected knitting 24" defines an outline for cutting. Appx1336, 3:12-15. Reed even refers to stitch 24 as "an outline seam." Appx1336, 4:42-43. Reed says that Figure 1 shows three garments formed from two tubes 12 and 14, and "[t]he anatomy of the user is inserted between the two portions of tubes 12 and 14." Appx1336, 3:25-26. The only possible way for anatomy to be inserted between tubes 14 and 15, would be for a cut to made inside of seam 24 and creating a separation of the layers so the wearer's legs can extend through the opening.




FIG. 1

Appx1330. Likewise, the only possible way for the garment to be assembled in the regular manner is for a cut to be made along the inside of the seam, again exactly as Mr. Holden confirmed. Appx1221-1222, ¶105; Appx1227-1229, ¶115-117.

The Board's contrary interpretation of Reed has no evidentiary support. Independently, the finding has absolutely no bearing on two of the combinations adidas proposed. As to the use of Reed to completely interknit two layers of fabric together, it would not matter whether one were to cut inside or outside of the outline – the result would still render a textile element of unitary construction. Likewise, as to the use of Reed to implement Nishida's varying stitches with different areas, the cutting location is also irrelevant as the textile element would still have different areas of unitary construction without a seam (*e.g.,* the toe area

versus other areas of the upper). Accordingly, the Board's findings on inoperability must be reversed or, at minimum, vacated for further proceedings.

## V. The Concurrence Cannot Salvage the Judgement Below.

The additional rationale offered in the concurring opinion cannot salvage the Board's judgment. The concurrence essentially posited that Reed does not "provide a reason to use it[s invention] in forming … part of a shoe," and there is an "evidentiary gap" to jump to footwear or shoe uppers. Appx48; Appx98-99. The majority appropriately rejected this rationale when it found that "Reed is directed to the manufacture of all types of garments, including footwear" and "is related directly to preparation of garment[] layouts from a knitted textile structure." Appx17; Appx67.

The concurrence's rationale not only contradicts the majority's findings, it has no evidentiary support and contradicts the legal requirement that Reed "must be considered for everything that it teaches, not simply the described invention or a preferred embodiment." *CRFD*, 876 F.3d at 349 (quoting *Applied Materials*, 692 F.3d at 1298). The evidence summarized above as to the motivations for using Nishida to make a shoe upper per Reed's method, which encompasses making all types of garments and emphasizes the flexibility of the patterns to be employed, confirms that the rationale of the concurrence cannot salvage the Board's ultimate judgment. Accordingly, this Court should reverse or, at minimum, remand.

## CONCLUSION

For the reasons stated above, the judgments of the Board should be reversed or remanded. Reed and Nishida are properly combined to render obvious all elements of the challenged claims of the Challenged Patents.

Date: February 26, 2018

Respectfully submitted,

/s/Mitchell G. Stockwell
Mitchell G. Stockwell

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 26th day of February, 2018 by the CM/ECF system and electronic mail.

/s/ Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
(404) 815-6500
mstockwell@kilpatricktownsend.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certified that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). Exclusive of the portion exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), this brief contains 13,944 words, as counted by the word-processing system used to prepare the brief.

/s/Mitchell G. Stockwell
Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
(404) 815-6500
mstockwell@kilpatricktownsend.com

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 21
Entered: October 19, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

adidas AG,
Petitioner,

v.

NIKE, Inc.,
Patent Owner.

---

Case IPR2016-00921
Patent 7,814,598 B2

---

Before JOSIAH C. COCKS, MICHAEL J. FITZPATRICK, and JAMES B. ARPIN, *Administrative Patent Judges.*

Opinion for the Board filed by *Administrative Patent Judge* ARPIN.

Opinion Concurring by *Administrative Patent Judge* FITZPATRICK.

ARPIN, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. BACKGROUND

adidas AG ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–19 to institute an *inter partes* review of claims 1–13 of U.S. Patent No. 7,814,598 B2 (Ex. 1001, "the '598 patent").[1] Paper 1 ("Pet."). Nike, Inc. ("Patent Owner") did not file a Preliminary Response.[2] Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of claims 1–13 of the '598 patent. Paper 6 ("Inst. Dec."), 22–23.

After institution, Patent Owner filed a Patent Owner Response to the Petition (Paper 9 ("PO Resp.")), and Petitioner replied (Paper 10 ("Reply")).[3] Each party requested an oral hearing (Papers 15 and 16); and

---

[1] Petitioner identifies adidas International B.V.; adidas North America, Inc.; adidas America, Inc.; and adidas International, Inc., as real parties-in-interest. Pet. 1.

[2] Patent Owner identifies only itself, as a real party-in-interest. Paper 5, 2.

[3] Patent Owner filed objections to the admissibility of some of Petitioner's evidence. Paper 12. Petitioner served – and improperly filed – supplemental evidence in response to Patent Owner's objections. Paper 13; Ex. 1015; 37 C.F.R. § 42.64(c); *see* 37 C.F.R. § 42.64(b)(2) ("The party relying on evidence to which an objection is timely served may respond to the objection *by serving* supplemental evidence within ten business days of service of the objection." (emphasis added)); *GoPro, Inc. v. Contour IP Holding LLC*, Case IPR2015-01078, slip op. at 2–3 (PTAB Apr. 7, 2016) (Paper 40) ("If the supplemental evidence does not cure the objection and the opposing party files a motion to exclude, the submitting party may file the supplemental evidence with its opposition to the motion to exclude."). Ultimately, Patent Owner did not file a motion to exclude, and, therefore, Patent Owner did not preserve its objections. 37 C.F.R. § 42.64(c). Regardless, Exhibit 1015 is expunged because we did not authorize its filing.

we held a consolidated oral hearing with Case IPR2016-00922 on July 12, 2017. A transcript of that hearing is of record in this case. Paper 20 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6, and this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during the review. For the reasons discussed below, we determine that Petitioner has not met its burden to prove, by a preponderance of the evidence, that claims 1–13 of the '598 patent are unpatentable on the ground upon which we instituted *inter partes* review.

*A. The '598 Patent*

The '598 patent is a divisional of U.S. Patent Application No. 10/791,289, filed on March 3, 2004, now issued as U.S. Patent No. 7,347,011 B2 ("the '011 patent") (Ex. 1001 at (62)) and relates to articles of footwear incorporating an upper that is at least partially formed from a textile material (*id.* at 1:18–21). Conventional articles of athletic footwear may include two primary elements: an upper and a sole structure. *Id.* at 1:23–26. The upper may form a void in the interior of the footwear for receiving a wearer's foot, and the upper may extend over the instep and toe areas, along the medial and lateral sides, and around the heel area of the wearer's foot. *Id.* at 1:41–46.

In particular, the Specification describes articles of footwear having an upper incorporating a knitted textile element and having a sole structure secured to the upper. *Id.* at 3:27–33. Methods for manufacturing an article of footwear include "mechanically-manipulating a yarn with a circular knitting machine, for example, to form a cylindrical textile structure. In addition, the method involves removing at least one textile element from the

textile structure, and incorporating the textile element into an upper of the article of footwear." *Id.* at 3:41–46.

Figure 9 of the '598 patent is reproduced below.




**Figure 9**

Figure 9 depicts textile structure 60 formed on a circular knitting machine. *Id.* at 7:48–51. For example,

> [a] suitable knitting machine for forming textile element 40 is a wide-tube circular knitting machine that is produced in the Lonati Group by Santoni S.p.A. of Italy under the SM8 TOP1 model number. This Santoni S.p.A. wide-tube circular knitting machine may form a textile structure having a diameter that ranges from 10 inches to 20 inches, with 8 feeds for each diameter.

*Id.* at 7:14–20. As discussed below, the types of stitches that form textile structure 60 may be varied to form an outline of one or more textile elements 40 on textile structure 60. *Id.* at 7:65–8:3. In particular, as depicted in Figure 9, the outlines for at least two textile elements 40 may be formed on textile structure 60. *Id.* at 7:53–54.

Figure 8 of the ’598 patent is reproduced below.




**Figure 8**

Figure 8 depicts an embodiment of an upper according to the ’598 patent. *Id.* at 5:59–6:64. “Textile element 40 is a single material element that is formed to exhibit a unitary (i.e., one-piece) construction, and textile element 40 is formed or otherwise shaped to extend around the foot.” *Id.* at 5:40–43; *see also id.* at Figs. 10 (depicting textile element 40′), 11 (depicting textile element 40″). In particular,

> Textile element 40 is a single material element with a unitary construction, as discussed above. *As defined for purposes of the present invention, unitary construction is intended to express a configuration wherein portions of a textile element are not joined together by seams or other connections, as depicted with textile element 40 in FIG. 8.* Although the various edges 41a-44d are joined together to form seams 51-54,

> the various portions of textile element 40 are formed as [a] unitary element *without seams* . . . .

*Id.* at 6:41–50 (emphases added). Consequently, textile element 40 is formed, such that portions of the textile element are not joined together with seams or other connections. *Id.* at 5:40–43. Edges 41a–44d are joined together as shown in Figures 3–5 to form seams 51–54, thereby forming at least a portion of a void for receiving the foot. *Id.* at 6:41–50. In contrast, lateral region 31, medial region 32, instep region 33, lower regions 34, and heel regions 35 together have a unitary construction without seams (*id.* at 5:46–58, 6:47–50).

Figure 11 of the ’598 patent is reproduced below.




**Figure 11**

Figure 11 depicts another embodiment of an upper according to the ’598 patent. *Id.* at 9:29–10:7. Textile element 40″ includes three different

areas with three different textures. *Id.* at 9:31–32. First texture 46″ is generally smooth and extends in strips across lateral region 31, medial region 32, and instep region 33 of the upper. *Id.* at 9:32–35. In addition, textile element 40″ includes second texture 47″ and third texture 48″. *Id.* at 9:35–39. Moreover, the Specification of the ’598 patent describes that:

> The different textures 46″-48″ are formed *by merely varying the type of stitch formed* by the wide-tube circular knitting machine at each location of textile element 40″. Textures 46″-48″ may exhibit aesthetic differences, or the differences may be structural. . . . The air-permeability of textile element 40″ may also vary in the different areas.

*Id.* at 9:39–47 (emphasis added).

*B. Illustrative Claim*

Claims 1 and 9 are independent, method claims. Claims 2–8 depend directly or indirectly from claim 1, and claims 10–13 depend directly or indirectly from claim 9. Claims 1 and 4 are illustrative of the claims at issue and are reproduced below:

> 1. A method of manufacturing an article of footwear, the method comprising steps of:
>
> mechanically-manipulating a yarn with a circular knitting machine to form a cylindrical textile structure;
>
> removing at least one textile element from the textile structure;
>
> incorporating the textile element into an upper of the article of footwear.
>
> 4. The method recited in claim 1, wherein the step of mechanically manipulating includes forming the textile element to include a first area and a second area with a unitary construction, the first area being formed of a first stitch configuration, and the second area being formed of a second stitch configuration that is different from the

> first stitch configuration to impart varying textures to a surface of the textile element.

*Id.* at 11:43–50 (claim 1), 11:58–12:6 (claim 4).

*C. Related Proceedings*

Neither party identifies any related litigation. Pet. 1; Paper 5, 2. As discussed above, the ’598 patent is a divisional of the application that issued as the ’011 patent, which is the subject of IPR2013-00067. Pet. 1. In that case, the panel instituted *inter partes* review of claims 1–46 of the ’011 patent, and Patent Owner requested cancellation of claims 1–46 and proposed substitute claims 47–50 in a Motion to Amend. The panel granted Patent Owner’s request to cancel claims 1–46, but denied Patent Owner’s request as to the substitute claims. Patent Owner appealed the Board’s decision to the U.S. Court of Appeals for the Federal Circuit (the “Federal Circuit”). The Federal Circuit issued a decision in Patent Owner’s appeal on February 11, 2016, which affirmed-in-part and vacated-in-part the Board’s decision, and remanded the case to the Board for further proceedings regarding the status of the substitute claims. *Nike, Inc. v. adidas AG*, 812 F.3d 1326, 1329 (Fed. Cir. 2016). The Federal Circuit issued its mandate in that case on April 4, 2016. In addition, Petitioner has requested *inter partes* review of claims of related patents in IPR2016-00920 (U.S. Patent No. 8,042,288 B2), institution denied, and IPR2016-00922 (U.S. Patent No. 8,266,749 B2), institution granted. Paper 5, 2.

*D. Applied References and Declaration*

Petitioner relies on the following references and declaration in support of its asserted ground of unpatentability:

| Exhibit | References and Declaration |
|---|---|
| 1003 | Declaration of Mr. Lenny M. Holden |
| 1006 | U.S. Patent No. 3,985,003 to Reed, issued Oct. 12, 1976 ("Reed") |
| 1009 | U.S. Patent No. 5,345,638 to Nishida, issued Sept. 13, 1994 ("Nishida") |
| 1010 | David J. Spencer, *Knitting technology: a comprehensive handbook and practical guide*, 1–413 (2001) (3rd Ed., Woodhead Publ. Ltd.) ("Spencer") |
| 1012 | International Standard, *Textile machinery — Knitting machines — Nominal diameters of circular machines*, 1–6 (2003) (2nd Ed., ISO 8117:2003(E)) ("ISO 8117") |

Pet. iv.

### *E. Instituted Ground of Unpatentability*

We instituted review on the following ground of unpatentability:

| References | Basis | Challenged Claims |
|---|---|---|
| Reed and Nishida | 35 U.S.C. § 103(a) | 1–13 |

Pet. 8.

## II. ANALYSIS

### *A. Person of Ordinary Skill in the Art*

Petitioner argues that a person of ordinary skill in the relevant art would have at least a few years of experience in the footwear industry, *a broad understanding of shoemaking*, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) *the available and varied ranges of typical construction methods within a product cycle*; and (4) the functional requirements of footwear and the range of material choices available. Pet. 8–9 (citing Ex. 1003 ¶ 34). Patent Owner

contests Petitioner's assessment of the level of ordinary skill in the relevant art, but does not propose an alternative assessment. PO Resp. 12–14.

Initially, Patent Owner contends that Petitioner has failed to consider appropriate factors identified by our reviewing court and utilized by other panels to assess the level of ordinary skill in the art. *Id.* at 12–13. We agree with Petitioner that it is not necessary to consider every factor or to weigh the factors equally in order to assess the level of ordinary skill in the art. Reply 2 (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995)). Here, we may rely on Petitioner's declarant's testimony (Ex. 1003 ¶ 34) and the teachings of the prior art to evaluate Petitioner's assessment of the level of ordinary skill in the art. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). In particular, Reed and Nishida identify the types of problems encountered in the art prior art solutions to these problems, and the sophistication of the technology. *E.g.*, Ex. 1006, 1:13–55; Ex. 1009, 1:10–36; *see, e.g.*, Ex. 1007, 1:8–32, 2:12–64; Ex. 1008, 1:11–54; Ex. 1010, 145–160; *see also* Ex. 1010, Preface ("The aim of this book is to combine in a single volume the fundamental principles of weft and warp knitting in such a manner that its contents are useful to readers in education, industry or commerce. It thus [fulfills] the long felt need for a comprehensive up-to-date textbook explaining this important sector of textile technology.").

Patent Owner contends that the level of ordinary skill in the art is "low" (PO Resp. 13), but it is not clear whether Patent Owner further contends that Petitioner's assessment is deficient because Petitioner fails to argue that a person possessing such a "low" level of ordinary skill in the art also would have "experience using knitting technologies to create knitted footwear uppers" (*id.* at 13–14) or whether the inclusion of such skill would

raise the "low" level of skill in the art (*id.* at 14). Alternatively, Patent Owner may merely be contending that Petitioner's declarant fails to qualify as a person of ordinary skill in the art. *Id.* at 14 ("If it was too 'dangerous' for Mr. Holden with his nearly forty years of experience, a person with just a "few years of experience" would not have had any knitting experience, let alone experience using knitting technologies to create uppers."); *see* Tr. 62:17–22. Patent Owner is not required to help us assess the level of ordinary skill in the art and does not do so here. *See* PO Resp. 18 ("Petitioner may criticize NIKE for not submitting an expert declaration. But it is Petitioner's burden to prove unpatentability; it is not NIKE's burden to prove patentability.").

In response to Patent Owner's contentions, Petitioner argues that the level of ordinary skill in the art is not low and that hands-on knitting experience is not required. Reply 2–3. Petitioner further argues Patent Owner has not required knitting experience in its previous assessment with respect to a related patent of the level of ordinary skill in the art. *Id.* (citing IPR2013-00067, Ex. 2010 ¶ 52). Based on the record before us and to the extent necessary, we again adopt Petitioner's assessment of a person of ordinary skill in the relevant art. Inst. Dec. 8 n.3.

*B. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are construed according to their broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b). Under that standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249,

1257 (Fed. Cir. 2007). The following four claim terms are at issue in this proceeding.

### 1. *"a first area and a second area with a unitary construction" (Claims 4 and 11)*

Petitioner argues that the term "a first area and a second area with a unitary construction" means "a textile element having a unitary construction and having a first area and a second area." Pet. 7. As Petitioner notes, this is the construction that this panel gave to the same term appearing in the substitute claims of the '011 patent. *adidas AG v. Nike, Inc.*, Case IPR2013-00067, slip op. at 16–17 (PTAB Apr. 28, 2014) (Paper 60). We further note that the '598 patent's Specification provides that "[a]s defined for purposes of the present invention, unitary construction is intended to express a configuration *wherein portions of a textile element are not joined together by seams or other connections*, as depicted with textile element 40 in FIG. 8." Ex. 1001, 6:41–46 (emphasis added); *see* IPR2013-00067, Ex. 1002, 6:41–46 (identical disclosure). The '011 patent and the '598 patent share the same Specification (apart from their claims), neither party contested our construction of this term in the appeal of our decision in the *inter partes* review of the claims of the '011 patent, and Patent Owner does not contest Petitioner's proposed construction of this term in this proceeding. Therefore, in view of the express definition of the phrase "unitary construction" in the Specification of the '598 patent, we adopt Petitioner's proposed construction for this term. *See* Tr. 20:5–13, 37:11–17.

### 2. *"wide-tube circular knitting machine" (Claims 2 and 9)*

We determine that the broadest reasonable interpretation of the term "wide-tube circular knitting machine" is "a circular knitting machine

forming body garment sized, tubular textile structures, including those having a diameter that ranges from 10 inches to 20 inches." *See* Inst. Dec. 10–11. Neither party contests this construction. *See* Tr. 20:5–13, 37:11–17.

*3. "impart" (claims 4 and 11) and "texture" (claims 3, 4, 10, and 11)*

During the course of the review, the parties raised issues regarding the construction of two additional terms that appear only in the challenged dependent claims. First, Petitioner argues that the term "impart" means "to give, convey, or grant from." Reply 21 (citing Ex. 1014).[4] Further, Petitioner argues that this definition is consistent with the use of the word "impart" in the Specification of the '598 patent. *E.g.*, Ex. 1001, Abstract, 1:30–35, 1:60–63, 1:65–2:3, 3:33–37, 7:35–37; *see* Tr. 21:4–14. Patent Owner does not propose an alternative construction for the term "impart." Further, neither party argues that the term "impart" carries special meaning in the relevant art. In fact, we find Spencer's use of the word "impart" in the handbook on knitting technology consistent with Petitioner's dictionary definition and the word's use in the Specification of the '598 patent. *See* Ex. 1010, 189. Thus, to the extent any construction of this term is necessary, we find that the broadest reasonable interpretation of the term "impart" is "to give, convey, or grant from." *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("[E]ach [term] is used in common

[4] Petitioner relies on a definition of "impart" from a current, on-line dictionary rather than from a dictionary contemporaneous with the effective filing date of the '598 patent. However, the record contains no suggestion that the relevant definition of "impart" has changed since the effective filing date of the '598 patent, and we determine that it has not. *See* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 659 (2nd ed. 1999) (Ex. 3001) ("impart" means "to give; bestow").

parlance and has no special meaning in the art. Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term.").

Second, although Petitioner does not provide an express interpretation for the term "texture,"[5] Petitioner's declarant testifies "texture" "generally could be an actual texture or a perceived texture based on the arrangement of colors in a pattern." Reply 4 (citing Ex. 2004, 178:20–24; *see also id.* at 177:1–178:19, 178:25–184:11). Patent Owner disputes Mr. Holden's interpretation of "texture," which appears inconsistent with Spencer's discussion of texture. *See* Ex. 2004, 80:24–81:8. In particular, according to Spencer, "[c]olour is one of the five ingredients of fashion, the other four being style, silhouette, texture and pattern." Ex. 1010, 127. Thus, Spencer appears to distinguish between color and texture.

The Specification of the '598 patent does not define "texture," but contrasts between "smooth" and "textured" areas of a textile element. Ex. 1001, 9:23–24. Moreover, with respect to Figure 11, the Specification of the '598 patent explains that:

> The different textures 46"-48" are formed by merely varying the type of stitch formed by the wide-tube circular knitting machine at each location of textile element 40". Textures 46"-48" may exhibit aesthetic differences, or the differences may be structural. For example, the degree of stretch in areas with textures 46"-48" may be different, or the wear resistance of the areas may vary depending upon the stitch utilized. The air-permeability of textile element 40" may also vary in the

[5] A relevant dictionary definition of the word "texture" is "the characteristic structure of the threads, fibers, etc., that make up a textile fabric: *course texture*," "a rough or grainy surface quality," or "anything produced by weaving; woven fabric." Ex. 3001, 1351.

> different areas. Third texture 48" is formed to include a plurality of apertures that extend through textile element 40". The apertures may be formed by omitting stitches at specific locations during the wide-tube circular knitting process, and the apertures facilitate the transfer of air between the void within upper 20 and the area outside of upper 20. *Accordingly, the various stitches formed in textile element 40", or one of textile elements 40 or 40', may be utilized to vary the texture, physical properties, or aesthetics of footwear 10 within a single, unitary element of material.*

*Id.* at 39–57 (emphasis added). From this explanation, we understand that "texture," as used in the '598 patent, is distinguishable from the physical and aesthetic properties of a textile element. According to the recitations of claims 4 and 11, "texture" is produced as part of the step recited in claims 1 and 9 of "mechanically-manipulating a yarn with a circular knitting machine." *See* Ex. 1001, 11:45–46. Thus, to the extent any construction of this term is necessary, we find that the broadest reasonable interpretation of the term "texture" in the context of claims 4 and 11 is "a non-smooth surface formed by mechanically-manipulating a yarn with a circular knitting machine." Such a surface may be created by "varying the type of stitch formed by the wide-tube circular knitting machine at each location of textile element." *Id.* at 9:39–42.

### *4. Other Claim Terms*

For purposes of this Final Written Decision, we discern no other claim terms that require express interpretation.

### *C. Obviousness over Reed and Nishida*

#### *1. Overview*

Petitioner argues that claims 1–13 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Reed and Nishida. To support its arguments, Petitioner provides a detailed mapping of limitations of the challenged claims to Reed and Nishida. Pet. 14–29. Petitioner also cites Mr. Holden's Declaration for support. *See* Ex. 1003 ¶¶ 92–130.

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art;[6] and (4) objective evidence of nonobviousness, i.e., secondary considerations.[7] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). On this record and for the reasons set forth below, we are not persuaded that Petitioner demonstrates by a preponderance of the evidence that claims 1–13 of the '598 patent are

---

[6] *See supra* Section II.A.; *see also* Ex. 1003 ¶ 36 ("Based on my experience, I have an understanding of the capabilities of the skilled person in this field, and my opinions are provided from the perspective of such a person.").

[7] The record lacks arguments or evidence of secondary considerations. *See generally* PO Resp.

unpatentable as rendered obvious over the combined teachings of Reed and Nishida.

### *2. Reed (Ex. 1006)*

Reed is directed to a method of manufacturing a wearable item, which includes, among other things, mechanically manipulating a yarn with a circular-knitting machine to form a cylindrical textile structure (Ex. 1006, 2:22–25), textile elements located in different portions of the textile structure (*id.* at 2:29–31), removing the textile elements from the textile structure (*id.* at 3:12–19, 5:67–6:5), and incorporating the textile element(s) "to form *all types of garments* worn by men, women and children" (*id.* at 5:56–58 (emphasis added); *see id.* at 1:33–35).[8] In particular, Reed describes methods of making preseamed garments (*id.* at 3:8–21) or preseamed sections of a garment, which sections may be seamed together "by standard practices" to form a garment (*id.* at 6:10–17). As Reed explains,

> *From the preceding description of the preferred embodiments, it is evident that the objects of the invention are obtained to produce a preformed and preseamed fabric on a circular knitting machine so as to reduce time, cost and labor involved in making garments.* The types of program used to form the final product is to be varied with the imagination of the programmer, as well as the type of product which may be

[8] Patent Owner contends that Reed is not analogous art. PO Resp. 29–31. In particular, Patent Owner contends that Reed is not from the same field of endeavor as the challenged claims and that Reed's teachings are not reasonably pertinent to the particular problem with which the recited methods are involved. *Id.* at 29–30. Because Reed is directed to the manufacture of all types of garments, including footwear (Reply 12–14; *see* Ex. 1006, 1:33–44), and Reed is related directly to preparation of garments layouts from a knitted textile structure (Reply 14–15; *see* Ex. 1006, 2:29–35), we are persuaded that Reed is analogous art to the challenged claims.

> formed. The essence of the present invention is a garment formed of juxtaposed sections of simultaneously knitted, concentric tubes interconnected by knitting.

*Id.* at 6:18–28 (emphasis added).

Reed's Figure 1 is reproduced below.




FIG. 1

Figure 1 depicts tubular knitted structure 10, such as that produced by a circular knitting machine. *Id.* at 2:66–3:1. Knitted structure 10 comprises inner tube 12 and outer tube 14, and

> [a]round the circumference of the knitted structure 10 are illustrated three garments which, for example, may be skirts 16, 18 and 20.[9]
>
> The garments 16, 18 and 20 are outlined by a plurality of interconnecting knitted stitches 22 and 24. *The interconnecting knitting 22 not only forms the outline of the garments 16, 18 and 20, but joins the inner tube 12 to the outer tube 14 so as to create a seam.* The interconnecting knitting 24 is merely to

---

[9] We are persuaded that "skirts" are "body garments." *See* Ex. 1003 ¶ 97.

> define the lower outline of the skirt upon which the pattern may be cut.

*Id.* at 3:1–15 (emphasis added).

Reed explains that the use of circular knitting machines in the garment industry historically was limited to making tubular, knitted garments, such as ladies stockings, sweaters, and other garments, wherein the entire knitted fabric was used as a unit to form one surface of a finished garment. Pet. 10–11 (citing Ex. 1006, 1:33–44; Ex. 1003 ¶ 94); *see supra* Section II.C.1. (note 6). Reed further teaches that "[c]omputer electronic knitting brought about the possibilities of making patterns and designs of up to three million stitches (previously approximately 50,000 was maximum). With this system, patterns and designs are possible that before could not be made." Ex. 1006, 1:50–55; *see* Ex. 1003 ¶ 95. Reed states that its method uses "an electronic circular double knitting machine" and that an "object of the [Reed] invention is to provide a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Ex. 1006, 1:58–59, 2:22–25, Figs 1–6; *see* Ex. 1003 ¶ 95. Further, Reed teaches that:

> If the present process is used to preform *an exterior decorative fabric having a lining or inner-lining or interfacing attached thereto*, the severed sections must be assembled and seamed by standard practices. By providing the lining or interfacing already attached to the section, a substantial amount of time is saved in measuring, marking and cutting the original fabric and lining or interlining as well as stitching them together.

Ex. 1006, 6:10–17 (emphasis added).

*3. Nishida (Ex. 1009)*

Nishida is directed to the production of a shoe upper by (1) cutting out a layout in the form of the shoe upper from a web of material and (2) shaping the shoe upper by connecting material parts of the layout by the formation of seams. *See* Ex. 1009, Abstract. By this process, such shoe uppers may be produced efficiently and in reduced time despite the many individual parts present or to be made visible. *Id.*

Figure 2 of Nishida is reproduced below.




Figure 2 illustrates an embodiment of the upper layout according to Nishida. *Id.* at 3:6–12. Web of material 1 may include one or a plurality of layouts 2. Further, web of material 1 includes backing 4 that may be a knitted material, and different areas of layouts 2 may be formed by knitting different yarns or fibers on backing 4. *Id.* at 3:15–26, 5:63–6:2. Moreover, Nishida's web of

material 1 may be "knitted in two or more layers or can be especially thick or additionally embroidered." *Id.* at 3:66–4:1.

Consequently, web of material 1 may be used to produce layouts 2 by different production measures, such as different styles, yarn material, color, material thickness, number of layers of material, or the like, simultaneously with the production of web of material 1. *Id.*; *see id.*, Figs. 1, 2. Each layout 2, including a sole part, may be cut from web of material 1 as a unit and processed into an upper. *Id.* Nishida describes the manufacture of an article of footwear incorporating such an upper. *Id.* at 3:9–12, Fig. 3.

Figure 4 of Nishida is reproduced below.




Fig. 4

Figure 4 depicts a section of web of material 1 with radially symmetric layout 2 having sole part sections 29.1 and 29.2 provided on opposite sides of the upper, as well as tongue 40. *Id.* at 2:64–66. Nishida sets forth the following in association with Figure 4:

> [T]ongue 40, for example, according to FIG. 4, can be provided also in the course of producing the web of material 1 with different weave structures and/or weave patterns and/or embroideries or with one or with several prints or the like. On a web of material 1, different tongues 40 can be produced corresponding to a shoe shape and/or a shoe size both in shape, size, color or colors, patterns or the like. Preferably, in each case, related tongues 40 are produced simultaneously with a layout 2 on same web of material 1.
>
> For optimum surface use of web of material 1, a tongue 40 can be produced in the open space 41 located between the two layout sections 42 and 43, which later form the rear of foot or heel-pan shoe part.
>
> Preferably, each layout 2 has at least five, preferably more than ten, patterns and a tongue 40 has at least two, preferably at least three patterns produced or appearing, which are different from one another in each case.

*Id.* at 5:27–44; *cf. id.*, Fig. 2 (reproduced above, depicting web of material 1 including layouts 2 without tongues). Thus, as depicted in Figure 4, tongues may be individual parts of an article of footware "produced separately and applied to the upper later" and are of a relatively simply, substantially rectangular shape. *See* Ex. 1009, 1:50–53 (describing the inclusion of a tongue in a *conventional* article of footware). Tongues and uppers may be taken from the same web of material or from different webs. *See id.* at 5:37–40.[10]

[10] Although we find that Nishida teaches layouts both of an upper and of a tongue, Petitioner does not argue that Nishida's tongue layouts separately

### *4. Petitioner's Arguments*

Petitioner argues that Reed and Nishida teach or suggest all of the limitations of claims 1–13 of the '598 patent. Pet. 9–29. In particular, Petitioner argues that Reed and Nishida teach or suggest all of the limitations of each of independent claims 1 and 9. *Id.* at 14–16 (claim 1), 19–20 (claim 9).

#### *a. Independent Claims 1 and 9*

Independent claim 1 recites "[a] method of manufacturing an article of footwear." Ex. 1001, 11:43; *see also id.* at 12:21 (claim 9). Reed teaches that its circular knitting methods may be used to manufacture "all types of garments." Ex. 1006, 5:56–57. Although Reed specifically identifies stockings and hosiery (*id.* at 1:33–35, 5:57–58), e.g., footwear, as garments manufactured by circular knitting, Reed does not describe shoes expressly as "garments." Nishida also teaches that the webs of material depicted in its Figures 1 and 2 are "produced by a *conventional* textile process." Ex. 1009, 3:6–7 (emphasis added). Thus, we are persuaded that Petitioner has shown that Reed alone, as well as the combined teachings of Reed and Nishida, teach or suggest a method of manufacturing an article of footwear.

The method of claim 1 further comprises the step of "*mechanically-manipulating* a yarn with a circular knitting machine to form a cylindrical textile structure." Ex. 1001, 11:45–46 (emphasis added); *see also id.* at 12:23–25 (claim 9 reciting "a *wide-tube* circular knitting machine" (emphasis added)). Reed teaches the use of circular knitting machines,

---

teach textile elements that may be incorporated into an article of footwear. *See* Pet. 16, 28; Ex. 1003 ¶ 86, App'x C (pg. 140).

including such machines as can produce body garments, such as skirts (*see id.* at Fig. 2), shirts and pants (*see id.* at Fig. 3), and dresses (*see id.* at Fig. 6), for men, women, and children (*id.* at 5:56–57). In view of our construction of the term "a wide-tube circular knitting machine" above (*see supra* Section II.B.2.; *see also* Ex. 1001, 7:6–8 (describing circular knitting machine capable of producing textile structures large enough for manufacturing "body garment[s]")), we are persuaded that Reed teaches not only a circular knitting machine, but also a wide-tube circular knitting machine. *See* Pet. 18 (claim 2 recites a "wide-tube circular knitting machine" and Petitioner relies solely on Reed to teach this limitation); Ex. 1003 ¶ 97.

The method of claim 1 further comprises the step of "removing at least one textile element from the textile structure." Ex. 1001, 11:47–48; *see also id.* at 12:26 (claim 9 recites "removing a textile element from the textile structure"). We are persuaded based on the evidence cited in the Petition that Petitioner has shown that the teachings of Reed or Nishida, alone or combined, teach or suggest this limitation of the independent claims. Pet. 16 (claim 1; citing, e.g., Ex. 1006, 3:12–19; Ex. 1009, 1:10–18); *id.* at 19–20 (claim 9); *see* Ex. 1003 ¶¶ 103–104.

Finally, the method of claim 1 comprises the step of "*incorporating* the textile element *into* an upper of the article of footwear." Ex. 1001, 11:49–50 (emphases added); *see id.* at 12:27–28 (claim 9). Petitioner relies solely on Nishida to supply this limitation, and argues that Nishida teaches this limitation of the independent claims. Pet. 16 (claim 1), 20 (claim 9); *see* Ex. 1003 ¶¶ 124–125. We agree.

Petitioner argues that a person of ordinary skill in the art would have had reason to combine the identified teachings of Reed and Nishida to achieve the methods recited in independent claims 1 and 9. Pet. 12–14. In particular, Petitioner argues that, because Reed teaches that its methods are applicable to "*all* types of garments" (Ex. 1006, 5:56–57 (emphasis added); *see* Ex. 1003 ¶ 131)), a person of ordinary skill in the art would have had reason to apply the teachings of Reed to the processes and shoe parts of Nishida. Pet. 13 (citing Ex. 1003 ¶ 133). Further, Petitioner argues that, because both Reed and Nishida teach the advantages of reducing cost through the use of computer-controlled knitting machines, a person of ordinary skill in the art would have had reason to combine their teachings. *Id.* (citing Ex. 1003 ¶¶ 134–135). Finally, Petitioner argues that a person of ordinary skill in the art would have had reason to apply Reed's methods for producing textile elements, from which to produce garments, to produce Nishida's shoe upper layouts. *Id.* at 13–14; *see KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

*b. Dependent Claims 2–8 and 10–13*

With respect to the challenged dependent claims, Petitioner argues that Reed teaches or suggests the additional limitations recited in claim 2 (Pet. 17–18; *see supra* Section II.B.2.); that Nishida teaches or suggests the additional limitations recited in claims 7, 8, 12, and 13 (*id.* at 28–29); and that that Reed and/or Nishida teaches or suggests the additional limitations

recited in claims 3–6,[11] 10, and 11 (*id.* at 18–28; *see supra* Section II.B.1.). Petitioner provides a detailed mapping of the limitations of each of these dependent claims onto the teachings of Reed and/or Nishida. *See* Ex. 1003, App'x A. Moreover, Petitioner argues that a person of ordinary skill in the relevant art would have had at least the same reasons to combine the teachings of Reed and Nishida to achieve the methods recited in these dependent claims, as that given for combining the teachings of Reed and Nishida to achieve the recited methods of the independent claims. *See id.* at 12–14.

Although we have reviewed the entirety of Petitioner's analysis and evidence for both the independent and dependent claims, we highlight the following specific evidence and arguments for emphasis. Claim 4 recites:

> The method recited in claim 1, wherein the step of mechanically manipulating includes forming the textile element *to include a first area and a second area with a unitary construction*, the first area being formed of a first stitch configuration, and the second area being formed of a second stitch configuration that is different from the first stitch configuration to impart varying textures to a surface of the textile element.

Ex. 1001, 11:58–12:6 (emphasis added). Claim 11 depends from claim 9 and recites substantially the same limitations as claim 4. *Id.* at 12:33–40.

---

[11] In particular, claim 6 recites the method of claim 1 "wherein the step of mechanically manipulating includes forming apertures in the textile element." Ex. 1001, 12:10–12. Although Patent Owner contends that Petitioner fails to demonstrate that Nishida teaches forming apertures by omitting stitches while knitting to form a net-like structure (*see* Pet. 26–28 (citing Ex. 1009, 4:1–5, 4:31–38); PO. Resp. 50–55; Reply 23–25), we are persuaded that Nishida teaches the formation of apertures and that forming apertures by omitting stiches was a well-known technique (*see* Ex. 1010, 57, 70, 172; Ex. 1003 ¶¶ 199, 200).

Petitioner argues that Reed teaches these limitations in two ways. Pet. 21. First, Petitioner argues that Reed teaches that the edges of the garments 16, 18, 20, depicted in Reed's Figure 1 (reproduced above) are formed by interknitted stitches and that the remainder of the garments 16, 18, 20 are formed by non-interknitted stitches. *Id.* (citing Ex. 1003 ¶ 115). Specifically, the seams or outlines of the garments 16, 18, 20 are formed with interknitted stitches (shown in X's and O's in Reed's Figure 2), which are formed by feeds 1, 2, 3, and 4 on needles 7, 9, 8, and 10, as shown in Reed's Figures 3B and 3D. Ex. 1006, 5:3–18, Figs. 3A–3E; *see* Ex. 1003 ¶ 115. Reed further teaches that "two feeds [i.e., feeds 1, 3 for the dial needles] are used for one course of the inner tube 12 and two feeds [i.e., feeds 2, 4 for the cylinder needles] are used for the outer tube 14." Ex. 1006, 4:61–64, Figs. 2, 2A, 3A–3E; *see id.* at 5:67–6:3; Ex. 1003 ¶¶ 115, 116. "Because the interknitted stitches are part of the garments 16, 18, 20, and the garments 16, 18, 20 also comprise areas that are only formed as part of the outer tube 14 or the inner tube 12, the garments 16, 18, 20 have a plurality of different knitted textures formed by varying at least one of the stitch type and the yarn type." Pet. 21 (citing Ex. 1003 ¶ 116). Thus, because the stitches create a texture different from the remainder of the textile element, Petitioner concludes that Reed teaches "a first area and a second area with a unitary construction."

Second, Petitioner also argues that Reed teaches "how the two layers 12, 14 themselves may be formed of different yarns or stitch configurations." Pet. 21 (citing Ex. 1003 ¶ 117).

> If the two tubes 12 and 14 are knitted of two different fibers, the knitted structure may form sections of a garment to be assembled in the regular manner. For example, the outside

> tube 14 may be a normal decorative fabric wherein the inner tube 12 may be formed of material such as lining. By simultaneously knitting and interknitting the two layers, a step is saved by producing a section of garment which is prelined. Similarly, the layer 12 (instead of being lining) may be interfacing, which is attached to the outside layer 14 and again saves a step in the manufacture of garments. Another example where two different fibers are used to make the inner and outer tubing would be in the foundation garment industry, where the inner fabric could be cotton or other soft fibers and the outer fabric would be lycra or elasticized yarns.

Ex. 1006, 3:61–4:8; *see* Pet. 21–22; Ex. 1003 ¶ 117. Thus, Petitioner alternatively argues that the separate circular knitted tubes may be the first and second areas recited in claims 4 and 11.

Finally, Petitioner alternatively argues that Nishida teaches these limitations. Pet. 22. In particular, Nishida teaches that "in the embodiment according to FIGS. 1 and 2, with layout 2 on the web of material 1, areas 26 and 27 are produced in a *configuration, color or style that is different from the other areas*." Ex. 1009, 4:6–9 (emphasis added)); *see id.* at Abstract; 1:65–69, 2:40–45, 3:15–26, 3:47–48, 4:12–28, 4:48–55, 5:56–6:2; Ex. 1003 ¶¶ 118, 119. Nishida further states that

> [l]ayout 2 is divided into different individual parts or areas, which differ from one another, such as by being of another material style and/or by being of different fibers or yarns, for example, from wool, wool with metal yarns, silk, silk with metal yarns, wool with plastic fibers or the like . . . .

Ex. 1009, 3:15–25; *see* Ex. 1003 ¶ 121. Petitioner argues that Nishida's teachings achieve a textile element with multiple knit constructions. Pet. 22. Specifically, these varying constructions of Nishida's layout may achieve varying elasticity, air permeability, absorptivity, softness, extensibility, wear resistance, and appearance, which Petitioner argues teach the "varying

textures" recited in these claims. *Id.* (citing Ex. 1009, 3:43–52, 5:63–6:2, 6:1–31); *see* Ex. 1003 ¶¶ 120, 121. Thus, Petitioner argues that either Reed or Nishida teaches these limitations.

Although we have highlighted specific evidence and arguments for emphasis, we have reviewed the entirety of Petitioner's analysis and evidence for independent claims 1 and 9, as well for dependent claims 2–8 and 10–13, and the supporting testimony of Mr. Holden. As noted above, Petitioner relies on the same reasons to combine the teachings of Reed and Nishida for its challenges to each of claims 1–13 of the '598 patent. *See* Pet. 12–14.

5. *Patent Owner's Contentions*

Patent Owner raises seven separate contentions why Petitioner fails to demonstrate that the combined teachings of Reed and Nishida render any of claims 1–13 of the '598 patent unpatentable. *See* PO Resp. 3–4. Because we find certain of the Patent Owner's contentions persuasive and dispositive, we do not address each of Patent Owner's separate contentions.

*a. Low Level of Ordinary Skill in the Art*

Patent Owner contends that Petitioner's assessment of the level of ordinary skill in the art is conclusory and is not based on the factors that the Board has considered in determining the level of ordinary skill in the art. *Id.* at 12–13. We have addressed the appropriate assessment of the level of ordinary skill in the art above. *See supra* Section II.A. Whether the level of ordinary skill in the art is "low" or "high" may make it more or less difficult for Petitioner to demonstrate obviousness. PO Resp. 14 ("In sum, the level of ordinary skill in the art at the time of the '598 patent was low. It is more difficult, therefore, for Petitioner to establish obviousness. . . ."); *see Kinetic*

*Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366 (Fed. Cir. 2012) ("Because it is generally easier to establish obviousness under a higher level of ordinary skill in the art, we must assume that, in light of the jury's verdict, it adopted the lower level of skill proposed by S & N." (citation omitted)). However, a "low" relative level of skill alone cannot *prevent* Petitioner from demonstrating obviousness.

Here, only Petitioner – the party bearing the burden of persuasion – has proposed an assessment of the level of ordinary skill in the art. *See supra* Section II.A.; *but see* IPR2013-00067, Ex. 2010 ¶ 52 (Patent Owner proposed that a "POSITA . . . would have a few years of experience with design and development of footwear and knowledge of textiles used in such footwear"). For the reasons set forth above, we have adopted Petitioner's assessment. Further, as noted above, Petitioner's declarant testifies from the point of view of someone with the assessed level of skill, a level which the declarant exceeds. *See* Ex. 1003 ¶ 36; Ex. 1004. Thus, regardless whether the level of ordinary skill is deemed "low" or "high," we are not persuaded that the relative assessment of the level of ordinary skill in the art here affects our evaluation of Petitioner's arguments and evidence.

*b. Weight Given to Declarant's Testimony*

Patent Owner contends that Petitioner's declarant, Mr. Holden, did not author his declaration and, during cross-examination, Mr. Holden was unable to answer basic questions about the declaration, the patent at issue, the prior art, footwear, and knitting technologies. PO Resp. 15; *see* Ex. 2004, 12:2–18. Mr. Holden testified that "[he] worked with counsel one on one to basically give her a verbal description of my opinions and -- and my thoughts on the -- on these issues, and she did the actual typing of the

document." Reply 3 (quoting Ex. 2004, 12:7–11); *see* Ex. 2004, 12:12–13:16. Declarants often have assistance in authoring their declarations. *See Square, Inc. v. Think Computer Corp.*, Case CBM2014-00159, slip op. at 26–27 (PTAB Nov. 27, 2015) (Paper 47) ("the mechanics of declaration preparation is 'a waste of time, both for the witness and the Board'"). Mr. Holden was not required to be the sole author of his declaration. Rather, the relevant issue regarding the preparation of Mr. Holden's declaration is whether Mr. Holden adopted the content of his declaration as his own. Here, he has. *See* Ex. 1003 ¶¶ 3, 4, 209.

As Patent Owner suggests, we weigh Mr. Holden's declaration testimony in light of his testimony on cross-examination. Although Mr. Holden indicated that he was unable to define or was unfamiliar with certain terms during cross-examination, he did name references, including Spencer (Ex. 1010), that he could and would consult to obtain the answers to specific questions. Tr. 63:20–64:13. Moreover, Patent Owner's counsel acknowledged that persons of ordinary skill in the art (or declarants) do not have to have all of the knowledge relevant to their testimony in their heads and that they are allowed to consult references, as appropriate. *Id.* at 63:20–64:2. Although Patent Owner notes that Mr. Holden apparently was not aware of Spencer until this *inter partes* review (*see* Ex. 2004, 77:1–3; Tr. 64:1–6), his learning of and relying on a *new* reference alone is not sufficient reason to disregard, i.e., give *no* weight to, Mr. Holden's testimony. Further, the issue here is not whether Mr. Holden is a person of ordinary skill in the art, but rather whether his testimony is of value to the panel. *See* Tr. 64:15–18. Thus, as indicated in the discussion below, we determine the appropriate weight to give to Mr. Holden's testimony.

*c. Failure to Explain How and Why a Person of Ordinary Skill in the Art Would Have Combined the Teachings of Reed and Nishida to Achieve the Recited Methods*

Initially, Patent Owner contends that Petitioner fails to address the full scope and content of the prior art and ignores critical disclosure of both references. PO Resp. 19. In particular, Patent Owner notes that "Reed states that his 'present invention relates generally to knitted garments and more particularly to a garment which is preseamed and preformed on a circular knitting machine.'" *Id.* (quoting Ex. 1006, 1:8–11 (emphasis omitted)); *see* Tr. 36:3–9. Patent Owner contends that this description of Reed's "present invention" limits the scope of Reed to *preseamed* garments made on circular knitting machines. PO Resp. 19–20. Although this description may limit the scope of Reed's recited methods, the scope of Reed's teachings is broader than what Reed specifically refers to as the "present invention" (Ex. 1006, 1:8–11) and encompasses "the conventional methods involv[ing] superimposing two preexisting panels of material, forming a garment into those preexisting panels, cutting the shaped garment from the two preexisting panels, and then seaming the two cutouts together to create the final garment" (PO Resp. 20 (citing Ex. 1006, 6:18–22)). *See* Reply 7 (quoting *In re Heck*, 699 F.2d 1331, 1332–33 (Fed. Cir. 1983) ("The use of patents as references is not limited to what the patentees describe as their own inventions or to the problems with which they are concerned. They are part of the literature of the art, relevant for all they contain." (citation omitted))). Although Reed's teachings may be broader than preseamed garments and garment sections, Petitioner relies only on the embodiments of Reed's invention that are directed to preseamed garments *and* to preseamed

sections of garments. Pet. 14–15 (citing Ex. 1006, 1:58–64); Reply 6–8; *see* Tr. 9:17–10:7, 16:17–17:8, 25:17–26:21, 30:4–11.

With respect to Nishida, Patent Owner contends that Nishida's web of material has two primary components: a backing and one or more layouts printed on or produced in the backing. PO Resp. 24–25 (citing Ex. 1009, 1:40–2:53, 3:6–26). The backing may be formed prior to the production of the layouts. *Id.* Patent Owner notes that Nishida seeks to improve on previously known methods for producing layouts, such as those described in German Patent No. 627 878. *Id.* at 23. Nevertheless, the reference to the German patent is exemplary, and we do not interpret Nishida as limited to the methods described in the German Patent. *See* Ex. 1009, 1:39–46 ("to further develop this previously known process"); Reply 8.

After the backing is formed, Nishida teaches printing on or producing layouts in the backing. Ex. 1009, 3:13–15. The layouts are printed by a fabric printing process *onto* the backing or produced by a textile production process *inside* the backing. PO Resp. 25 (citing Ex. 1009, 1:50–56, 2:20–26, 3:13–15, 5:45–52); *see* Reply 9. "[T]he material can be woven or knitted in two or more layers or can be especially thick or additionally embroidered." Ex. 1009, 3:66–4:1.

As noted above, each of the embodiments of Reed, relied upon by Petitioner, describes the pre-seaming of garments or sections of garments *before* their removal from the cylindrical textile structure. The teachings of Nishida, relied upon by Petitioner, do not teach pre-seaming and, instead, teach the seaming of the upper layout *after* its removal from the web of material. Ex. 1009, 4:19–30 (Figs. 2 and 3), 5:3–26 (Figs. 4 and 5); *see* Pet. 28; PO Resp. 26–27; Tr. 45:2–46:8. Patent Owner contends that

Petitioner fails to explain why and how a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims. PO Resp. 31–37. In particular, because Petitioner relies on the teachings of the embodiments of Reed which describe pre-seamed garments and pre-seamed sections of garments and because Nishida does not teach pre-seaming, Patent Owner contends that Petitioner has not shown why and how a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims. For the following reasons, we agree.

*i. Failure of Proof*

Petitioner bears the burden of proving by a preponderance of the evidence that the challenged claims are unpatentable. This includes demonstrating by a preponderance of the evidence that a person of ordinary skill in the art would have had reason to combine the teachings of Reed and Nishida to achieve the methods recited in the challenged claims. As noted above, Petitioner argues that a person of ordinary skill in the art would have had at least three reasons to combine the teachings of Reed and Nishida to achieve the methods recited in the challenged claims. Pet. 12–14; *see* Tr. 10:12–11:12. First, Petitioner argues that, because Reed teaches that its methods are applicable to "*all* types of garments" (Ex. 1006, 5:56–57 (emphasis added); *see* Ex. 1003 ¶ 131), a person of ordinary skill in the art would have had reason to apply the teachings of Reed to the processes and shoe parts of Nishida. Pet. 13 (citing Ex. 1003 ¶ 133). Second, Petitioner argues that, because both Reed and Nishida teach the advantages of reducing cost through the use of computer-controlled knitting machines, a person of ordinary skill in the art would have had reason to combine their teachings.

Pet. 13 (citing Ex. 1003 ¶¶ 134–135). Third, Petitioner argues that a person of ordinary skill in the art would have had reason to apply Reed's methods for producing textile elements, from which to produce garments, to produce Nishida's shoe upper patterns. *Id.* at 13–14; *see KSR*, 550 U.S. at 417. However, none of these reasons or any other reason identified by Petitioner addresses the differences between Reed and Nishida, specifically pre-seaming.

Independent claims 1 and 9 do not mention seaming or pre-seaming expressly. *See* Ex. 1001, 11:43–50 (claim 1), 12:21–28 (claim 9). Further, Patent Owner acknowledged that at least independent claims 1 and 9 do not mention seaming or pre-seaming. Tr. 37:7–10. Claims 2, 3, 5–8, 10, 12, and 13 also do not mention seaming or pre-seaming expressly. *See* Ex. 1001, 11:51–57, 12:7–20, 12:29–32, 12:41–48. As we noted above, however, claims 4 and 11 recite "a unitary construction," which "is intended to express a configuration *wherein portions of a textile element are not joined together by seams or other connections*." *Id.* at 6:43–46. Thus, we interpret the limitations of claims 4 and 11 to recite a textile element having areas of different textures, but without seams. *See supra* Section II.B.1. Moreover, under principles of claim differentiation, we further are persuaded that the scope of challenged claims 1–3, 5–10, 12, and 13 is broad enough to encompass methods related to both pre-seamed and unseamed garments and garment sections. Nothing in the Specification (Ex. 1001) or in the prosecution history (Ex. 1002) of the '598 patent overcomes the presumptive scope of the independent claims arising from the doctrine of claim differentiation. *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000).

Neither Petitioner nor its declarant, Mr. Holden addresses the fact that each of the relied upon embodiments of Reed teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming. PO Resp. 31–37; *see* Tr. 34:17–35:12; *see also* Ex. 2004, 161:5–163:19 (Mr. Holden was unable to identify teachings in Nishida directed to pre-seamed and preformed uppers). Moreover, during cross-examination, Mr. Holden acknowledged that he had not been asked to nor had he considered how the teachings of these references could be combined. In particular, the following colloquy occurred during Mr. Holden's deposition:

> Q. (By Mr. Harris) And isn't it also true that nowhere in your declaration do you describe how a person of ordinary skill in the art would create a preseamed and preformed footwear upper on a circular knitting machine?
>
> MS. WILLIAMS: Objection.
>
> THE WITNESS: I don't recall that there's any por- -- portion of that. Again, I was not asked to hypothesize on that particular point.
>
> Q. (By Mr. Harris) Okay. Just so I'm clear, you weren't asked to offer an opinion on how a person of ordinary skill in the art would create a preseamed and preformed footwear upper on a circular knitting machine; correct?
>
> A. I don't recall that I was asked that particular question.
>
> Q. Thank you.

Ex. 2004, 152:22–153:13; *see* Tr. 53:19–57:5.

In *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, our reviewing court found that where "[t]he expert failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims," such testimony "is not

sufficient and is fraught with hindsight bias." 694 F.3d 1312, 1327 (Fed. Cir. 2012); *see* PO Resp. 55–57; Reply 25–26; *see also Hyundai Motor Co. v. Blitzsafe Texas, LLC*, Case IPR2016-01476, slip op. at 32 (PTAB Jan. 24, 2017) (Paper 12) ("A determination of obviousness cannot be reached where the record lacks 'explanation as to *how* or *why* the references would be combined to produce the claimed invention.'"; quoting *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016)). Despite Mr. Holden's testimony that a person of ordinary skill in the art would have had reason to combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims (*see* Ex. 1003 ¶¶ 131–137), Mr. Holden's testimony during cross-examination makes clear that he did not perform the necessary analysis to support his conclusions. *See* 37 C.F.R. § 42.65(a).

Petitioner's evidence, and, in particular, Mr. Holden's testimony, is deficient with respect to the limitations recited in claims 4 and 11, in that it fails to offer any explanation why a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve a method in which seams of the kind taught by Reed apparently are prohibited. Petitioner argues that Reed teaches the "a unitary construction" limitation of claims 4 and 11 either because the interconnecting stitches are a different texture from the rest of the garment or garment section or because the inner and outer circular knit materials may have different textures. Pet. 21–22. Thus, Mr. Holden testifies in support that Reed's interknitted stitches, i.e., the joining seams, teach textures different from the remainder of Reed's finished garments or garment sections (Ex. 1003 ¶¶ 115, 116) or that circular knit materials, although joined by seams, may have different textures (*id.* ¶ 117). These arguments and testimony seem inconsistent with Petitioner's position

that either the finished garments or garment sections are the "textile element" recited in the challenged claims and that, in claims 4 and 11, "the textile element [includes] a first area and a second area with *a unitary construction*." *See* Tr. 16:17–17:12. These apparent inconsistencies are not explained.

Alternatively, Petitioner argues (Pet. 22) and Mr. Holden testifies (Ex. 1003 ¶¶ 118–121) that the limitations of claims 4 and 11 are taught by Nishida. In particular, Mr. Holden testifies that Nishida describes that, "in the embodiment according to FIGS. 1 and 2, with layout 2 on the web of material 1, ***areas 26 and 27 are produced in a configuration***, color or style ***that is different from the other areas***." *Id.* ¶ 118 (quoting Ex. 1009, 4:6–9 (emphasis added by declarant)). Mr. Holden concludes from his analysis of Nishida that "[a] person of ordinary skill in the art at least as of March 3, 2004 would have understood that Nishida's disclosure regarding varying the knit of individual areas would include having a substantially smooth texture in one area, and a rougher texture in another area." *Id.* ¶ 121. What Mr. Holden fails to explain, however, is how and why this teaching of Nishida is combined with the teachings of the relied upon embodiments of Reed to achieve the methods recited in claims 4 and 11. Petitioner and its declarant rely instead on the *general* arguments presented in connection with independent claims 1 and 9 regarding reasons to combine the teachings of Reed and Nishida. Pet. 12–14; Ex. 1003 ¶¶ 131–137. Given the language of the claims, our interpretation of that language, and the teachings of Reed and Nishida, we find Petitioner's arguments and evidence, especially Mr. Holden's testimony, insufficient and unpersuasive.

Consequently, having weighed Petitioner's evidence of reasons to combine the teachings of Reed and Nishida, noting the deficiencies in Mr. Holden's analysis in support of those reasons, we are not persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in art would have had reason to combine the teachings of Reed and Nishida to achieve the methods recited in the challenged claims.

*ii. Combined Teachings of Reed and Nishida Render Reed Inoperable for its Intended Purpose*

As our reviewing court has explained,

> "obviousness is a question of law based on several underlying factual findings," including what a reference teaches, and whether proposed modifications would change a reference's "principle of operation." Where "a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield predictable results." { "pageset": "S74 *However, combinations that change the "basic principles under which the [prior art] as designed to operate,"* *or that render the prior art "inoperable for its intended purpose," may fail to support a conclusion of obviousness.*

*Plas-Pak Industries, Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 757–758 (Fed. Cir. 2015) (citations omitted, emphasis added).

As noted above, we find that the fundamental purpose of Reed's methods is to produce pre-seamed, finished garments or sections of garments. *E.g.*, Ex. 1006, 1:58–64, 3:8–21, 5:67–6:17; *see supra* Section II.C.2. As Reed explains, "[t]he essence of the present invention is a garment formed of juxtaposed sections of simultaneously knitted, *concentric* tubes *interconnected* by knitting." Ex. 1006, 6:25–28 (emphases added). As

we also note above, the methods recited in challenged claims 1–3, 5–10, 12, and 13 do not specify whether or not the textile elements are pre-seamed. Thus, we interpret those claims broadly to cover both pre-seamed and unseamed textile elements.

As discussed above, however, claims 4 and 11 are interpreted to describe “a unitary construction,” which does not include seams. *See supra* Section II.B.1. Thus, “a unitary construction” does not appear to read on Reed’s pre-seamed, finished garment or garment section. Further, Petitioner does not argue that, like Reed, Nishida teaches pre-seamed uppers or sections of uppers or tongues. Consequently, we determine that, relying on Nishida’s teachings to supply the “unitary construction” limitation with respect to claims 4 and 11 in the context of the teachings of Reed, as Petitioner suggests (Pet. 22), would require the alteration of the principles of operation of Reed or would render Reed inoperable for its intended purpose.

In response to Patent Owner’s contention that Petitioner’s combination of the teachings of Reed and Nishida renders Reed inoperable for its intended purpose, Petitioner argues that a person of ordinary skill in the art would understand that

> [t]o produce two single-layer layouts, the POSITA would simply cut along the garment side of stitches 22, 24 (highlighted in red below) so that all seams remain with the surrounding tube material, and the two layouts are no longer connected to each other after removal from the tubes 12, 14.

Reply 18–19 (citing Ex. 1006, 3:9–15, 5:67–6:3; Ex. 1003 ¶¶ 103, 112). In particular, Petitioner produces the following annotated version of Reed’s Figure 1.




Reply 19. Petitioner has annotated Reed's Figure 1 to add red lines indicating cut lines *on* the garment *inside* of stitches 22, 24. As depicted in annotated Figure 1, Petitioner argues that the finished garments or garment sections could be cut from the textile structure inside of the seams, as indicated by the red lines. *Id.* According to Petitioner, "[t]he two separated layouts are then processed *and seamed* along the edges, as described in both Reed and Nishida." *Id.* (emphasis added). Nevertheless, Petitioner provides no explanation of why a person of ordinary skill in the art would have reason to seam the garments or garment sections, only then to remove the seams, so that the garments or garment sections could be reseamed later. *Id.* at 18–19; *see* Tr. 59:21–60:12, 68:20–70:21.[12] We find these arguments contrary to the teachings of Reed and unpersuasive.

---

[12] Petitioner's counsel argue that Reed's seams may be used as an outline, but we do not find that Reed teaches that cuts are taught inside the outline to remove the seam from the garment section. Ex. 1006, 3:9–12 (Interconnected knitted stitches form *both* an outline and a seam joining the inner and outer tubes.); *see* Tr. 70:2–21. Cutting inside the seams of a finished garment would change a *finished* garment into an *unfinished* garment or a *seamed* garment section into an *unseamed* garment section and

Consequently, with respect to challenged claims 4 and 11, we find that Petitioner's proposed combination of the teachings of Reed and Nishida would render Reed either inoperable or unsuitable for its intended purpose. Thus, we are not persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in art would have had reason to combine the teachings of Reed and Nishida to achieve the methods recited in challenged claims 4 and 11.

*6. Summary*

Based on our review of the arguments and evidence presented by each party, we conclude that Petitioner fails to demonstrate by a preponderance of the evidence that either of independent claims 1 and 9 is unpatentable as rendered obvious by the combined teachings of Reed and Nishida. Moreover, at least because Petitioner's arguments for the obviousness of dependent claims 2–8 and 10–13 over Reed and Nishida rely on the arguments and evidence presented with respect to independent claims 1 and 9, we also conclude that Petitioner fails to demonstrate by a preponderance of the evidence that any of the dependent claims is unpatentable as rendered obvious by the combined teachings of Reed and Nishida. We further determine that for the additional reasons set forth above, Petitioner fails to demonstrate by a preponderance of the evidence that claims 4 and 11 are rendered obvious by the combined teachings of Reed and Nishida.[13]

---

would appear entirely contrary to the teachings of Reed. *See* Ex. 1006, 3:15–21.

[13] Patent Owner also contends that Reed teaches away from its combination with Nishida (PO Resp. 42–44; *but see* Reply 19–20), in view of our determinations above, we need not reach this contention.

## III. SUMMARY

We are not persuaded that Petitioner demonstrates by a preponderance of the evidence that any of claims 1–13 of the ’598 patent is rendered obvious over the combined teachings of Reed and Nishida.

## IV. ORDER

It is, therefore,

ORDERED that, pursuant to 35 U.S.C. § 318(a), Petitioner fails to demonstrate by a preponderance of the evidence that any of claims 1–13 is unpatentable as rendered obvious over the combined teachings of Reed and Nishida; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Trials@uspto.gov
571-272-7822

Paper 21
Entered: October 19, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

adidas AG,
Petitioner,

v.

NIKE, Inc.,
Patent Owner.

---

Case IPR2016-00921
Patent 7,814,598 B2

---

Before JOSIAH C. COCKS, MICHAEL J. FITZPATRICK, and
JAMES B. ARPIN, *Administrative Patent Judges.*

FITZPATRICK, *Administrative Patent Judge*, concurring.

I concur with the majority's decision that Petitioner did not meet its burden under 35 U.S.C. § 318(a) to prove by a preponderance of the evidence that the challenged claims are unpatentable. I would reach that decision, however, merely for the reasons set forth below.

Reed did not invent circular knitting. Reed notes that "[c]ircular knitting machines have been used to make tubular, knitted garments, such as ladies' stockings, sweaters and other garments." Ex. 1006, 1:33–35. Reed explained further that "[i]n these tubular garments, the user's anatomy is in the center of the single tube." *Id*. at 1:35–37. Reed further explained that circular double knitting, in which two tubes or layers are simultaneously knitted, was also known in the prior art. *Id*. at 1:37–39 ("'Two tube,' 'double layer,' 'Bi-knit' and 'duo-fold' fabrics have been produced on circular knitting machines."). As with circular knit single-tube garments, the tubes of circular knit double-tube garments surrounded the anatomy of the user. *Id*. at 1:39–44.

What Reed invented was circular double knitting of garments in which "the anatomy of the user would fit between the single knitted fabrics instead of in the center of the tubes." *Id*. at 1:67–2:1. Figure 1 of Reed is reproduced below.




FIG. 1

Figure 1 of Reed, reproduced above, shows a doubled-layered tube of knitted structure 10 as it would come off a circular knitting machine in accordance with a preferred embodiment of Reed. *Id*. at 2:66–3:3. "[T]ubes 12 and 14 are simultaneously knitted concentrically on a circular double knit machine." *Id*. at 3:3–5. The tubes are stitched together along interconnecting knitting 22, thereby forming the outline of three skirts 16, 18, and 20 that are subsequently cut out from the knitted structure.[14] *Id*. at 3:8–21. Reed explains:

> [T]he knitted structure 10 includes (around its circumference) a plurality of finished garments [i.e., three skirts] which need only be severed from the structure 10 and turned inside out if a hidden seam is desired. Only a minimum amount of additional sewing is required to form hems and attach various decorative ornaments to complete a finished garment.

*Id*. at 3:15–21. Reed states that its invention "produce[s] a preformed and preseamed fabric on a circular knitting machine so as to reduce time, cost and labor involved in making garments." *Id*. at 6:20–22.

As stated in the majority opinion, Nishida is directed to the production of a shoe upper by (1) cutting out a layout in the form of the shoe upper from a web of material and (2) shaping the shoe upper by connecting material parts of the layout by the formation of seams. *See* Ex. 1009, Abstract; *see also id.* at Fig. 2 (illustrating layout of shoe upper on web of material).

Petitioner argues the following:

> Reed's explicit statement that "[t]he present invention may be used to form all types of garments worn by men, women and children" (Reed, 5:56–57) in combination with

[14] The tubes also are stitched together along interconnecting knitting 24, but that "is merely to define the lower outline of the skirt upon which the pattern may be cut." Ex. 1006, 3:12–15.

> Reed's explicit reference to the fact that footwear items, such as stockings, were conventionally knit with circular knitting machines (Reed, 1:33–44), would have suggested to a person of ordinary skill in the relevant art at least as of March 3, 2004, that Reed's process could be used to form all types of articles of clothing including footwear, particularly since clothing is understood to refer to all things that people wear to cover their bodies. (Ex. 1003, ¶131.)
>
> With this understanding, the skilled person would have been motivated to use Reed's process to produce textile elements for all types of clothing, including forming textile elements to be incorporated into footwear as described in Nishida. (Ex. 1003, ¶132.)
>
> With this understanding, the skilled person would have been motivated to use Reed's process to produce textile elements for all types of clothing, including forming textile elements to be incorporated into footwear as described in Nishida. (Ex. 1003, ¶132.)

Pet. 12–13.

Petitioner's reasons to combine the prior art teachings are not persuasive. It is true that Reed states that its invention "may be used to form all types of garments," but that does not mean Reed provides a reason to use it in forming any specific type of garment, let alone part of a shoe. Petitioner attempts to provide such a reason by relying, not on a stated purpose of Reed's invention (which is what Petitioner asserts in its obviousness challenge), but rather on what circular knitting machines traditionally had been used for prior to Reed's invention. *See* Pet. 12. More specifically, Petitioner relies on Reed's statement that, prior to Reed, circular knitting machines were used "to make tubular, knitted garments, such as ladies' *stockings*, sweaters and other garments." Ex. 1006, 1:33–35 (emphasis added); *see also* Pet. 12 (referring to "stockings" and citing

Ex. 1006, 1:33–44). Petitioner extrapolates Reed's reference to "stockings" to footwear and then further to an upper of a shoe. However, there is an evidentiary gap jumping from "stockings" to footwear and an additional evidentiary gap subsequently jumping from footwear generally to a shoe's upper specifically. The cited testimony of Petitioner's declarant does not fill those gaps. It is merely repetitive of the arguments block-quoted above. *Compare* Pet. 12–13, *with* Ex. 1003 ¶¶ 131–33.

Nor could I fill those gaps if I wanted. To summarize Reed, it: (1) acknowledges that circular knitting of tubular garments in which the anatomy is placed inside a resulting tube of knitted structure was known prior to Reed; and (2) describes its invention of double circular knitting garments in which the anatomy is placed between layers of the resulting tube. *See, e.g.*, Ex. 1006, 3:25–31. Nishida's upper (*see, e.g.*, Ex. 1009, Fig. 2) is neither a "tubular garment" that could be made using a pre-Reed circular knitting method (*see* Ex. 1006, 1:33–37) nor a garment that could be "produce[d as] a preformed and preseamed fabric on a circular knitting machine" using Reed's invented method (*see id*. at 6:20–22).

For these reasons, I concur with the majority's decision that Petitioner did not meet its burden under 35 U.S.C. § 318(a) to prove by a preponderance of the evidence that the challenged claims are unpatentable.

PETITIONER:

Mitchell G. Stockwell
Vaibhav P. Kadaba
Tiffany L. Williams
KILPATRICK TOWNSEND & STOCKTON LLP
mstockwell@kilpatricktownsend.com
wkadaba@kilpatricktownsend.com
tiwilliams@kilpatricktownsend.com

PATENT OWNER:

Christopher J. Renk
Michael J. Harris
BANNER & WITCOFF, LTD
crenk@bannerwitcoff.com
mharris@bannerwitcoff.com
bwlitdocket@bannerwitcoff.com

Trials@uspto.gov
571-272-7822

Paper 21
Entered: October 19, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

adidas AG,
Petitioner,

v.

NIKE, Inc.,
Patent Owner.

---

Case IPR2016-00922
Patent 8,266,749 B2

---

Before JOSIAH C. COCKS, MICHAEL J. FITZPATRICK, and JAMES B. ARPIN, *Administrative Patent Judges.*

Opinion for the Board filed by *Administrative Patent Judge* ARPIN.

Opinion Concurring by *Administrative Patent Judge* FITZPATRICK.

ARPIN, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.7*3

## I. BACKGROUND

adidas AG ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–9, 11–19, and 21 of U.S. Patent No. 8,266,749 B2 (Ex. 1001, "the '749 patent").[1] Paper 2 ("Pet."). Nike, Inc. ("Patent Owner") did not file a Preliminary Response.[2] Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of claims 1–9, 11–19, and 21 of the '749 patent. Paper 6 ("Inst. Dec."), 23.

After institution, Patent Owner filed a Patent Owner Response to the Petition (Paper 9 ("PO Resp.")), and Petitioner replied (Paper 10 ("Reply")).[3] Each party requested an oral hearing (Papers 15 and 16); and

---

[1] Petitioner identifies adidas International B.V.; adidas North America, Inc.; adidas America, Inc.; and adidas International, Inc., as real parties-in-interest. Pet. 1.

[2] Patent Owner identifies only itself, as a real party-in-interest. Paper 5, 2.

[3] Patent Owner filed objections to the admissibility of some of Petitioner's evidence. Paper 12. Petitioner served – and improperly filed – supplemental evidence in response to Patent Owner's objections. Paper 13; Ex. 1015; 37 C.F.R. § 42.64(c); *see* 37 C.F.R. § 42.64(b)(2) ("The party relying on evidence to which an objection is timely served may respond to the objection *by serving* supplemental evidence within ten business days of service of the objection." (emphasis added)); *GoPro, Inc. v. Contour IP Holding LLC*, Case IPR2015-01078, slip op. at 2–3 (PTAB Apr. 7, 2016) (Paper 40) ("If the supplemental evidence does not cure the objection and the opposing party files a motion to exclude, the submitting party may file the supplemental evidence with its opposition to the motion to exclude."). Ultimately, Patent Owner did not file a motion to exclude, and, therefore, Patent Owner did not preserve its objections. 37 C.F.R. § 42.64(c). Regardless, Exhibit 1015 is expunged because we did not authorize its filing.

we held a consolidated oral hearing with Case IPR2016-00921 on July 12, 2017. A transcript of that hearing is of record in this case. Paper 20 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6, and this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during the review. For the reasons discussed below, we determine that Petitioner has not met its burden to prove, by a preponderance of the evidence, that claims 1–9, 11–19, and 21 of the '749 patent are unpatentable on the ground upon which we instituted *inter partes* review.

*A. The '749 Patent*

The '749 patent claims priority from U.S. Patent Application No. 10/791,289, filed on March 3, 2004, now issued as U.S. Patent No. 7,347,011 B2 ("the '011 patent") (Ex. 1001 at (60)) and relates to articles of footwear incorporating an upper that is at least partially formed from a textile material (*id.* at 1:20–23). Conventional articles of athletic footwear may include two primary elements: an upper and a sole structure. *Id.* at 1:25–28. The upper may form a void in the interior of the footwear for receiving a wearer's foot, and the upper may extend over the instep and toe areas, along the medial and lateral sides, and around the heel area of the wearer's foot. *Id.* at 1:42–47.

In particular, the Specification describes articles of footwear having an upper incorporating a knitted textile element and having a sole structure secured to the upper. *Id.* at 3:27–33. Methods for manufacturing an article of footwear include "mechanically-manipulating a yarn with a circular knitting machine, for example, to form a cylindrical textile structure. In addition, the method involves removing at least one textile element from the

textile structure, and incorporating the textile element into an upper of the article of footwear." *Id.* at 3:41–46.

Figure 9 of the '749 patent is reproduced below.




**Figure 9**

Figure 9 depicts textile structure 60 formed on a circular knitting machine. *Id.* at 7:38–39. For example,

> [a] suitable knitting machine for forming textile element 40 is a wide-tube circular knitting machine that is produced in the Lonati Group by Santoni S.p.A. of Italy under the SM8 TOP1 model number. This Santoni S.p.A. wide-tube circular knitting machine may form a textile structure having a diameter that ranges from 10 inches to 20 inches, with 8 feeds for each diameter.

*Id.* at 7:14–20. As discussed below, the types of stitches that form textile structure 60 may be varied to form an outline of one or more textile elements 40 on textile structure 60. *Id.* at 7:64–8:3. In particular, as depicted in Figure 9, the outlines for at least two textile elements 40 may be formed on textile structure 60. *Id.* at 7:53–54.

Figure 8 of the ’749 patent is reproduced below.




Figure 8

Figure 8 depicts an embodiment of an upper according to the ’749 patent. *Id.* at 5:59–6:64. “Textile element 40 is a single material element that is formed to exhibit a unitary (i.e., one-piece) construction, and textile element 40 is formed or otherwise shaped to extend around the foot.” *Id.* at 5:40–43; *see also id.* at Figs. 10 (depicting textile element 40′), 11 (depicting textile element 40″). In particular,

> Textile element 40 is a single material element with a unitary construction, as discussed above. *As defined for purposes of the present invention, unitary construction is intended to express a configuration wherein portions of a textile element are not joined together by seams or other connections, as depicted with textile element 40 in FIG. 8.* Although the various edges 41a-44d are joined together to form seams 51-54,

> the various portions of textile element 40 are formed as [a] unitary element *without seams* . . . .

*Id.* at 6:41–50 (emphases added). Consequently, textile element 40 is formed, such that portions of the textile element are not joined together with seams or other connections. *Id.* at 5:40–43. Edges 41a–44d are joined together as shown in Figures 3–5 to form seams 51–54, thereby forming at least a portion of a void for receiving the foot. *Id.* at 6:41–50. In contrast, lateral region 31, medial region 32, instep region 33, lower regions 34, and heel regions 35 together have a unitary construction without seams (*id.* at 5:46–58, 6:47–50). Referring to Figure 9,

> a first textile element 40 and a second textile element 40 may be *simultaneously* formed in a single textile structure 60. As the diameter of textile element 60 is increased or the width of textile element 40 decreases, however, an even greater number of textile elements 40 may be outlined on textile structure 60.

*Id.* at 7:58–63 (emphasis added).

Figure 11 of the '749 patent is reproduced below.




**Figure 11**

Figure 11 depicts another embodiment of an upper according to the ’749 patent. *Id.* at 9:29–10:7. Textile element 40″ includes three different areas with three different textures. *Id.* at 9:31–32. First texture 46″ is generally smooth and extends in strips across lateral region 31, medial region 32, and instep region 33 of the upper. *Id.* at 9:32–35. In addition, textile element 40″ includes second texture 47″ and third texture 48″. *Id.* at 9:32–35. Moreover, the Specification of the ’749 patent describes that:

> The different textures 46″-48″ are formed *by merely varying the type of stitch formed* by the wide-tube circular knitting machine at each location of textile element 40″. Textures 46″-48″ may exhibit aesthetic differences, or the differences may be structural. . . . The air-permeability of textile element 40″ may also vary in the different areas.

*Id.* at 9:39–47 (emphasis added).

### *B. Illustrative Claim*

Claims 1 and 13 are independent, method claims. Claims 2–9, 11, and 12 depend directly or indirectly from claim 1, and claims 14–19 and 21 depend directly or indirectly from claim 13. Claims 1 and 11 are illustrative of the claims at issue and are reproduced below:

> 1. A method of manufacturing an article of footwear, the method comprising:
>
> simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure;
>
> removing the knitted textile element from the surrounding knitted textile structure;
>
> incorporating the knitted textile element into the article of footwear.
>
> 11. The method of claim 1, wherein simultaneously knitting a textile element with a surrounding textile structure includes forming the knitted textile element to include a first area and a second area with a unitary construction, the first area being formed of a first stitch configuration, and the second area being formed of a second stitch configuration that is different from the first stitch configuration to impart varying textures to a surface of the knitted textile element.

*Id.* at 11:43–52 (claim 1), 12:14–21 (claim 11).

### *C. Related Proceedings*

Neither party identifies any related litigation. Pet. 1; Paper 5, 2. As discussed above, the ’749 patent is a continuation of the application that issued as the ’011 patent, which is the subject of IPR2013-00067. Pet. 1. In that case, the panel instituted *inter partes* review of claims 1–46 of the ’011 patent, and Patent Owner requested cancellation of claims 1–46 and

proposed substitute claims 47–50 in a Motion to Amend. The panel granted Patent Owner's request to cancel claims 1–46, but denied Patent Owner's request as to the substitute claims. Patent Owner appealed the Board's decision to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit"). The Federal Circuit issued a decision in Patent Owner's appeal on February 11, 2016, which affirmed-in-part and vacated-in-part the Board's decision, and remanded the case to the Board for further proceedings regarding the status of the substitute claims. *Nike, Inc. v. adidas AG*, 812 F.3d 1326, 1329 (Fed. Cir. 2016). The Federal Circuit issued its mandate in that case on April 4, 2016. In addition, Petitioner has requested *inter partes* review of claims of related patents in IPR2016-00920 (U.S. Patent No. 8,042,288 B2), institution denied, and IPR2016-00921 (U.S. Patent No. 8,266,749 B2), institution granted. Paper 5, 2.

*D. Applied References and Declaration*

Petitioner relies on the following references and declaration in support of its asserted ground of unpatentability:

| Exhibit | References and Declaration |
|---|---|
| 1003 | Declaration of Mr. Lenny M. Holden |
| 1006 | U.S. Patent No. 3,985,003 to Reed, issued Oct. 12, 1976 ("Reed") |
| 1009 | U.S. Patent No. 5,345,638 to Nishida, issued Sept. 13, 1994 ("Nishida") |
| 1010 | David J. Spencer, *Knitting technology: a comprehensive handbook and practical guide*, 1–413 (2001) (3rd Ed., Woodhead Publ. Ltd.) ("Spencer") |
| 1012 | International Standard, *Textile machinery — Knitting machines — Nominal diameters of circular machines,* 1–6 (2003) (2nd Ed., ISO 8117:2003(E)) ("ISO 8117") |

Pet. iv.

### *E. Instituted Ground of Unpatentability*

We instituted review on the following ground of unpatentability:

| References | Basis | Challenged Claims |
|---|---|---|
| Reed and Nishida | 35 U.S.C. § 103(a) | 1–9, 11–19, and 21 |

Pet. 7.

## II. ANALYSIS

### *A. Person of Ordinary Skill in the Art*

Petitioner argues that a person of ordinary skill in the relevant art would have at least a few years of experience in the footwear industry, *a broad understanding of shoemaking*, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) *the available and varied ranges of typical construction methods within a product cycle*; and (4) the functional requirements of footwear and the range of material choices available. Pet. 8 (citing Ex. 1003 ¶ 34). Patent Owner contests Petitioner's assessment of the level of ordinary skill in the relevant art, but does not propose an alternative assessment. PO Resp. 17–19.

Initially, Patent Owner contends that Petitioner has failed to consider appropriate factors identified by our reviewing court and utilized by other panels to assess the level of ordinary skill in the art. *Id.* at 17–18. We agree with Petitioner that it is not necessary to consider every factor or to weigh the factors equally in order to assess the level of ordinary skill in the art. Reply 2 (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995)). Here, we may rely on Petitioner's declarant's testimony (Ex. 1003 ¶ 34) and the teachings of the prior art to evaluate Petitioner's assessment of the level

of ordinary skill in the art. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). In particular, Reed and Nishida identify the types of problems encountered in the art prior art solutions to these problems, and the sophistication of the technology. *E.g.*, Ex. 1006, 1:13–55; Ex. 1009, 1:10–36; *see, e.g.*, Ex. 1007, 1:8–32, 2:12–64; Ex. 1008, 1:11–54; Ex. 1010, 145–160; *see also* Ex. 1010, Preface ("The aim of this book is to combine in a single volume the fundamental principles of weft and warp knitting in such a manner that its contents are useful to readers in education, industry or commerce. It thus [fulfills] the long felt need for a comprehensive up-to-date textbook explaining this important sector of textile technology.").

Patent Owner contends that the level of ordinary skill in the art is "low" (PO Resp. 17–18), but it is not clear whether Patent Owner further contends that Petitioner's assessment is deficient because Petitioner fails to argue that a person possessing such a "low" level of ordinary skill in the art also would have "experience using knitting technologies to create knitted footwear uppers" (*id.* at 18–19) or whether the inclusion of such skill would raise the "low" level of skill in the art (*id.* at 19). Alternatively, Patent Owner may merely be contending that Petitioner's declarant fails to qualify as a person of ordinary skill in the art. *Id.* at 19 ("If it was too 'dangerous' for Mr. Holden with his nearly forty years of experience, a person with just a 'few years of experience' would not have had any knitting experience, let alone experience using knitting technologies to create uppers."); *see* Tr. 62:17–22. Patent Owner is not required to help us assess the level of ordinary skill in the art and does not do so here. *See* PO Resp. 22 ("Petitioner may criticize NIKE for not submitting an expert declaration.

But it is Petitioner's burden to prove unpatentability; it is not NIKE's burden to prove patentability.").

In response to Patent Owner's contentions, Petitioner argues that the level of ordinary skill in the art is not low and that hands-on knitting experience is not required. Reply 2–3. Petitioner further argues Patent Owner has not required knitting experience in its previous assessment with respect to a related patent of the level of ordinary skill in the art. *Id.* at 2 (citing IPR2013-00067, Ex. 2010 ¶ 52). Based on the record before us and to the extent necessary, we again adopt Petitioner's assessment of a person of ordinary skill in the relevant art. Inst. Dec. 8 n.3.

### *B. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are construed according to their broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b). Under that standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). The following four claim terms are at issue in this proceeding.

#### *1. "a first area and a second area with a unitary construction" (Claims 11 and 21)*

Petitioner argues that the term "a first area and a second area with a unitary construction" means "a textile element having a unitary construction and having a first area and a second area." Pet. 6. As Petitioner notes, this is the construction that this panel gave to the same term appearing in the substitute claims of the '011 patent. *adidas AG v. Nike, Inc.*, Case IPR2013-

00067, slip op. at 16–17 (PTAB Apr. 28, 2014) (Paper 60). We further note that the ’749 patent’s Specification provides that “[a]s defined for purposes of the present invention, unitary construction is intended to express a configuration *wherein portions of a textile element are not joined together by seams or other connections*, as depicted with textile element 40 in FIG. 8.” Ex. 1001, 6:42–46 (emphasis added); *see* IPR2013-00067, Ex. 1002, 6:41–46 (identical disclosure). The ’011 patent and the ’749 patent share the same Specification (apart from their claims), neither party contested our construction of this term in the appeal of our decision in the *inter partes* review of the claims of the ’011 patent, and Patent Owner does not contest Petitioner’s proposed construction of this term in this proceeding. Therefore, in view of the express definition of the phrase “unitary construction” in the Specification of the ’749 patent, we adopt Petitioner’s proposed construction as the broadest reasonable interpretation for this term. *See* Tr. 20:5–13, 37:11–17.

*2. “wide-tube circular knitting machine” (Claims 9 and 19)*

We determine that the broadest reasonable interpretation of the term “wide-tube circular knitting machine” is “a circular knitting machine forming body garment sized, tubular textile structures, including those having a diameter that ranges from 10 inches to 20 inches.” *See* Inst. Dec. 9–11. Neither party contests this construction. *See* Tr. 20:5–13, 37:11–17.

*3. “impart” (claims 11 and 21) and “texture” (claims 8, 11, and 21)*

During the course of the review, the parties raised issues regarding the construction of two additional terms that appear only in the challenged dependent claims. First, Petitioner argues that the term “impart” means “to

give, convey, or grant from." Reply 24 (citing Ex. 1014).[4] Further, Petitioner argues that this definition is consistent with the use of the word "impart" in the Specification of the '749 patent. *E.g.*, Ex. 1001, Abstract, 1:30–35, 1:60–63, 1:65–2:3, 3:33–37, 7:35–37; *see* Tr. 21:4–14. Patent Owner does not propose an alternative construction for the term "impart." Further, neither party argues that the term "impart" carries special meaning in the relevant art. In fact, we find Spencer's use of the word "impart" in the handbook on knitting technology consistent with Petitioner's dictionary definition and the word's use in the Specification of the '749 patent. *See* Ex. 1010, 189. Thus, to the extent any construction of this term is necessary, we find that the broadest reasonable interpretation of the term "impart" is "to give, convey, or grant from." *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("[E]ach [term] is used in common parlance and has no special meaning in the art. Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term.").

Second, although Petitioner does not provide an express interpretation for the term "texture,"[5] Petitioner's declarant testifies "texture" "generally

---

[4] Petitioner relies on a definition of "impart" from a current, on-line dictionary rather than from a dictionary contemporaneous with the effective filing date of the '749 patent. However, the record contains no suggestion that the relevant definition of "impart" has changed since the effective filing date of the '749 patent, and we determine that it has not. *See* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 659 (2nd ed. 1999) (Ex. 3001) ("impart" means "to give; bestow").

[5] A relevant dictionary definition of the word "texture" is "the characteristic structure of the threads, fibers, etc., that make up a textile fabric: *course texture*," "a rough or grainy surface quality," or "anything produced by weaving; woven fabric." Ex. 3001, 1351.

could be an actual texture or a perceived texture based on the arrangement of colors in a pattern." Reply 4–5 (citing Ex. 2004, 178:20–24; *see also id.* at 177:1–178:19, 178:25–184:11). Patent Owner disputes Mr. Holden's interpretation of "texture," which appears inconsistent with Spencer's discussion of texture. *See* Ex. 2004, 80:24–81:8. In particular, according to Spencer, "[c]olour is one of the five ingredients of fashion, the other four being style, silhouette, *texture* and pattern." Ex. 1010, 127 (emphasis added). Thus, Spencer appears to distinguish between color and texture.

The Specification of the '749 patent does not define "texture," but contrasts between "smooth" and "textured" areas of a textile element. Ex. 1001, 9:23–24. Moreover, with respect to Figure 11, the Specification of the '749 patent explains that:

> The different textures 46"-48" are formed by merely varying the type of stitch formed by the wide-tube circular knitting machine at each location of textile element 40". Textures 46"-48" may exhibit aesthetic differences, or the differences may be structural. For example, the degree of stretch in areas with textures 46"-48" may be different, or the wear resistance of the areas may vary depending upon the stitch utilized. The air-permeability of textile element 40" may also vary in the different areas. Third texture 48" is formed to include a plurality of apertures that extend through textile element 40". The apertures may be formed by omitting stitches at specific locations during the wide-tube circular knitting process, and the apertures facilitate the transfer of air between the void within upper 20 and the area outside of upper 20. *Accordingly, the various stitches formed in textile element 40", or one of textile elements 40 or 40', may be utilized to vary the texture, physical properties, or aesthetics of footwear 10 within a single, unitary element of material.*

*Id.* at 9:39–57 (emphasis added). From this explanation, we understand that "texture," as used in the '749 patent, is distinguishable from the physical and

aesthetic properties of a textile element. According to the recitations of claims 11 and 21, "texture" is produced as part of the step recited in claims 1 and 13 of "simultaneously knitting a textile element with a surrounding textile structure." *See* Ex. 1001, 11:45–46. Thus, to the extent any construction of this term is necessary, we find that the broadest reasonable interpretation of the term "texture" in the context of claims 11 and 21 is "a non-smooth surface formed while simultaneously knitting a textile element with a surrounding textile structure." Such a surface may be created by "varying the type of stitch formed by the wide-tube circular knitting machine at each location of textile element." *Id.* at 9:39–42.

#### *4. Other Claim Terms*

For purposes of this Final Written Decision, we discern no other claim terms that require express interpretation.

### *C. Obviousness over Reed and Nishida*

#### *1. Overview*

Petitioner argues that claims 1–9, 11–19, and 21 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Reed and Nishida. To support its arguments, Petitioner provides a detailed mapping of limitations of the challenged claims to Reed and Nishida. Pet. 13–32. Petitioner also cites Mr. Holden's Declaration for support. *See* Ex. 1003 ¶¶ 91–138.

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art;[6] and (4) objective evidence of nonobviousness, *i.e.*, secondary considerations.[7] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). On this record and for the reasons set forth below, we are not persuaded that Petitioner demonstrates by a preponderance of the evidence that claims 1–9, 11–19, and 21 of the '749 patent are unpatentable as rendered obvious over the combined teachings of Reed and Nishida.

*2. Reed (Ex. 1006)*

Reed is directed to a method of manufacturing a wearable item, which includes, among other things, simultaneously knitting two concentric tubes with a circular-knitting machine to form a cylindrical textile structure (Ex. 1006, Abstract, 1:58–64, 2:22–25, 3:3–5), textile elements located in different portions of the textile structure (*id.* at 2:29–31), removing the textile elements from the textile structure (*id.* at 3:12–19, 5:67–6:5), and incorporating the textile element(s) "to form *all types of garments* worn by men, women and children" (*id.* at 5:56–58 (emphasis added); *see id.* at 1:33–

[6] *See supra* Section II.A.; *see also* Ex. 1003 ¶ 36 ("Based on my experience, I have an understanding of the capabilities of the skilled person in this field, and my opinions are provided from the perspective of such a person.").

[7] The record lacks arguments or evidence of secondary considerations. *See generally* PO Resp.

35).[8] In particular, Reed describes methods of making preseamed garments (*id.* at 3:8–21) or preseamed sections of a garment, which sections may be seamed together "by standard practices" to form a garment (*id.* at 6:10–17). As Reed explains,

> *From the preceding description of the preferred embodiments, it is evident that the objects of the invention are obtained to produce a preformed and preseamed fabric on a circular knitting machine so as to reduce time, cost and labor involved in making garments.* The types of program used to form the final product is to be varied with the imagination of the programmer, as well as the type of product which may be formed. The essence of the present invention is a garment formed of juxtaposed sections of simultaneously knitted, concentric tubes interconnected by knitting.

*Id.* at 6:18–28 (emphasis added).

Reed's Figure 1 is reproduced below.

[8] Patent Owner contends that Reed is not analogous art. PO Resp. 34–36. In particular, Patent Owner contends that Reed is not from the same field of endeavor as the challenged claims and that Reed's teachings are not reasonably pertinent to the particular problem with which the recited methods are involved. *Id.* at 34–35. Because Reed is directed to the manufacture of all types of garments, including footwear (Reply 12–13; *see* Ex. 1006, 1:33–44), and Reed is related directly to preparation of garments layouts from a knitted textile structure (Reply 14–15; *see* Ex. 1006, 2:29–35), we are persuaded that Reed is analogous art to the challenged claims.




FIG. 1

Figure 1 depicts tubular knitted structure 10, such as that produced by a circular knitting machine. *Id.* at 2:66–3:1. Knitted structure 10 comprises inner tube 12 and outer tube 14, and

> [a]round the circumference of the knitted structure 10 are illustrated three garments which, for example, may be skirts 16, 18 and 20.[9]
>
> The garments 16, 18 and 20 are outlined by a plurality of interconnecting knitted stitches 22 and 24. *The interconnecting knitting 22 not only forms the outline of the garments 16, 18 and 20, but joins the inner tube 12 to the outer tube 14 so as to create a seam.* The interconnecting knitting 24 is merely to define the lower outline of the skirt upon which the pattern may be cut.

*Id.* at 3:1–15 (emphasis added).

Reed explains that the use of circular knitting machines in the garment industry historically was limited to making tubular, knitted garments, such

[9] We are persuaded that "skirts" are "body garments." *See* Ex. 1003 ¶ 97.

as ladies stockings, sweaters, and other garments, wherein the entire knitted fabric was used as a unit to form one surface of a finished garment. Pet. 10–11 (citing Ex. 1006, 1:33–44; Ex. 1003 ¶ 94); *see supra* Section II.C.1. (note 6). Reed further teaches that "[c]omputer electronic knitting brought about the possibilities of making patterns and designs of up to three million stitches (previously approximately 50,000 was maximum). With this system, patterns and designs are possible that before could not be made." Ex. 1006, 1:50–55; *see* Ex. 1003 ¶ 95. Reed states that its method uses "an electronic circular double knitting machine" and that an "object of the [Reed] invention is to provide a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Ex. 1006, 1:58–59, 2:22–25, Figs 1–6; *see* Ex. 1003 ¶ 95. Further, Reed teaches that:

> If the present process is used to preform *an exterior decorative fabric having a lining or inner-lining or interfacing attached thereto*, the severed sections must be assembled and seamed by standard practices. By providing the lining or interfacing already attached to the section, a substantial amount of time is saved in measuring, marking and cutting the original fabric and lining or interlining as well as stitching them together.

Ex. 1006, 6:10–17 (emphasis added).

*3. Nishida (Ex. 1009)*

Nishida is directed to the production of a shoe upper by (1) cutting out a layout in the form of the shoe upper from a web of material and (2) shaping the shoe upper by connecting material parts of the layout by the formation of seams. *See* Ex. 1009, Abstract. By this process, such shoe

uppers may be produced efficiently and in reduced time despite the many individual parts present or to be made visible. *Id.*

Figure 2 of Nishida is reproduced below.




Figure 2 illustrates an embodiment of the upper layout according to Nishida. *Id.* at 3:6–12. Web of material 1 may include one or a plurality of layouts 2. Further, web of material 1 includes backing 4 that may be a knitted material, and different areas of layouts 2 may be formed by knitting different yarns or fibers on backing 4. *Id.* at 3:15–26, 5:63–6:2. Moreover, Nishida's web of material 1 may be "knitted in two or more layers or can be especially thick or additionally embroidered." *Id.* at 3:66–4:1.

Consequently, web of material 1 may be used to produce layouts 2 by different production measures, such as different styles, yarn material, color, material thickness, number of layers of material, or the like, simultaneously with the production of web of material 1. *Id.*; *see id.*, Figs. 1, 2. Each

layout 2, including a sole part, may be cut from web of material 1 as a unit and processed into an upper. *Id.* Nishida describes the manufacture of an article of footwear incorporating such an upper. *Id.* at 3:9–12, Fig. 3.

Figure 4 of Nishida is reproduced below.




Fig. 4

Figure 4 depicts a section of web of material 1 with radially symmetric layout 2 having sole part sections 29.1 and 29.2 provided on opposite sides of the upper, as well as tongue 40. *Id.* at 2:64–66. Nishida sets forth the following in association with Figure 4:

> [T]ongue 40, for example, according to FIG. 4, can be provided also in the course of producing the web of material 1 with different weave structures and/or weave patterns and/or

> embroideries or with one or with several prints or the like. On a web of material 1, different tongues 40 can be produced corresponding to a shoe shape and/or a shoe size both in shape, size, color or colors, patterns or the like. Preferably, in each case, related tongues 40 are produced simultaneously with a layout 2 on same web of material 1.
>
> For optimum surface use of web of material 1, a tongue 40 can be produced in the open space 41 located between the two layout sections 42 and 43, which later form the rear of foot or heel-pan shoe part.
>
> Preferably, each layout 2 has at least five, preferably more than ten, patterns and a tongue 40 has at least two, preferably at least three patterns produced or appearing, which are different from one another in each case.

*Id.* at 5:27–44; *cf. id.*, Fig. 2 (reproduced above, depicting web of material 1 including layouts 2 without tongues). Thus, as depicted in Figure 4, tongues may be individual parts of an article of footware "produced separately and applied to the upper later" and are of a relatively simply, substantially rectangular shape. *See* Ex. 1009, 1:50–53 (describing the inclusion of a tongue in a *conventional* article of footware). Tongues and uppers may be taken from the same web of material or from different webs. *See id.* at 5:37–40.[10]

#### 4. *Petitioner's Arguments*

Petitioner argues that Reed and Nishida teach or suggest all of the limitations of claims 1–9, 11–19, and 21 of the '749 patent. Pet. 9–32. In particular, Petitioner argues that Reed and Nishida teach or suggest all of the

---

[10] Although we find that Nishida teaches layouts both of an upper and of a tongue, Petitioner does not argue that Nishida's tongue layouts separately teach textile elements that may be incorporated into an article of footwear. *See* Pet. 16, 28; Ex. 1003 ¶ 86, App'x C (pg. 140).

limitations of each of independent claims 1 and 13. *Id.* at 13–19 (claim 1), 20–21 (claim 13).

*a. Independent Claims 1 and 13*

Independent claim 1 recites "[a] method of manufacturing an article of footwear." Ex. 1001, 11:43; *see also id.* at 12:27 (claim 13). Reed teaches that its circular knitting methods may be used to manufacture "all types of garments." Ex. 1006, 5:56–57. Although Reed specifically identifies stockings and hosiery (*id.* at 1:33–35, 5:57–58), *e.g.*, footwear, as garments manufactured by circular knitting, Reed does not describe shoes expressly as "garments." Nishida also teaches that the webs of material depicted in its Figures 1 and 2 are "produced by a *conventional* textile process." Ex. 1009, 3:6–7 (emphasis added). Thus, we are persuaded that Petitioner has shown that Reed alone, as well as the combined teachings of Reed and Nishida, teach or suggest a method of manufacturing an article of footwear.

The method of claim 1 further comprises the step of "*simultaneously* knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure." Ex. 1001, 11:45–48 (emphasis added). Similarly, claim 13 recites:

> knitting a first textile element and a second textile element *simultaneously* with knitting a surrounding textile structure, the first knitted textile element located within a first portion of the knitted textile structure, the second knitted textile element located within a second portion of the knitted textile structure,
>
> varying at least one of the types of stitches or the types of yarns in the knitted textile structure to impart a texture to the first and second knitted textile elements different from a texture

> of the knitted textile structure extending between the first and second portions

*Id.* at 12:29–39 (emphasis added).

Reed teaches simultaneously knitting textile elements, including producing body garments, such as skirts (*see* Ex. 1006 Fig. 2), shirts and pants (*see id.* at Fig. 3), and dresses (*see id.* at Fig. 6), for men, women, and children (*id.* at 5:56–57) with a surrounding textile structure. Pet. 14–15. Reed further teaches simultaneously knitting textile elements, including sections of garments having "an exterior decorative fabric having a lining or inner-lining or interfacing attached thereto." Ex. 1006, 6:10–12. As noted above, Reed teaches that computerized knitting processes made possible numerous stitch varieties. *See id.* at 1:50–59; Ex. 1003 ¶ 95. Nishida also supplies this limitation. Pet. 14–15. Nishida's Figure 2, reproduced above (*see supra* Section II.C.3.) depicts textile elements, such as layouts 2, with a surrounding textile structure, such as web of material 1.

Pet. 15–16; *see* Ex. 1009, 3:15–26. Moreover, as noted above,

> *[T]ongue 40, for example, according to FIG. 4, can be provided also in the course of producing the web of material 1 with different weave structures and/or weave patterns and/or embroideries or with one or with several prints or the like. On a web of material 1, different tongues 40 can be produced corresponding to a shoe shape and/or a shoe size both in shape, size, color or colors, patterns or the like.* Preferably, in each case, related tongues 40 are produced simultaneously with a layout 2 on same web of material 1.
>
> . . .
>
> Preferably, each layout 2 has at least five, preferably more than ten, patterns and a tongue 40 has at least two, preferably at least three patterns produced or appearing, which are different from one another in each case.

Ex. 1009, 5:27–36, 41–44 (emphasis added). Thus, we determine that either Reed or Nishida teaches "simultaneously knitting a textile element with a surrounding textile structure" and "the first knitted textile element located within a first portion of the knitted textile structure," as recited in independent claims 1 and 13, respectively.

With regard to the second part of this limitation of claims 1 and 13, which Petitioner refers to as limitations 1C and 13C, Petitioner argues that:

> Reed describes using different types of stitches or yarns to impart a knitted texture to the textile element(s) that is different from a knitted texture in the surrounding textile structure. For example, Reed describes that the edges of the garments 16, 18, 20 are formed by interknitted stitches, whereas the remainder of the garments 16, 18, 20 are formed by non-interknitted stitches. . . . *Because the interknitted stitches are part of the garments 16, 18, 20, they form a texture in the garments that is different from the texture in the surrounding textile structure.*

Pet. 16 (emphasis added; citing Ex. 1006, 5:3–18; Ex. 1003 ¶¶ 108, 109); *see* Ex. 1006, 6:10–17 (describing the knitting of garment sections). Similarly, Petitioner argues that Nishida teaches that

> "*only just those parts of the web of material are produced in the necessary quality, thickness, multilayers or the like which correspond to the pattern or to an area of a pattern of the shoe upper or the related shoe part.* The remaining area of the web of material in contrast can consist of a simple, lightweight or inexpensive material quality, which holds together only the patterns or areas of such patterns in the web of material after their completion."

Pet. 17 (emphasis added; quoting Ex. 1009, 2:12–20; citing Ex. 1003 ¶¶ 110–111); *see* Ex.1009, 5:27–44 (describing the knitting of various tongues). We determine that either Reed or Nishida teaches this second part of the limitations of independent claims 1 and 13.

The method of claim 1 further comprises the step of "removing the knitted textile element from the surrounding knitted textile structure." Ex. 1001, 11:49–50; *see also id.* at 12:40–41 (claim 13 recites "removing the first and second knitted textile element from the knitted textile structure"). We are persuaded based on the evidence cited in the Petition that Petitioner has shown that the teachings of Reed or Nishida, alone or in combination, teach or suggest this limitation of the independent claims. Pet. 18 (claim 1; citing, *e.g.*, Ex. 1006, 3:12–19; Ex. 1009, 1:10–18); *id.* at 21 (claim 13); *see* Ex. 1003 ¶¶ 103–104.

Finally, the method of claim 1 comprises the step of "*incorporating* the knitted textile element *into* the article of footwear." Ex. 1001, 11:51–52 (emphases added); *see id.* at 12:42–43 (claim 13). Petitioner relies solely on Nishida to supply this limitation, and argues that Nishida teaches this limitation of the independent claims. Pet. 16 (claim 1), 20 (claim 13); *see* Ex. 1003 ¶ 126. We agree.

Petitioner argues that a person of ordinary skill in the art would have had reason to combine the identified teachings of Reed and Nishida to achieve the methods recited in independent claims 1 and 13. Pet. 11–13. In particular, Petitioner argues that, because Reed teaches that its methods are applicable to "*all* types of garments" (Ex. 1006, 5:56–57 (emphasis added); *see* Ex. 1003 ¶ 131), a person of ordinary skill in the art would have had reason to apply the teachings of Reed to the processes and shoe parts of Nishida. Pet. 12 (citing Ex. 1003 ¶ 133). Further, Petitioner argues that, because both Reed and Nishida teach the advantages of reducing cost through the use of computer-controlled knitting machines, a person of ordinary skill in the art would have had reason to combine their teachings.

*Id.* at 13 (citing Ex. 1003 ¶¶ 134–135). Finally, Petitioner argues that a person of ordinary skill in the art would have had reason to apply Reed's methods for producing textile elements, from which to produce garments, to produce Nishida's shoe upper layouts. *Id.*; *see KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

*b. Dependent Claims 2–9, 11, 12, 14–19, and 21*

With respect to the challenged dependent claims, Petitioner argues that Reed teaches or suggests the additional limitations recited in claims 9 and 19 (Pet. 29–31; *see supra* Section II.B.2.); that Nishida teaches or suggests the additional limitations recited in claims 7, 12, 17, and 18 (Pet. 25, 31–32); and that that Reed and/or Nishida teaches or suggests the additional limitations recited in claims 2–6, 8, 11, 14–16, and 21 (Pet. 19, 21–29, 31; *see supra* Section II.B.1.). Petitioner provides a detailed mapping of the limitations of each of these dependent claims onto the teachings of Reed and/or Nishida. *See* Ex. 1003, App'x A. Moreover, Petitioner argues that a person of ordinary skill in the relevant art would have had at least the same reason to combine the teachings of Reed and Nishida to achieve the methods recited in these dependent claims, as that given for combining the teachings of Reed and Nishida to achieve the recited methods of the independent claims. *See* Pet. 11–13.

Although we have reviewed the entirety of Petitioner's analysis and evidence for both the independent and dependent claims, we highlight the following specific evidence and arguments for emphasis. Claim 11 recites:

> The method of claim 1, wherein simultaneously knitting a textile element with a surrounding textile structure includes forming the knitted textile element *to include a first area and a second area with a unitary construction*, the first area being formed of a first stitch configuration, and the second area being formed of a second stitch configuration that is different from the first stitch configuration to impart varying textures to a surface of the knitted textile element.

Ex. 1001, 12:14–21 (emphasis added). Claim 21 depends from claim 13 and recites substantially the same limitations as claim 11. *Id.* at 13:5–14:5.

Petitioner argues that Reed teaches these limitations in two ways. Pet. 31. First, Petitioner argues that Reed teaches that the edges of the garments 16, 18, 20, depicted in Reed's Figure 1 (reproduced above) are formed by interknitted stitches and that the remainder of the garments 16, 18, 20 are formed by non-interknitted stitches. *Id.* at 25 (citing Ex. 1003 ¶¶ 115, 116 with respect to the limitations of claim 8). Specifically, the seams or outlines of the garments 16, 18, 20 are formed with interknitted stitches (shown in X's and O's in Reed's Figure 2), which are formed by feeds 1, 2, 3, and 4 on needles 7, 9, 8, and 10, as shown in Reed's Figures 3B and 3D. Ex. 1006, 5:3–18, Figs. 3A–3E; *see* Ex. 1003 ¶ 115. Reed further teaches that "two feeds[, *i.e.*, feeds 1, 3 for the dial needles] are used for one course of the inner tube 12 and two feeds[, *i.e.*, feeds 2, 4 for the cylinder needles] are used for the outer tube 14." Ex. 1006, 4:61–64, Figs. 2, 2A, 3A–3E; *see id.* at 5:67–6:3; Ex. 1003 ¶¶ 115, 116. Thus, because the stitches create a texture different from the remainder of the textile element, Petitioner concludes that Reed teaches "a first area and a second area with a unitary construction."

Second, Petitioner also argues that Reed teaches "how the two layers 12, 14 themselves may be formed of different yarns or stitch

configurations." Pet. 26 (citing Ex. 1003 ¶ 117). In particular, Reed describes the following:

> If the two tubes 12 and 14 are knitted of two different fibers, the knitted structure may form sections of a garment to be assembled in the regular manner. For example, the outside tube 14 may be a normal decorative fabric wherein the inner tube 12 may be formed of material such as lining. By simultaneously knitting and interknitting the two layers, a step is saved by producing a section of garment which is prelined. Similarly, the layer 12 (instead of being lining) may be interfacing, which is attached to the outside layer 14 and again saves a step in the manufacture of garments. Another example where two different fibers are used to make the inner and outer tubing would be in the foundation garment industry, where the inner fabric could be cotton or other soft fibers and the outer fabric would be lycra or elasticized yarns.

Ex. 1006, 3:61–4:8; *see* Pet. 26, 31; Ex. 1003 ¶ 117. Taking into account the above-noted description, Petitioner alternatively argues that Reed's separate circular knitted tubes may be the first and second areas recited in claims 11 and 21.

Finally, Petitioner alternatively argues that Nishida also teaches the limitation of "a first area and a second area with a unitary construction." Pet. 26–27, 31. In particular, Nishida teaches that "in the embodiment according to FIGS. 1 and 2, with layout 2 on the web of material 1, areas 26 and 27 are produced in a *configuration, color or style that is different from the other areas*." Ex. 1009, 4:6–9 (emphasis added); *see id.* at Abstract, 1:65–69, 2:40–45, 3:15–26, 3:47–48, 4:12–28, 4:48–55, 5:56–6:2; Ex. 1003 ¶¶ 118, 119. Nishida further states that:

> [l]ayout 2 is divided into different individual parts or areas, which differ from one another, such as by being of another material style and/or by being of different fibers or yarns, for

> example, from wool, wool with metal yarns, silk, silk with metal yarns, wool with plastic fibers or the like . . . .

Ex. 1009, 3:15–25; *see* Ex. 1003 ¶ 121. Petitioner argues that Nishida's teachings achieve a textile element with multiple knit constructions. Pet. 27. Specifically, these varying constructions of Nishida's layout may achieve varying elasticity, air permeability, absorptivity, softness, extensibility, wear resistance, and appearance, which Petitioner argues teach the "varying textures" recited in these claims. *Id.* (citing Ex. 1009, 3:43–52, 5:63–6:2, 6:1–31); *see* Ex. 1003 ¶¶ 120, 121. Thus, Petitioner argues that either Reed or Nishida teaches the above-noted limitation. Petitioner, however, does not specifically address the limitation's requirement that the knitted textile element is formed to include a first area and a second area "with a unitary construction" or how Reed and/or Nishida teaches "a unitary construction." *See* Pet. 31; *see also supra* Section II.B.1. (construing "a first area and a second area with a unitary construction" (Claims 11 and 21)).

Although we have highlighted specific evidence and arguments for emphasis, we have reviewed the entirety of Petitioner's analysis and evidence for independent claims 1 and 13, as well for dependent claims 2–9, 11, 12, 14–19, and 21, and the supporting testimony of Mr. Holden. As noted above, Petitioner relies on the same reasons to combine the teachings of Reed and Nishida for its challenges to each of claims 1–9, 11–19, and 21 of the '749 patent. *See* Pet. 11–13.

5. *Patent Owner's Contentions*

Patent Owner raises seven separate contentions why Petitioner fails to demonstrate that the combined teachings of Reed and Nishida render any of claims 1–9, 11–19, and 21 of the '749 patent unpatentable. *See* PO

Resp. 2–4. Because we find certain of the Patent Owner's contentions persuasive and dispositive, we do not address each of Patent Owner's separate contentions.

*a. Low Level of Ordinary Skill in the Art*

Patent Owner contends that Petitioner's assessment of the level of ordinary skill in the art is conclusory and is not based on the factors that the Board has considered in determining the level of ordinary skill in the art. *Id.* at 17–19. We have addressed the appropriate assessment of the level of ordinary skill in the art above. *See supra* Section II.A. Whether the level of ordinary skill in the art is "low" or "high" may make it more or less difficult for Petitioner to demonstrate obviousness. PO Resp. 19 ("In sum, the level of ordinary skill in the art at the time of the '749 patent was low. It is more difficult, therefore, for Petitioner to establish obviousness. . . ."); *see Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366 (Fed. Cir. 2012) ("Because it is generally easier to establish obviousness under a higher level of ordinary skill in the art, we must assume that, in light of the jury's verdict, it adopted the lower level of skill proposed by S & N." (citation omitted)). However, a "low" relative level of skill alone cannot *prevent* Petitioner from demonstrating obviousness.

Here, only Petitioner – the party bearing the burden of persuasion – has proposed an assessment of the level of ordinary skill in the art. *See supra* Section II.A.; *but see* IPR2013-00067, Ex. 2010 ¶ 52 (Patent Owner proposed that a "POSITA . . . would have a few years of experience with design and development of footwear and knowledge of textiles used in such footwear"). For the reasons set forth above, we have adopted Petitioner's assessment. Further, as noted above, Petitioner's declarant testifies from the

point of view of someone with the assessed level of skill, a level which the declarant exceeds. *See* Ex. 1003 ¶ 36; Ex. 1004. Thus, regardless whether the level of ordinary skill is deemed "low" or "high," we are not persuaded that the relative assessment of the level of ordinary skill in the art here affects our evaluation of Petitioner's arguments and evidence.

*b. Weight Given to Declarant's Testimony*

Patent Owner contends that Petitioner's declarant, Mr. Holden, did not author his declaration and, during cross-examination, Mr. Holden was unable to answer basic questions about the declaration, the patent at issue, the prior art, footwear, and knitting technologies. PO Resp. 19; *see* Ex. 2004, 12:2–18. Mr. Holden testified that "[he] worked with counsel one on one to basically give her a verbal description of my opinions and -- and my thoughts on the -- on these issues, and she did the actual typing of the document." Reply 3 (quoting Ex. 2004, 12:7–11); *see* Ex. 2004, 12:12–13:16. Declarants often have assistance in authoring their declarations. *See Square, Inc. v. Think Computer Corp.*, Case CBM2014-00159, slip op. at 26–27 (PTAB Nov. 27, 2015) (Paper 47) ("the mechanics of declaration preparation is 'a waste of time, both for the witness and the Board'"). Mr. Holden was not required to be the sole author of his declaration. Rather, the relevant issue regarding the preparation of Mr. Holden's declaration is whether Mr. Holden adopted the content of his declaration as his own. Here, he has. *See* Ex. 1003 ¶¶ 3, 4, 209.

As Patent Owner suggests, we weigh Mr. Holden's declaration testimony in light of his testimony on cross-examination. Although Mr. Holden indicated that he was unable to define or was unfamiliar with certain terms during cross-examination, he did name references, including

Spencer (Ex. 1010), that he could and would consult to obtain the answers to specific questions. Tr. 63:20–64:13. Moreover, Patent Owner's counsel acknowledged that persons of ordinary skill in the art (or declarants) do not have to have all of the knowledge relevant to their testimony in their heads and that they are allowed to consult references, as appropriate. *Id.* at 63:20–64:2. Although Patent Owner notes that Mr. Holden apparently was not aware of Spencer until this *inter partes* review (*see* Ex. 2004, 77:1–3; Tr. 64:1–6), his learning of and relying on a *new* reference alone is not sufficient reason to disregard, *i.e.*, give *no* weight to, Mr. Holden's testimony. Further, the issue here is not whether Mr. Holden is a person of ordinary skill in the art, but rather whether his testimony is of value to the panel. *See* Tr. 64:15–18. Thus, as indicated in the discussion below, we determine the appropriate weight to give to Mr. Holden's testimony.

*c. Failure to Explain How and Why a Person of Ordinary Skill in the Art Would Have Combined the Teachings of Reed and Nishida to Achieve the Recited Methods*

Initially, Patent Owner contends that Petitioner fails to address the full scope and content of the prior art and ignores critical disclosure of both references. PO Resp. 24. In particular, Patent Owner notes that "Reed states that his 'present invention relates generally to knitted garments and more particularly to a garment which is preseamed and preformed on a circular knitting machine.'" *Id.* (quoting Ex. 1006, 1:8–11 (emphasis omitted)); *see* Tr. 36:3–9. Patent Owner contends that this description of Reed's "present invention" limits the scope of Reed to *preseamed* garments made on circular knitting machines. PO Resp. 24–25. Although this description may limit the scope of Reed's recited methods, the scope of Reed's teachings is broader than what Reed specifically refers to as the "present invention"

(Ex. 1006, 1:8–11) and encompasses "the conventional methods involv[ing] superimposing two preexisting panels of material, forming a garment into those preexisting panels, cutting the shaped garment from the two preexisting panels, and then seaming the two cutouts together to create the final garment" (PO Resp. 25 (citing Ex. 1006, 6:18–22)). *See* Reply 7 (quoting *In re Heck*, 699 F.2d 1331, 1332–33 (Fed. Cir. 1983) ("The use of patents as references is not limited to what the patentees describe as their own inventions or to the problems with which they are concerned. They are part of the literature of the art, relevant for all they contain." (citation omitted))). Although Reed's teachings may be broader than preseamed garments and sections garments, Petitioner relies only on the embodiments of Reed's invention that are directed to preseamed garments *and* to preseamed sections of garments. Pet. 14 (citing Ex. 1006, 1:58–64); Reply 6–8; *see* Tr. 9:17–10:7, 16:17–17:8, 25:17–26:21, 30:4–11.

With respect to Nishida, Patent Owner contends that Nishida's web of material has two primary components: a backing and one or more layouts printed on or produced in the backing. PO Resp. 28–29 (citing Ex. 1009, 1:40–2:53, 3:6–26). The backing may be formed prior to the production of the layouts. *Id.* Patent Owner notes that Nishida seeks to improve on previously known methods for producing layouts, such as those described in German Patent No. 627 878. *Id.* at 28. Nevertheless, the reference to the German patent is exemplary, and we do not interpret Nishida as limited to the methods described in the German Patent. *See* Ex. 1009, 1:39–46 ("to further develop this previously known process"); Reply 8.

After the backing is formed, Nishida teaches printing on or producing layouts in the backing. Ex. 1009, 3:13–15. The layouts are printed by a

fabric printing process *onto* the backing or produced by a textile production process *inside* the backing. PO Resp. 29 (citing Ex. 1009, 1:50–56, 2:20–26, 3:13–15, 5:45–52); *see* Reply 9. "[T]he material can be woven or knitted in two or more layers or can be especially thick or additionally embroidered." Ex. 1009, 3:66–4:1.

As noted above, each of the embodiments of Reed, relied upon by Petitioner, describes the pre-seaming of garments or sections of garments *before* their removal from the cylindrical textile structure. The teachings of Nishida relied upon by Petitioner, do not teach pre-seaming and, instead, teach the seaming of the upper layout *after* its removal from the web of material. Ex. 1009, 4:19–30 (Figs. 2 and 3), 5:3–26 (Figs. 4 and 5); *see* Pet. 24; PO Resp. 31; Tr. 45:2–46:8. Patent Owner contends that Petitioner fails to explain why and how a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims. PO Resp. 36–41. In particular, because Petitioner relies on the teachings of the embodiments of Reed which describe pre-seamed garments and pre-seamed sections of garments and because Nishida does not teach pre-seaming, Patent Owner contends that Petitioner has not shown why and how a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims. For the following reasons, we agree.

*i. Failure of Proof*

Petitioner bears the burden of proving by a preponderance of the evidence that the challenged claims are unpatentable. This includes demonstrating by a preponderance of the evidence that a person of ordinary skill in the art would have had reason to combine the teachings of Reed and

Nishida to achieve the methods recited in the challenged claims. As noted above, Petitioner argues that a person of ordinary skill in the art would have had at least three reasons to combine the teachings of Reed and Nishida to achieve the methods recited in the challenged claims. Pet. 11–13; *see* Tr. 10:12–11:12. First, Petitioner argues that, because Reed teaches that its methods are applicable to "*all* types of garments" (Ex. 1006, 5:56–57 (emphasis added); *see* Ex. 1003 ¶ 131), a person of ordinary skill in the art would have had reason to apply the teachings of Reed to the processes and shoe parts of Nishida. Pet. 12 (citing Ex. 1003 ¶ 133). Second, Petitioner argues that, because both Reed and Nishida teach the advantages of reducing cost through the use of computer-controlled knitting machines, a person of ordinary skill in the art would have had reason to combine their teachings. *Id.* at 13 (citing Ex. 1003 ¶¶ 134–135). Third, Petitioner argues that a person of ordinary skill in the art would have had reason to apply Reed's methods for producing textile elements, from which to produce garments, to produce Nishida's shoe upper patterns. *Id.*; *see KSR*, 550 U.S. at 417. However, none of these reasons or any other reason identified by Petitioner addresses the differences between Reed and Nishida, specifically pre-seaming.

Independent claims 1 and 13 do not mention seaming or pre-seaming expressly. *See* Ex. 1001, 11:43–52 (claim 1), 12:27–43 (claim 13). Further, Patent Owner acknowledged that at least independent claims 1 and 13 do not mention seaming or pre-seaming. Tr. 37:7–10. Claims 2–9, 11, 12, 14–19, and 21 also do not mention seaming or pre-seaming expressly. *See* Ex. 1001, 11:51–57, 12:7–20, 12:29–32, 12:41–48. As we noted above, however, claims 11 and 21 recite "a unitary construction," which "is intended to express a configuration *wherein portions of a textile element are*

*not joined together by seams or other connections*." *Id.* at 6:42–46. Thus, we interpret the limitations of claims 11 and 21 to recite a textile element having areas of different textures, but without seams. *See supra* Section II.B.1. Moreover, under principles of claim differentiation, we further are persuaded that the scope of challenged claims 1–9 and 12–19 is broad enough to encompass methods related to both pre-seamed and unseamed garments and garment sections. Nothing in the Specification (Ex. 1001) or in the prosecution history (Ex. 1002) of the '749 patent overcomes the presumptive scope of the independent claims arising from the doctrine of claim differentiation. *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000).

Neither Petitioner nor its declarant, Mr. Holden addresses the fact that each of the relied upon embodiments of Reed teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming. PO Resp. 36–41; *see* Tr. 34:17–35:12; *see also* Ex. 2004, 161:5–163:19 (Mr. Holden was unable to identify teachings in Nishida directed to pre-seamed and preformed uppers). Moreover, during cross-examination, Mr. Holden acknowledged that he had not been asked to nor had he considered how the teachings of these references could be combined. In particular, the following colloquy occurred during Mr. Holden's deposition:

> Q. (By Mr. Harris) And isn't it also true that nowhere in your declaration do you describe how a person of ordinary skill in the art would create a preseamed and preformed footwear upper on a circular knitting machine?
>
> MS. WILLIAMS: Objection.
>
> THE WITNESS: I don't recall that there's any por- -- portion of that. Again, I was not asked to hypothesize on that particular point.

> Q. (By Mr. Harris) Okay. Just so I'm clear, you weren't asked to offer an opinion on how a person of ordinary skill in the art would create a preseamed and preformed footwear upper on a circular knitting machine; correct?
>
> A. I don't recall that I was asked that particular question.
>
> Q. Thank you.

Ex. 2004, 152:22–153:13; *see* Tr. 53:19–57:5.

In *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, our reviewing court found that where "[t]he expert failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims," such testimony "is not sufficient and is fraught with hindsight bias." 694 F.3d 1312, 1327 (Fed. Cir. 2012); *see* PO Resp. 58–60; Reply 27; *see also Hyundai Motor Co. v. Blitzsafe Texas, LLC*, Case IPR2016-01476, slip op. at 32 (PTAB Jan. 24, 2017) (Paper 12) ("A determination of obviousness cannot be reached where the record lacks 'explanation as to *how* or *why* the references would be combined to produce the claimed invention.'"; quoting *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016)). Despite Mr. Holden's testimony that a person of ordinary skill in the art would have had reason to combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims (*see* Ex. 1003 ¶¶ 131–137), Mr. Holden's testimony during cross-examination makes clear that he did not perform the necessary analysis to support his conclusions. *See* 37 C.F.R. § 42.65(a).

Petitioner's evidence, and, in particular, Mr. Holden's testimony, is deficient with respect to the limitations recited in claims 11 and 21, in that it fails to offer any explanation why a person of ordinary skill in the art would

combine the teachings of Reed and Nishida to achieve a method in which seams of the kind taught by Reed apparently are prohibited. Petitioner argues that Reed teaches the "a unitary construction" limitation of claims 11 and 21 either because the interconnecting stitches are a different texture from the rest of the garment or garment section or because the inner and outer circular knit materials may have different textures. Pet. 25–29, 31. Thus, Mr. Holden testifies in support that Reed's interknitted stitches, i.e., the joining seams, teach textures different from the remainder of Reed's finished garments or garment sections (Ex. 1003 ¶¶ 114–116) or that circular knit materials, although joined by seams, may have different textures (*id.* ¶ 117). These arguments and testimony seem inconsistent with Petitioner's position that *either* the finished garments *or* garment sections are the "textile element" recited in the challenged claims and that, in claims 11 and 21,

> the knitted textile element [is formed] to include a first area and a second area *with a unitary construction*, the first area being formed of a first stitch configuration, and the second area being formed of a second stitch configuration that is different from the first stitch configuration to impart varying textures to a surface of the knitted textile element.

Pet. 19–20, 25–29, 31 (emphasis added); *see* Tr. 16:17–17:12. These apparent inconsistencies are not explained.

Alternatively, Petitioner argues (Pet. 26–29, 31) and Mr. Holden testifies (Ex. 1003 ¶¶ 118–121) that the limitations of claims 11 and 21 are taught by Nishida. In particular, Mr. Holden testifies that Nishida describes that, "in the embodiment according to FIGS. 1 and 2, with layout 2 on the web of material 1, ***areas 26 and 27 are produced in a configuration***, color or style ***that is different from the other areas***." *Id.* ¶ 118 (quoting Ex. 1009, 4:6–9 (emphasis added by declarant)). Mr. Holden concludes from his

analysis of Nishida that "[a] person of ordinary skill in the art at least as of March 3, 2004 would have understood that Nishida's disclosure regarding varying the knit of individual areas would include having a substantially smooth texture in one area, and a rougher texture in another area." *Id.* ¶ 121. What Mr. Holden fails to explain, however, is how and why this teaching of Nishida is combined with the teachings of the relied upon embodiments of Reed to achieve the methods recited in claims 11 and 21. Petitioner and its declarant rely instead on the *general* arguments presented in connection with independent claims 1 and 13 regarding reasons to combine the teachings of Reed and Nishida. Pet. 11–13; Ex. 1003 ¶¶ 131–137. Given the language of the claims, our interpretation of that language, and the teachings of Reed and Nishida, we find Petitioner's arguments and evidence, especially Mr. Holden's testimony, insufficient and unpersuasive.

Consequently, having weighed Petitioner's evidence of reasons to combine the teachings of Reed and Nishida, noting the deficiencies in Mr. Holden's analysis in support of those reasons, we are not persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in art would have had reason to combine the teachings of Reed and Nishida to achieve the methods recited in the challenged claims.

*ii. Combined Teachings of Reed and Nishida Render Reed Inoperable for its Intended Purpose*

As our reviewing court has explained,

> "obviousness is a question of law based on several underlying factual findings," including what a reference teaches, and whether proposed modifications would change a reference's "principle of operation." Where "a patent claims a structure already known in the prior art that is altered by the mere

> substitution of one element for another known in the field, the combination must do more than yield predictable results." { "pageset": "S74 *However, combinations that change the "basic principles under which the [prior art] as designed to operate," or that render the prior art "inoperable for its intended purpose," may fail to support a conclusion of obviousness.*

*Plas-Pak Industries, Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 757–758 (Fed. Cir. 2015) (citations omitted, emphasis added).

As noted above, we find that the fundamental purpose of Reed's methods is to produce pre-seamed, finished garments or sections of garments. *E.g.*, Ex. 1006, 1:58–64, 3:8–21, 5:67–6:17; *see supra* Section II.C.2. As Reed explains, "[t]he essence of the present invention is a garment formed of juxtaposed sections of simultaneously knitted, *concentric* tubes *interconnected* by knitting." Ex. 1006, 6:25–28 (emphases added). As we also note above, the methods recited in challenged claims 1–9 and 12–19 do not specify whether or not the textile elements are pre-seamed. Thus, we interpret those claims broadly to cover both pre-seamed and unseamed textile elements.

As discussed above, however, claims 11 and 21 are interpreted to describe "a unitary construction," which does not include seams. *See supra* Section II.B.1. Thus, "a unitary construction" does not appear to read on Reed's pre-seamed, finished garment or garment section. Further, Petitioner does not argue that, like Reed, Nishida teaches pre-seamed uppers or sections of uppers or tongues. Consequently, we determine that, relying on Nishida's teachings to supply the "unitary construction" limitation with respect to claims 11 and 21 in the context of the teachings of Reed, as Petitioner suggests (Pet. 26–29, 31), would require the alteration of the

principles of operation of Reed or would render Reed inoperable for its intended purpose.

In response to Patent Owner's contention that Petitioner's combination of the teachings of Reed and Nishida renders Reed inoperable for its intended purpose, Petitioner argues that a person of ordinary skill in the art would understand that

> [t]o produce two single-layer layouts, the POSITA would simply cut along the garment side of stitches 22, 24 (highlighted in red below) so that all seams remain with the surrounding tube material, and the two layouts are no longer connected to each other after removal from the tubes 12, 14.

Reply 18–19 (citing Ex. 1006, 3:9–15, 5:67–6:3; Ex. 1003 ¶¶ 103, 112). In particular, Petitioner produces the following annotated version of Reed's Figure 1.



FIG. 1

Reply 19. Petitioner has annotated Reed's Figure 1 to add red lines indicating cut lines *on* the garment *inside* of stitches 22, 24. As depicted in annotated Figure 1, Petitioner argues that the finished garments or garment sections could be cut from the textile structure inside of the seams, as indicated by the red lines. *Id.* According to Petitioner, "[t]he two separated

layouts are then processed *and seamed* along the edges, as described in both Reed and Nishida." *Id.* (emphasis added). Nevertheless, Petitioner provides no explanation of why a person of ordinary skill in the art would have reason to seam the garments or garment sections, only then to remove the seams, so that the garments or garment sections could be reseamed later. *Id.* at 18–19; *see* Tr. 59:21–60:12, 68:20–70:21.[11] We find these arguments contrary to the teachings of Reed and unpersuasive.

Consequently, with respect to challenged claims 11 and 21, we find that Petitioner's proposed combination of the teachings of Reed and Nishida would render Reed either inoperable or unsuitable for its intended purpose. Thus, we are not persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in art would have had reason to combine the teachings of Reed and Nishida to achieve the methods recited in challenged claims 11 and 21.

*6. Summary*

Based on our review of the arguments and evidence presented by each party, we conclude that Petitioner fails to demonstrate by a preponderance of the evidence that either of independent claims 1 and 13 is unpatentable as rendered obvious by the combined teachings of Reed and Nishida.

---

[11] Petitioner's counsel argue that Reed's seams may be used as an outline, but we do not find that Reed teaches that cuts are taught inside the outline to remove the seam from the garment section. Ex. 1006, 3:9–12 (*Interconnected* knitted stitches form *both* an outline and a seam joining the inner and outer tubes.); *see* Tr. 70:2–21. Cutting inside the seams of a finished garment would change a *finished* garment into an *unfinished* garment or a *seamed* garment section into an *unseamed* garment section and would appear entirely contrary to the teachings of Reed. *See* Ex. 1006, 3:15–21.

Moreover, at least because Petitioner's arguments for the obviousness of dependent claims 2–9, 11, 12, 14–19, and 21 over Reed and Nishida rely on the arguments and evidence presented with respect to independent claims 1 and 13, we also conclude that Petitioner fails to demonstrate by a preponderance of the evidence that any of the dependent claims is unpatentable as rendered obvious by the combined teachings of Reed and Nishida. We further determine that for the additional reasons set forth above, Petitioner fails to demonstrate by a preponderance of the evidence that claims 11 and 21 are rendered obvious by the combined teachings of Reed and Nishida.[12]

## III. SUMMARY

We are not persuaded that Petitioner demonstrates by a preponderance of the evidence that any of claims 1–9, 11–19, and 21 of the '749 patent is rendered obvious over the combined teachings of Reed and Nishida.

## IV. ORDER

It is, therefore,

ORDERED that, pursuant to 35 U.S.C. § 318(a), Petitioner fails to demonstrate by a preponderance of the evidence that any of claims 1–9, 11–19, and 21 is unpatentable as rendered obvious over the combined teachings of Reed and Nishida; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

[12] Patent Owner also contends that Reed teaches away from its combination with Nishida (PO Resp. 46–48; *but see* Reply 19–20), in view of our determinations above, we need not reach this contention.

Trials@uspto.gov
571-272-7822

Paper 21
Entered: October 19, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

adidas AG,
Petitioner,

v.

NIKE, Inc.,
Patent Owner.

---

Case IPR2016-00922
Patent 8,266,749 B2

---

Before JOSIAH C. COCKS, MICHAEL J. FITZPATRICK, and JAMES B. ARPIN, *Administrative Patent Judges.*

FITZPATRICK, *Administrative Patent Judge*, concurring.

I concur with the majority's decision that Petitioner did not meet its burden under 35 U.S.C. § 318(a) to prove by a preponderance of the evidence that the challenged claims are unpatentable. I would reach that decision, however, merely for the reasons set forth below.

Reed did not invent circular knitting. Reed notes that "[c]ircular knitting machines have been used to make tubular, knitted garments, such as ladies' stockings, sweaters and other garments." Ex. 1006, 1:33–35. Reed explained further that "[i]n these tubular garments, the user's anatomy is in the center of the single tube." *Id*. at 1:35–37. Reed further explained that circular double knitting, in which two tubes or layers are simultaneously knitted, was also known in the prior art. *Id*. at 1:37–39 ("'Two tube,' 'double layer,' 'Bi-knit' and 'duo-fold' fabrics have been produced on circular knitting machines."). As with circular knit single-tube garments, the tubes of circular knit double-tube garments surrounded the anatomy of the user. *Id*. at 1:39–44.

What Reed invented was circular double knitting of garments in which "the anatomy of the user would fit between the single knitted fabrics instead of in the center of the tubes." *Id*. at 1:67–2:1. Figure 1 of Reed is reproduced below.



FIG. 1

Figure 1 of Reed, reproduced above, shows a doubled-layered tube of knitted structure 10 as it would come off a circular knitting machine in accordance with a preferred embodiment of Reed. *Id*. at 2:66–3:3. "[T]ubes 12 and 14 are simultaneously knitted concentrically on a circular double knit machine." *Id*. at 3:3–5. The tubes are stitched together along interconnecting knitting 22, thereby forming the outline of three skirts 16, 18, and 20 that are subsequently cut out from the knitted structure.[13] *Id*. at 3:8–21. Reed explains:

> [T]he knitted structure 10 includes (around its circumference) a plurality of finished garments [i.e., three skirts] which need only be severed from the structure 10 and turned inside out if a hidden seam is desired. Only a minimum amount of additional sewing is required to form hems and attach various decorative ornaments to complete a finished garment.

*Id*. at 3:15–21. Reed states that its invention "produce[s] a preformed and preseamed fabric on a circular knitting machine so as to reduce time, cost and labor involved in making garments." *Id*. at 6:20–22.

As stated in the majority opinion, Nishida is directed to the production of a shoe upper by (1) cutting out a layout in the form of the shoe upper from a web of material and (2) shaping the shoe upper by connecting material parts of the layout by the formation of seams. *See* Ex. 1009, Abstract; *see also id.* at Fig. 2 (illustrating layout of shoe upper on web of material).

Petitioner argues the following:

> Reed's explicit statement that "[t]he present invention may be used to form all types of garments worn by men, women and children" (Ex. 1006, 5:56–57) in combination with

[13] The tubes also are stitched together along interconnecting knitting 24, but that "is merely to define the lower outline of the skirt upon which the pattern may be cut." Ex. 1006, 3:12–15.

> Reed's explicit reference to the fact that footwear items, such as stockings, were conventionally knit with circular knitting machines (Ex. 1006, 1:33–44), would have suggested to a person of ordinary skill in the relevant art at least as of March 3, 2004, that Reed's process could be used to form all types of articles of clothing including footwear, particularly since "clothing" is understood to refer to all things that people wear to cover their bodies. (Ex. 1003, ¶131.) Specifically, the skilled person would have understood Reed's reference to "all types of garments" to include tops, pants, shorts, skirts, dresses, suits, outerwear, underwear, footwear, headwear, nightwear, swimwear, and accessories (such as headbands, scarves, bandanas, handkerchiefs, neckties, gloves, cummerbunds, etc.). (Ex. 1003, ¶131.)
>
> With this understanding, the skilled person would have been motivated to use Reed's process to produce textile elements for all types of clothing, including forming textile elements to be incorporated into footwear as described in Nishida. (Ex. 1003, ¶132.)
>
> The skilled person would have found Nishida's process of manufacturing textile elements to be analogous art to Reed's process, as both are directed to methods of simultaneously forming textile elements within a surrounding textile structure using programmable and/or computerized single needle selection technology, removing the textile elements, and incorporating the textile elements into a wearable item. (Ex. 1003, ¶133.)

Pet. 11–12.

Petitioner's reasons to combine the prior art teachings are not persuasive. It is true that Reed states that its invention "may be used to form all types of garments" (Ex. 1006, 5:56–57), but that does not mean Reed provides a reason to use it in forming any specific type of garment, let alone part of a shoe. Petitioner attempts to provide such a reason by relying, not on a stated purpose of Reed's invention (which is what Petitioner asserts in

its obviousness challenge), but rather on what circular knitting machines traditionally had been used for prior to Reed's invention. *See* Pet. 12. More specifically, Petitioner relies on Reed's statement that, prior to Reed, circular knitting machines were used "to make tubular, knitted garments, such as ladies' *stockings*, sweaters and other garments." Ex. 1006, 1:33–35 (emphasis added); *see also* Pet. 12 (referring to "stockings" and citing Ex. 1006, 1:33–44). Petitioner extrapolates Reed's reference to "stockings" to footwear and then further to an upper of a shoe. However, there is an evidentiary gap jumping from "stockings" to footwear and an additional evidentiary gap subsequently jumping from footwear generally to a shoe's upper specifically. The cited testimony of Petitioner's declarant does not fill those gaps. It is merely repetitive of the arguments block-quoted above. *Compare* Pet. 11–12, *with* Ex. 1003 ¶¶ 131–33.

Nor could I fill those gaps if I wanted. To summarize, Reed (1) acknowledges that circular knitting of tubular garments in which the anatomy is placed inside a resulting tube of knitted structure was known prior to Reed; and (2) describes its invention of double circular knitting garments in which the anatomy is placed between layers of the resulting tube. *See, e.g.*, Ex. 1006, 3:25–31. Nishida's upper (*see, e.g.*, Ex. 1009, Fig. 2) is neither a "tubular garment" that could be made using a pre-Reed circular knitting method (*see* Ex. 1006, 1:33–37) nor a garment that could be "produce[d as] a preformed and preseamed fabric on a circular knitting machine" using Reed's invented circular knitting method (*see id*. at 6:20–22).

For these reasons, I concur with the majority's decision that Petitioner did not meet its burden under 35 U.S.C. § 318(a) to prove by a preponderance of the evidence that the challenged claims are unpatentable.

PETITIONER:

Mitchell G. Stockwell
Vaibhav P. Kadaba
Tiffany L. Williams
KILPATRICK TOWNSEND & STOCKTON LLP
mstockwell@kilpatricktownsend.com
wkadaba@kilpatricktownsend.com
tiwilliams@kilpatricktownsend.com

PATENT OWNER:

Christopher J. Renk
Michael J. Harris
BANNER & WITCOFF, LTD
crenk@bannerwitcoff.com
mharris@bannerwitcoff.com
bwlitdocket@bannerwitcoff.com