Nos. 2018-1180 and 2018-1181

# United States Court of Appeals for the Federal Circuit

**adidas AG,**
*Appellant*

**v.**

**NIKE, Inc**,
*Appellee*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
Nos. IPR2016-00921 and IPR2016-00922

## APPELLEE NIKE, INC.'S CORRECTED RESPONSE BRIEF

Christopher J. Renk
Michael J. Harris
Aaron P. Bowling
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Suite 3000
Chicago, IL 60606
Telephone: (312) 463-5000

*Attorneys for Appellee NIKE, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Appellee NIKE, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

   NIKE, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   NIKE, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   N/A

4. The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   N/A

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

   NIKE, Inc. is unaware of any other cases pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeals.

Date: April 12, 2018

/s/ Christopher J. Renk
Christopher J. Renk
*Counsel for NIKE, Inc.*

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ v

TABLE OF ABBREVIATIONS ........ vii

STATEMENT OF RELATED CASES ........ viii

STATEMENT OF THE ISSUE ON APPEAL ........ 1

STATEMENT OF THE CASE ........ 2

I. ADIDAS MISCHARACTERIZES THE PRIOR ART ........ 2

A. Reed's embodiments on which adidas relies are directed to preseamed garments or preseamed sections of garments ........ 2

B. Nishida does not teach preseamed embodiments of its invention ........ 6

II. ADIDAS MISCHARACTERIZES THE RECORD BELOW ........ 10

A. The Board did not identify any unseamed embodiments of Reed's invention ........ 10

B. adidas did not rely on unseamed embodiments in Reed at any phase of the proceedings, let alone "every phase" ........ 12

C. NIKE argued Reed's embodiments on which adidas relies are directed to preseamed garments or preseamed sections of garments ........ 13

D. adidas never argued the level of skill in the art is relatively high, and the Board never found the level is relatively high ........ 13

E. The Board did not find all of the *Graham* factors weigh toward obviousness ........ 15

SUMMARY OF THE ARGUMENT ........ 17

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 24

I. ADIDAS HAS NOT IDENTIFIED ANY LEGAL ERRORS, AND THE BOARD DID NOT COMMIT ANY LEGAL ERRORS ........ 24

A. The *Graham* factors do not "uniformly confirm obviousness as a matter of law" ........ 24

B. The Board's motivation-to-combine findings are not "flawed as a matter of law" .......... 26

C. The Board's non-obviousness conclusion is not "based on a legally and factually flawed reading of the record" .......... 28

D. The Board's findings on inoperability are not "legally flawed" .......... 31

II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FACTUAL FINDINGS THAT ADIDAS FAILED TO SHOW WHY AND HOW A POSITA WOULD HAVE COMBINED THE TEACHINGS OF REED AND NISHIDA TO ACHIEVE THE RECITED METHODS OF THE CHALLENGED PATENTS .......... 34

A. Substantial evidence supports the Board's determination that Reed does not disclose unseamed embodiments of its invention .......... 35

B. Substantial evidence supports the Board's determination that Nishida does not disclose preseamed embodiments of its invention .......... 38

C. Substantial evidence supports the Board's determination that adidas failed to demonstrate a motivation to combine .......... 40

D. Substantial evidence supports the Board's additional determinations regarding the Unitary Construction Claims .......... 48

E. The Board's decision satisfies *Princeton Vanguard* .......... 54

III. THE COURT SHOULD AFFIRM FOR THE ADDIITONAL REASON THAT THE LEVEL OF SKILL IN THE ART IS LOW .......... 54

IV. ALTERNATIVELY, THE COURT SHOULD AFFIRM AS TO ALL CLAIMS OF THE '749 PATENT BECAUSE THE BOARD INCORRECTLY DETERMINED REED OR NISHIDA DISCLOSE EACH LIMITATION OF THE INDEPENDENT CLAIMS .......... 56

A. Reed does not disclose "a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure" .......... 57

B. Nishida does not disclose "simultaneously knitting a textile element with a surrounding structure" .......... 58

C. Nishida does not disclose "a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure" .......... 60

V. ALTERNATIVELY, THE COURT SHOULD AFFIRM AS TO CLAIM 6 OF THE '598 PATENT BECAUSE THE BOARD INCORRECTLY DETERMINED NISHIDA DISCLOSES EACH LIMITATION OF THE CLAIM ............................61

CONCLUSION ..........................................................................................................63

## TABLE OF AUTHORITIES

### Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312, 1327 (Fed. Cir. 2012).................................................. 44, 45, 48

*Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016)........................................................................31

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016)........................................................................27

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017)........................................................................20

*Bosch Auto. Serv. Sols., LLC v. Matal*,
878 F.3d 1027 (Fed. Cir. 2017)................................................................. 22, 41

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017)........................................................................46

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018)........................................................... 22, 41, 48

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966) ...........................................................................................57

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)..........................................................................46

*In re Baxter Int'l, Inc.*,
678 F.3d 1357 (Fed. Cir. 2012)........................................................................30

*In re Chevalier*,
500 F. App'x 932 (Fed. Cir. 2013) .................................................................27

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
637 F.3d 1314 (Fed. Cir. 2011)........................................................................25

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir 2016)................................................................. 25, 26

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014)....................27

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012)....................56

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017).................... 20, 25, 43

*Microsoft Corp. v. Enfish, LLC*,
662 F. App'x 981 (Fed. Cir. 2016) ....................41

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)....................33

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
600 F. App'x 755 (Fed. Cir. 2015) .................... 32, 34

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015)....................54

*Purdue Pharma L.P. v. Depomed, Inc.*,
643 F. App'x 960 (Fed. Cir. 2016) ....................26

*Qualtrics LLC v. OpinionLab, Inc.*,
679 Fed. Appx. 1016 (Fed. Cir. 2017) (nonprecedential).................... 37, 40

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015)....................38

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
617 F.3d 1296 (Fed. Cir. 2010)....................31

*Velander v. Garner*,
348 F.3d 1359 (Fed. Cir. 2003).................... 22, 45

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016)....................27

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 706....................62

# TABLE OF ABBREVIATIONS

| Abbreviations | Explanation |
| --- | --- |
| adiBrief | Opening Brief of Appellant adidas AG (ECF No. 17) |
| adidas | Appellant adidas AG (Petitioner below) |
| NIKE | Appellee NIKE, Inc. (Patent Owner below) |
| Board | Patent Trial & Appeal Board, United States Patent & Trademark Office |
| POSITA | Person of ordinary skill in the relevant art at the time of the invention |
| The ’598 patent | U.S. Patent No. 7,814,598 to Dua *at al.* |
| The ’749 patent | U.S. Patent No. 8,266,749 to Dua *at al.* |
| The Challenged Patents | The ’598 patent and the ’749 patent |
| Nishida | U.S. Patent No. 5,345,638 to Nishida |
| Reed | U.S. Patent No. 3,985,003 to Reed |
| Holden Declaration | Declaration of Lenny M. Holden, submitted as Exhibit 1003 in support of the Petitions below |
| Unitary Construction Claims | Claims 4 and 11 of the ’598 patent and claims 11 and 21 of the ’749 patent |

## STATEMENT OF RELATED CASES

1. NIKE is unaware of any other appeals in or from these two *inter partes* reviews before this or any other appellate court.

2. NIKE is unaware of any other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeals.

## STATEMENT OF THE ISSUE ON APPEAL

1. Whether substantial evidence supports the Board's factual findings that adidas failed to show why and how a POSITA would have combined the teachings of Reed and Nishida to achieve the recited methods of claims 1–13 of the '598 patent and claims 1–9, 11–19, and 21 of the '749 patent.

## STATEMENT OF THE CASE

The Board resolved each of these *inter partes* reviews based on the factual finding that adidas failed to show why and how a POSITA would have combined the teachings of Reed and Nishida to achieve the recited methods in the Challenged Patents. The Board found adidas' alleged evidence "deficient," "unpersuasive," and "insufficient." The Board made these factual findings after evaluating the record and the parties' arguments over an 18-month proceeding and a 90-minute oral hearing. The Board explained these factual findings in a pair of well-reasoned Final Written Decisions, each over forty pages in length. The Board's factual findings are legally proper and supported by substantial evidence.

On appeal, adidas attempts to undermine the Board's well-grounded factual findings by manufacturing "legal error," raising new and unfounded arguments for the first time, and by mischaracterizing both the prior art and the record of the proceedings. NIKE addresses those mischaracterizations below.

### I. ADIDAS MISCHARACTERIZES THE PRIOR ART

#### A. Reed's embodiments on which adidas relies are directed to preseamed garments or preseamed sections of garments

Reed describes methods of making preseamed garments or preseamed sections of garments. (Appx17–19; Appx1335 at 1:8–11; Appx1336 at 3:8–21;

Appx1337 at 6:10–22.)[1] adidas incorrectly states throughout its brief that Reed discloses "unseamed" embodiments. (*E.g.*, adiBrief at 5–7, 21–23, 35, 37, 62.) Reed does not disclose any unseamed embodiments of its invention. Below NIKE provides an accurate description of Reed.

Reed explains its "invention uses an electronic circular double knitting machine programmed to simultaneously knit two concentric tubes . . . and additionally programmed to interconnect the two concentric tubes by a knit interlock stitch to form the outline of the design of a garment." (Appx1335 at 1:58–64.) The "resulting knitted structure will have two layers of single fabric knitted or seamed together in the shape of the desired garment wherein the anatomy of the user would fit between the single knitted fabrics." (*Id.* at 1:64–68.)

Figure 1 in Reed, reproduced below, shows a knitted structure as "it would come off a circular double knit knitting machine" in accordance with the invention. (Appx1330; Appx1335 at 2:66–68.) The knitted structure, labeled 10, has an inner tube, labeled 12, and an outer tube, labeled 14. (Appx1336 at 3:1–3.) The outer tube 14 is "concentric to, and encompasses, the inner tube 12." (*Id.*) The "tubes

---

[1] The Board's Final Written Decisions in these proceedings are nearly identical. (Appx1–49 and Appx50–101.) To avoid duplicative citations to identical portions of the decisions, NIKE cites to the Board's decision in IPR2016–00921 (Appx1–49), with the understanding that NIKE also refers to the identical portion of the Board's decision in IPR2016–00922 (Appx50–101).

12 and 14 are simultaneously knitted concentrically" on the circular double knit machine. (Appx1336 at 3:3–5.)




FIG. 1

In the example shown in Figure 1, the knitted structure 10 includes three garments which, for example, may be skirts 16, 18 and 20. (Appx1336 at 3:5–7.) The "garments 16, 18 and 20 are outlined by a plurality of interconnecting knitted stitches 22 and 24" that the circular double knitting machine stitches during the knitting process. (*Id.* at 3:8–9.) The interconnecting knitting forms the outline of the garments and "joins the inner tube 12 to the outer tube 14 so as to create a seam." (*Id.* at 3:9–12.) That is, the skirts are preseamed by the circular double knitting machine during the knitting process. (*Id.*) In this way, "the knitted structure 10 includes (around its circumference) a plurality of finished garments

which need only be severed from the structure 10 and turned inside out if a hidden seam is desired." (*Id.* at 3:15–19.)

Reed identifies a number of "objects of the invention," including providing "a method for preseaming and preforming knitted garments" and providing "a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." (Appx1335 at 2:19–40.) Reed states that all of the "objects of the invention" are "obtained" by producing a "preseamed fabric on a circular knitting machine so as to reduce time, cost and labor involved in making garments." (Appx1337 at 6:18–22.)

adidas cherry-picks two sentences from Reed to argue it discloses unseamed embodiments. (adiBrief at 7 (citing Appx1336 at 3:61–63; Appx1137 at 6:10–13).) Neither sentence discloses an unseamed embodiment of Reed's invention. (Appx1336 at 3:61–63; Appx1137 at 6:10–13.) Rather, the sentences are directed to garment sections that are preseamed. (*Id.*) The text surrounding the two sentences, shown in the table below, confirms the garment sections are preseamed. (Appx1336 at 3:63–68; Appx1337 at 6:13–17.)

| Excerpt Cited by Adidas | Immediately Following Sentence(s) |
|---|---|
| "If the two tubes 12 and 14 are knitted of two different fibers, the knitted section may form sections of a garment to be assembled in the regular manner." (Appx1336 at 3:61–63.) | "For example, the outside tube 14 may be a normal decorative fabric wherein the inner tube 12 may be formed of material such as lining. By *simultaneously knitting and interknitting the two layers*, a step is saved by producing a section of garment which is *prelined*." (Appx1336 at 3:63–68 (emphasis added).) |
| "If the present process is used to preform an exterior decorative fabric having a lining or inner-lining or interfacing attached thereto, the severed sections must be assembled and seamed by standard practices." (Appx1337 at 6:10–13.) | "By providing the lining or interfacing *already attached to the sections*, a substantial amount of time is saved in measuring, making, and cutting the original fabric and lining or innerlining as well as *stitching them together*." (Appx1337 at 6:13–17 (emphasis added).) |

Thus, as the Board found, each of Reed's embodiments on which adidas relies "describes the pre-seaming of garments or sections of garments *before* their removal from the cylindrical textile structure." (Appx33.) Reed does not disclose any unseamed embodiments of its invention. (*Id.*)

**B. Nishida does not teach preseamed embodiments of its invention**

Nishida teaches the production of a shoe upper.[2] (Appx1363 at 1:50–56, 2:1–10; Appx1364 at 3:27–4:46; *see also* Appx20–22.) adidas incorrectly states

[2] A shoe typically has two primary elements: an upper and a midsole/outsole structure. Tphe upper covers the foot. The midsole/outsole structure is below the upper between the foot and the ground.

throughout its brief that Nishida discloses preseamed layouts for shoe uppers. (*See, e.g.*, adiBrief at 7–8 and 46.) Nishida does not disclose any preseamed layouts. Nishida discloses only unseamed layouts that must be cut from preexisting webs of material and then folded and seamed to create shoe uppers. Below NIKE provides an accurate summary of Nishida.

Nishida teaches producing a web of material with two primary components – a preexisting backing and one or more layouts printed on or produced in the backing. (Appx1364 at 3:6–26.) The backing is formed prior to the production of the layouts. (Appx1363 at 1:48–2:53; Appx1364 at 3:6–26.) The backing "can be a conventionally used material formed, for example, of a warp and filling or a knitted fabric." (Appx1364 at 3:13–15.)

After the backing is formed, Nishida teaches printing layouts (with a fabric printing process) or producing layouts (with a textile production process) on or in the preexisting backing. (Appx1363 at 1:50–56, 2:20–26; Appx1364 at 3:13–15; Appx1365 at 5:45–52.) Nishida teaches layouts with different weave or knit types in different areas that correspond to different areas of the upper. (Appx1363 at 1:50–56, 1:57–59, 2:20–26; Appx1364 at 3:13–15; Appx1365 at 5:45–52.) Figure 2 of Nishida, reproduced below, shows an example of layouts printed or produced on or in a preexisting backing. (Appx1360; Appx1363 at 2:59–60.)

2/4 Fig. 2




After the layouts are printed or produced on or in the preexisting backing, each layout is cut from the web of material as a single cut-out unit. (Appx1363 at 2:1–5.) The cut-out unit includes the upper portion (*i.e.*, the portion surrounding the foot) and a related "sole part" portion (*i.e.*, the bottom surface of the upper that is under the foot). (*Id.* at 2:1–7.) The upper portion of the cut-out unit is first folded and seamed to create the upper. (Appx1364 at 3:27–4:46.) The related "sole part" is then "stitched or basted to the free outside edge" of the upper. (Appx1363 at 2:9–10; Appx1364 at 4:19–3.) That completed upper is "then brought into a gluing, injection or casting mold, in which a midsole and an outsole are molded by known measures." (Appx1364 at 4:43–46.)

adidas argues—for the first time in this appeal—that Nishida teaches preseamed layouts for shoe uppers. (adiBrief at 44–46.) adidas points to the

Abstract and one other sentence in Nishida. (*Id.*) Neither discloses preseamed layouts for shoe uppers. (*Id.*)

Nishida's Abstract provides the "sole part," which is the bottom surface of the finished upper, is "attached to the layout." (Appx1358.) But Nishida's "sole part" is not "attached to the layout" by preseaming, and the "sole part" of the layout is not preseamed to the upper portion of the layout. (Appx1363 at 1:48–2:10.) Instead, the upper and the sole part are "attached" because both are produced in the web of material and "remain connected" when cut out as a single "cut-out unit." (*Id.*)

The other sentence of Nishida that adidas cites states, "the material can be woven or knitted in two or more layers or can be especially thick or additionally embroidered." (adiBrief at 45 (citing Appx1364 at 3:67–4:1).) That sentence says nothing about preseaming the layouts before they are cut from the web of material. (Appx1364 at 3:67–4:1.) Rather, when read in context, that sentence is directed to the material for the preexisting web of material. (*Id.* at 3:62–4:1.) The full context provides:

> In the production of web of material 1, suitable measures can be used to make these upper areas so as to achieve the desired effects; for example, in this case, especially tension-proof fibers or yarns can be used. Optionally, in this case, the material can be woven or knitted in two or more layers or can be especially thick or additionally embroidered.

(*Id.*) Thus, as the Board found, Nishida does "not teach pre-seaming," but rather teaches "the seaming of the upper layout *after* its removal from the web of material." (Appx33.)

## II. ADIDAS MISCHARACTERIZES THE RECORD BELOW

### A. The Board did not identify any unseamed embodiments of Reed's invention

adidas incorrectly states, on five occasions, that the Board identified "unseamed embodiments" in Reed. (*See, e.g.*, adiBrief at 23, 35.) The Board made no such finding. The Board reached the opposite conclusion: every embodiment of Reed's invention, including every embodiment adidas relies on, is directed to preseamed garments or preseamed sections of garment. The Board stated, for example, "each of the embodiments of Reed, relied upon by Petitioner, describes the pre-seaming of garments or sections of garments *before* their removal from the cylindrical textile structure." (Appx32–34; *see also* Appx17.)

adidas cites a single sentence in the Board's decision, stripped from context, to argue the Board identified "unseamed embodiments." (adiBrief at 35 (citing Appx32), 61–62 (same); *see also* adiBrief at 21, 23, 27.) Below NIKE has reproduced and underlined the sentence, along with its surrounding context. In this passage, the Board addresses a legal technicality in response to one of NIKE's arguments. (Appx32.) The Board states:

> [NIKE] notes that "Reed states that his 'present invention relates generally to knitted garments and more particularly to a garment which is preseamed and preformed on a circular knitting machine.'" [NIKE] contends that this description of Reed's "present invention" limits the scope of Reed to preseamed garments made on circular knitting machines. Although this description may limit the scope of Reed's recited methods, the scope of Reed's teachings is broader than what Reed specifically refers to as the "present invention" and encompasses "the conventional methods involv[ing] superimposing two preexisting panels of material, forming a garment into those preexisting panels, cutting the shaped garment from the two preexisting panels, and then seaming the two cutouts together to create the final garment." Although Reed's teachings may be broader than preseamed garments and garment sections, Petitioner relies only on the embodiments of Reed's invention that are directed to preseamed garments and to preseamed sections of garments.

(Appx32–33.)

In other words, the Board merely explained Reed discloses everything in the four corners of the document, including one sentence describing prior art in the background section of the specification. (Appx32.) Reed includes a "Description of the Prior Art," in which Reed describes "conventional methods" of making clothes. (Appx32–33.) Reed states that, in the prior art, "clothing in the garment industry is generally made by superimposing one fabric over another, cutting it into panels to conform to the shape of the individual according to current fashion, seaming along the outer edges of the panel and attaching various parts, by stitching to form seams, until a complete garment is formed." (Appx1335 at 1:13–19.)

Those conventional methods are not embodiments of Reed's invention. To the contrary, Reed criticizes those conventional methods as inefficient uses of "time, cost and labor." (*Id.*; Appx1337 at 6:18–22.)

The Board never found, as adidas claims (adiBrief at 35), "that Reed broadly discloses . . . unseamed embodiments" of its invention. And although the Board observed Reed's reference to "conventional methods" of making clothes in its description of the prior art, adidas never relied, at any point in these proceedings, on Reed's description of the prior art to support its obviousness challenges. The Board found every embodiment of Reed's invention, which formed the basis of adidas' challenge, is directed to preseamed garments or preseamed garment sections. (Appx32–34.)

### B. adidas did not rely on unseamed embodiments in Reed at any phase of the proceedings, let alone "every phase"

adidas did not rely "upon Reed's unseamed embodiments in every phase of the proceeding," as it incorrectly contends in its brief. (adiBrief at 20.) As explained above, *supra* STATEMENT OF THE CASE I(A), Reed does not disclose any "unseamed embodiments" of its invention (Appx1335 at 1:8–11; Appx1337 at 6:19–23), nor did adidas rely on one. Instead, the Board determined that each embodiment identified by adidas throughout the proceeding—including those adidas reasserts on appeal (adiBrief at 20)—is directed to preseamed garments or preseamed garment sections. (Appx32–34.) *Supra* STATEMENT OF THE CASE II(A).

Moreover, adidas never argued the Challenged Patents were obvious based on the combination of Nishida and the "conventional methods" disclosed in one sentence of Reed's "Description of the Prior Art."

### C. NIKE argued Reed's embodiments on which adidas relies are directed to preseamed garments or preseamed sections of garments

adidas incorrectly states NIKE "did not argue that adidas limited its analysis to pre-seamed embodiments." (adiBrief at 38; *see also* adiBrief at 20.) NIKE repeatedly argued that every embodiment in Reed, including each embodiment on which adidas relies, is directed to preseamed garments or preseamed garment sections. (*E.g.*, Appx480 ("Reed is limited to using a circular knitting machine to make preseamed garments"); Appx483 ("Reed states that all of his "objects of the invention" are "obtained" by producing "a preformed and preseamed fabric on a circular knitting machine . . ."); Appx492 ("Reed never suggests its invention could be used for anything other than a specific and limited type of garment—a preseamed garment."); Appx499 ("Reed has a 'very specific function' of producing preseamed garments").)

### D. adidas never argued the level of skill in the art is relatively high, and the Board never found the level is relatively high

adidas incorrectly states it "argued that there was a relatively high level of ordinary skill in the art at the time of filing." (adiBrief at 9 (citing (Appx221–222, Appx278).) adidas cites to a portion of each of its IPR petitions, but nowhere in

those pages—or elsewhere in the record—does adidas argue for a "high" or "relatively high" level of skill in the art. (*Id.*) adidas' petitions merely recite a description of a *person* having ordinary skill in the art, without indicating whether that level of skill is low, high, or something in between. (*Id.*) Until filing this appeal, adidas never argued the level of skill in the art is "high" or "relatively high." As discussed below, *infra* ARGUMENT II(B), adidas waived that argument.

adidas also incorrectly states the Board determined the level of skill in the art is "high" or "relatively high." (adiBrief at 9, 13, 25, 31, 35, 50, 51.) The Board adopted adidas' description of a *person* of ordinary skill in the art, which NIKE did not dispute, but the Board never determined whether that person's level of skill is low, high, or something in between. (Appx11 ("we again adopt Petitioner's assessment of a *person* of ordinary skill in the relevant art") (emphasis added) (citing Appx348 n.3 (Institution Decision) ("we adopt Petitioner's assessment of a *person* of ordinary skill in the art", *i.e.*, one having "at least a few years of experience in the footwear industry, a broad understanding of shoemaking, and an understanding of [certain processes, methods, and requirements]."')).)

In fact, the Board expressly declined to address whether the level of skill in the art is low, high, or something in between: "regardless [of] whether the level of ordinary skill is deemed 'low' or 'high,' we are not persuaded that the relative

assessment of the level of ordinary skill in the art here affects our evaluation of Petitioner's arguments and evidence." (Appx30.)

### E. The Board did not find all of the *Graham* factors weigh toward obviousness

adidas incorrectly states the Board "applied the *Graham* factors and found that they all weigh toward obviousness." (adiBrief at 23; *see also* adiBrief at 29.) adidas fails to provide any record citations for this assertion. (*Id.*) In reality, the Board considered the *Graham* factors (Appx16), "reviewed the entirety of Petitioner's analysis and evidence" (Appx29), and then held adidas failed to meet its burden of demonstrating obviousness by a preponderance of the evidence (Appx39 ("having weighed Petitioner's evidence of reasons to combine the teachings of Reed and Nishida, noting the deficiencies in Mr. Holden's analysis in support of those reasons, we are not persuaded . . ."); Appx43).

To the extent adidas argues that the Board's factual findings, as applied to the *Graham* factors, weigh in favor of obviousness (adiBrief at 40 ("all of the fact-finding related to the four Graham factors falls in favor of adidas"))—this argument also fails. For example, adidas argues factor 1 (scope and content of the prior art) weighs in favor of obviousness because, according to adidas, the Board determined Reed and Nishida teach "exactly the [same] kind of post-cutting seams." (adiBrief at 29–30.) The Board found exactly the opposite. (Appx33 ("each of the embodiments of Reed, relied upon by Petitioner, describes the pre-

seaming of garments or sections of garments *before* their removal from the cylindrical textile structure. The teachings of Nishida, relied upon by Petitioner, do not teach pre-seaming and, instead, teach the seaming of the upper layout *after* its removal from the web of material").)

adidas also claims factor 3 (level of skill in the art) weighs in favor of obviousness, because, according to adidas, the Board found a "higher level of skill in the art." (adiBrief at 31.) As noted above, *supra* STATEMENT OF THE CASE II(D), the Board made no such finding. The Board never found that any, let alone all, of the *Graham* factors weigh in favor of obviousness.

## SUMMARY OF THE ARGUMENT

The Board's Decisions are the direct result of adidas' failure of proof. (Appx34–42.) adidas bore the burden of proving the Challenged Patents invalid by a preponderance of the evidence, and it failed to do so. (*Id.*) Specifically, the Board determined adidas failed to show "why and how a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims." (Appx33–34.) The Board found adidas' arguments and evidence "insufficient and unpersuasive." (Appx38–39.)

On appeal, adidas' arguments remain insufficient and unpersuasive. adidas relies on mischaracterizations of the record, manufactured "legal errors," and new, unfounded assertions raised for the first time. None of adidas' arguments have merit, and none of adidas' arguments cure its failure of proof below.

The Board found adidas failed to reconcile fundamental differences between Reed and Nishida. (Appx34–39.) Substantial evidence supports that finding. Reed teaches preseamed garments or preseamed sections of garments and Nishida teaches unseamed layouts formed on a preexisting backing material that are then cut-out, folded, and seamed. (Appx33–37.) *See supra* STATEMENT OF THE CASE I(A)–(B), II(E). adidas provided the Board with three conclusory reasons for *why* a person of skill in the art would allegedly combine the references, but, as the Board found, "none of these reasons or any other reason identified by [adidas] addresses

the differences between Reed and Nishida, specifically preseaming." (Appx35.) As the Board explained, "[n]either [adidas] nor its declarant, Mr. Holden, addresses the fact that each of the relied upon embodiments of Reed teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming." (Appx36.)

The Board also found adidas wholly failed to address *how* a POSITA would combine the references. (Appx34–39.) Substantial evidence supports that finding. adidas' expert, Mr. Holden, did not opine on how a POSITA would combine Reed's teaching of preseaming garments on a circular double knitting machine with Nishida's teaching of forming unseamed layouts in a preexisting backing material that are then cut-out, folded, and seamed. (Appx36.) In fact, Mr. Holden conceded during cross-examination that he was never asked—nor did he consider—how the teachings of these references could be combined:

> Q. (By Mr. Harris) And isn't it also true that nowhere in your declaration do you describe how a person of ordinary skill in the art would create a preseamed and preformed footwear upper on a circular knitting machine?
>
> THE WITNESS: I don't recall that there's any portion of that. Again, I was not asked to hypothesize on that particular point.
>
> Q. (By Mr. Harris) Okay. Just so I'm clear, you weren't asked to offer an opinion on how a person of ordinary skill in the art would create a preseamed and

> preformed footwear upper on a circular knitting machine; correct?
>
> A. I don't recall that I was asked that particular question.

(Appx2046–2047.)

The Board also found adidas failed to prove a motivation to combine because the combined teachings of Reed and Nishida render Reed inoperable for its intended purpose. (Appx39–42.) Substantial evidence supports that finding. The Board found adidas' arguments on this issue "contrary to the teachings of Reed and unpersuasive." (Appx41.) In short, the "fundamental purpose" of Reed is to "produce pre-seamed, finished garments or sections of garments." (Appx39–42.) Nishida's upper, however, cannot be preseamed on Reed's circular double knitting machine because the edges of Nishida that need to be seamed together to form the upper, or a portion of the upper, would be on the same panel; they would not be on juxtaposed panels such that the circular double knitting machine could seam them together *before* removal from the cylindrical textile structure. (*Id.*) Nishida's upper, if produced on Reed's circular double knitting machine, would need to be folded and seamed *after* it is cut from the cylindrical textile structure. (*Id.*) adidas did not provide any evidence to the contrary. (*Id.*) As noted above, adidas and its expert never even attempted to explain how a POSITA could possibly preseam Nishida's upper on Reed's circular double knitting machine.

adidas cannot overcome its failure of proof. adidas attacks the Board's factual findings by alleging a number of vague "legal errors." (adiBrief at 23–24, 27, 29, 33–35, 38–39, 41, 50–52, 57, 59, 65.) But each of those alleged errors lacks legal authority and is based on misrepresentations of fact. adidas also argues the Board's factual findings lack substantial evidence. Those arguments similarly fail because, in each instance, adidas either misrepresents the record or asks this Court to reweigh the same evidence and reach its own factual determination. (adiBrief at 40–65.) This Court routinely declines to do so, and the result should be no different here. *See, e.g.*, *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1362 (Fed. Cir. 2017) ("If a fact finding is supported by substantial evidence, we may not reverse it. We do not reweigh the evidence and reach our own factual determination regarding motivation.").

This Court's precedent and substantial evidence support the Board's findings that adidas failed to prove why and how a POSITA would have combined Reed and Nishida. *Metalcraft of Mayville, Inc. v. The Toro Co.,* 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("We agree with the district court that Toro provides no explanation or reasoning for concluding that one of skill in the art would have combined these particular references to produce the claimed invention. Without any explanation as to how or why the references would be combined to arrive at

the claimed invention, we are left with only hindsight bias that KSR warns against.") NIKE respectfully requests that this Court affirm.

## STANDARD OF REVIEW

adidas' articulation of the standard of review is deficient in two ways. First, adidas claims the Board "erred" or acted "improperly" by attributing discounted weight to the testimony of adidas' expert, Mr. Holden. (adiBrief at 26, 44, 47.) But adidas never sets forth or applies this Court's standard for reviewing the Board's evaluation of that testimony. (*Id.*)

This Court reviews Board evidentiary determinations for an abuse of discretion. *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1037 (Fed. Cir. 2017); *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 442 (Fed. Cir. 2015). Here, the Board held Mr. Holden "did not perform the necessary analysis to support his conclusions" (Appx37), and that his testimony was otherwise "deficient," "unpersuasive," and "insufficient." (Appx37–38.) This Court should not disturb those findings absent an abuse of discretion. *See, e.g.*, *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018) ("[T]he PTAB determined [petitioner's] expert's testimony was 'unsupported' and entitled to 'little weight' because he did not address or account for [key issues] 'anywhere in his opinion.' The PTAB [i]s entitled to weigh the credibility of the witnesses, and, thus, we decline to disturb these credibility determinations here."); *see also Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003).

Second, adidas asks this Court to misapply the substantial evidence standard as to the Board's factual findings. adidas suggests throughout its brief that this Court should reverse if there is not substantial evidence showing *no* motivation to combine. (*E.g.*, adiBrief at 40.) That places an improper burden on NIKE.

The Board determined, as a matter of fact, that adidas failed to prove by a preponderance of the evidence a skilled artisan would have or could have been motivated to combine Reed and Nishida. (Appx43.) On appeal, NIKE need not present evidence showing no motivation to combine. Instead, affirmance is proper if substantial evidence supports the Board's findings that adidas failed to show why and how a POSITA would have combined Reed and Nishida. *See, e.g.*, *Securus Techs., Inc. v. Glob. Tel*Link Corp.*, 701 F. App'x 971, 976 (Fed. Cir. 2017) (affirming Board's rejection of obviousness challenge where the "Board correctly observed that [petitioner's] proposed rationale to combine the teachings of [prior art] was simply too conclusory to satisfy its burden of proving by a preponderance of the evidence that the skilled artisan would have combined these references in the way of the claimed invention. . . . [petitioner] failed to explain how or why the skilled artisan would combine the teachings [and] [w]e agree with the Board that a broad characterization of [the prior art] as both falling within the same alleged field . . . without more, is not enough for [petitioner] to meet its burden of presenting a sufficient rationale to support an obviousness conclusion.")

# ARGUMENT

## I. ADIDAS HAS NOT IDENTIFIED ANY LEGAL ERRORS, AND THE BOARD DID NOT COMMIT ANY LEGAL ERRORS

adidas litters its Opening Brief with the terms like "legal error," "legally improper," and "legally flawed." (adiBrief at 23–24, 27, 29, 33–35, 38–39, 41, 50–52, 57, 59, 65.) But each of adidas' alleged "legal errors" is premised on misrepresented facts, unsupported by law, or both. Below NIKE addresses each alleged "legal error"—and why adidas' arguments should be rejected. *See Elbit Sys.*, 881 F.3d at 1359 ("Elbit improperly attempts to create legal error by selectively quoting from a portion of one of the PTAB's multiple findings analyzing why it found Elbit's expert unpersuasive, and we will not find legal error based upon an isolated statement stripped from its context.")

### A. The *Graham* factors do not "uniformly confirm obviousness as a matter of law"

adidas argues "the *Graham* factors uniformly confirm obviousness as a matter of law," and that the Board "committed legal error by finding facts that plainly weighed in favor of obviousness, yet concluding that the claims were non-obvious. (adiBrief at 29.) adidas misstates the record. As noted above, the Board never found that any of the *Graham* factors weigh in favor of obviousness. *Supra* STATEMENT OF THE CASE II(E). Nor did the Board reach factual findings that weigh in favor of obviousness. *Id.* Rather, the Board found adidas failed to prove

why and how a POSITA would combine the teachings of Reed and Nishida to achieve the recited methods of the challenged claims. (Appx33–34.)

adidas also fails to provide legal authority for its argument that the *Graham* factors are determinative of obviousness even in the absence of a motivation to combine. (adiBrief at 28–32.) Over its three-page discussion of alleged "legal error," adidas offers only one legal citation, which it cites for the generic proposition that a higher level of skill in the art generally favors obviousness. (*Id.* (citing *Innovention Toys, LLC v. MGA Entm't, Inc*., 637 F.3d 1314, 1323 (Fed. Cir. 2011).) That proposition is irrelevant here. (Appx30 (expressly declining to address whether level of skill is high or low).) *Supra* STATEMENT OF THE CASE II(D).

adidas' argument is also contradicted by this Court's precedent that holds a challenger's failure to demonstrate a motivation to combine is alone sufficient to support a finding of non-obviousness. *See, e.g.*, *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd*., 821 F.3d 1359, 1368 (Fed. Cir 2016) ("When an obviousness determination relies on the combination of two or more references, there must be some suggestion or motivation to combine the references"); *Metalcraft of Mayville*, 848 F.3d at 1367 ("[I]t is not enough for [challenger] to merely demonstrate that elements of the claimed invention were independently known in the prior art. Without any explanation as to how or why the references

would be combined to arrive at the claimed invention, we are left with only hindsight bias that KSR warns against."); *Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 966 (Fed. Cir. 2016) (Board did not err in finding Purdue failed to establish reason to combine the cited prior art where Purdue's expert opined generally on the interrelated teachings of the references, but did not explain how or why a POSITA would have been motivated to combine the references).

### B. The Board's motivation-to-combine findings are not "flawed as a matter of law"

adidas alleges "legal error" in the Board's determination that adidas failed to establish a sufficient motivation to combine. (adiBrief at 32–35.) But "[t]he presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact," *Intelligent Bio-Sys*, 821 F.3d at 1366, and the majority of adidas' argument is a challenge of the Board's factual findings. (adiBrief at 33 ("the record shows motivations for such a basic combination"), 34 ("there is an express motivation to combine Reed and Nishida" and "[t]his combination . . . is nothing more than common sense"), 35 ("[t]here is simply no basis to suggest that POSTIA would not be motivated . . .").) As discussed below, *infra* ARGUMENT II(C), substantial evidence supports these factual findings.

The only "legal error" adidas appears to allege is due to the Board's consideration of the "preseaming differences" between Reed and Nishida despite construing the non-Unitary Construction claims to encompass both preseamed and

unseamed layouts. (adiBrief at 32.) Here too, adidas fails to provide any relevant legal authority for this alleged "legal error." adidas' three-page argument contains three legal citations. (adiBrief at 32–35.) None of the cases supports adidas' argument. adidas first cites *In re Chevalier*, but that is an inoperability case in which motivation to combine was not disputed, and adidas fails to explain how the generic quoted sentence applies here. (adiBrief at 33.) adidas next cites *Perfect Web* and *Leapfrog* for the proposition that courts may consider common sense when evaluating obviousness. (adiBrief at 34.) That proposition does not support adidas' alleged "legal error," and adidas offers no explanation otherwise (*id*).

Instead, this Court's precedent requires the Board to consider fundamental differences between Reed and Nishida. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co*., 839 F.3d 1034, 1051 n.15 (Fed. Cir. 2016) (en banc) (when determining "whether a skilled artisan would be motivated to combine the slider toggle" in one reference with another reference, "statements regarding users preferring other forms of switches" were relevant, even though reference did not teach away). Considering fundamental differences in the references is necessary because the obviousness inquiry does not merely ask whether a POSITA "*could* combine these references," but instead asks whether "they *would* have been motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc*., 751 F.3d 1327, 1352 (Fed. Cir. 2014); *see also WBIP, LLC v. Kohler Co*., 829 F.3d 1317, 1337 (Fed. Cir. 2016).

For these reasons, the Board's constructions of the non-Unitary Construction Claims to encompass both preseamed and unseamed layouts does not help adidas overcome its failure to explain why and how a POSITA would combine Reed and Nishida despite the fundamental differences in their teachings. In other words, the Board did not err when it found adidas failed to establish a motivation to combine because "neither Petitioner nor its declarant, Mr. Holden, addresses the fact that each of the relied upon embodiments of Reed teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming." (Appx36.) The Court should reject adidas' argument.

### C. The Board's non-obviousness conclusion is not "based on a legally and factually flawed reading of the record"

In a single, undivided section titled "The Board's Conclusion of Non-Obviousness is Based on a Legally and Factually Flawed Reading of the Record," adidas sets forth a string of alleged "errors," claiming that various aspects of the Board's analysis and findings are "fatally flawed," have "no colorable basis," "violat[e] the requirements of [an unidentified section] of the APA" and are "legally improper and factually flawed." (adiBrief at 35–40.)

adidas' argument begins with three consecutive mischaracterizations of the record, followed by an application of irrelevant law. adidas claims: (i) "the Board found that Reed broadly discloses both preseamed and unseamed embodiments" (adiBrief at 35); (ii) "adidas repeatedly referenced these embodiments throughout

the proceeding" (*id.* at 39); and (iii) "NIKE did not argue that adidas limited its analysis to pre-seamed embodiments" (*id.* at 38). Each of those statements is incorrect, as discussed above, *supra* STATEMENT OF THE CASE II(A)–(C).

Those misstatements form the basis of three additional "legal errors" alleged by adidas. First, adidas claims the Board's motivation-to-combine conclusion is legally improper because it relies on an argument that was not "advanced by a party," *i.e.*, the argument that adidas identified only preseamed embodiments in Reed. (adiBrief at 38.) But NIKE *did* advance that argument below when it repeatedly asserted that all embodiments of Reed are directed to preseamed garments or preseamed garment sections. *Supra* STATEMENT OF THE CASE II(C).

Second, adidas claims the Board's motivation-to-combine conclusion is legally improper because the Board "ignore[d]" the unseamed embodiments of Reed's invention. (adiBrief at 39; *see also* adiBrief at 36 (the Board "overlooked" aspects of Reed's disclosure).) As explained above, *supra* STATEMENT OF THE CASE II(A), adidas relied upon certain embodiments in Reed as part of its obviousness challenge—which did not include the "conventional methods" disclosed in one sentence of Reed's "Description of the Prior Art." The Board addressed each of the embodiments adidas identified in Reed and determined that each of those embodiments is directed to preseamed garments or preseamed garment sections. *E.g.*, Appx33 ("[E]ach of the embodiments of Reed, relied upon

by Petitioner, describes the pre-seaming of garments or sections of garments before their removal from the cylindrical textile structure"). Notably, the Board cited and discussed each of Reed's embodiments that adidas cites in this appeal. (Compare adiBrief at 35–39 (citing Appx1335 at 1:58–64; Appx1336 at 3:61–4:9; Appx1337 at 6:10–17) to the Board's FWD at Appx17 (citing Appx1337 at 6:10–17); Appx19 (citing Appx1337 at 6:10–17); Appx27–28 (citing Appx1336 at 3:61–4:8); Appx33 (citing Appx1335, 1:58–64); Appx39 (citing Appx1335 at 1:58–64 and Appx1337 at 5:67–6:17)).

Third, adidas claims the Board "overlooked . . . the teachings in Nishida that the layout can be knitted together in more than one layer *before* it is cut from the surrounding textile element." (adiBrief at 36.) But adidas provides no additional discussion of that argument, nor does it provide a citation to Nishida. (*Id.*) To the extent adidas intended to cite to Appx1364, 3:67–4:1—which adidas cites elsewhere in its brief—the Board addressed that portion of Nishida in its Final Written Decision and concluded it does not teach a preseamed embodiment. (Appx21, Appx33.)

Because the Board did not "ignore" or "overlook" any of the embodiments on which adidas relies, adidas' argument is nothing more than a challenge to the Board's factual determination as to what each reference teaches. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012) ("the determination of what a reference

teaches is a question of fact"); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1303 (Fed. Cir. 2010) (same). As discussed below, *infra* ARGUMENT II(A)–(B), substantial evidence supports the Board's factual findings.

### D. The Board's findings on inoperability are not "legally flawed"

adidas alleges two "legal errors" in the Board's inoperability findings. (adiBrief at 57–61.) First, adidas quotes, without explanation, from *Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016), for the proposition that obviousness does not require "the features of a secondary reference [to] be bodily incorporated into the structure of the primary reference . . .") That legal proposition is irrelevant here. The Board never required the features of Nishida or Reed to be "bodily incorporated into the structure of the [other] reference." (*See* Appx39–42.) And, tellingly, adidas never cites to any portion of the Board's decision that allegedly violates this legal principle. (*Id.* at 57–58.)

Instead, the Board's inoperability determination follows a three-step analysis that accords with this Court's precedent. First, the Board found "the fundamental purpose of Reed's methods is to produce pre-seamed, finished garments or sections of garments." (Appx39.) Second, the Board found that Nishida does not teach preseamed embodiments (*e.g.*, Appx33 ("The teachings of Nishida, relied upon by

Petitioner, do not teach pre-seaming and, instead, teach the seaming of the upper layout *after* its removal from the web of material") and determined that adidas had conceded that Nishida discloses only unseamed embodiments (Appx40 (noting that adidas "does not argue that, like Reed, Nishida teaches pre-seamed uppers or sections of uppers or tongues" and that adidas relies on Nishida for the unseamed, limitation of [the Unitary Construction Claims])). Third, based on those two findings, the Board concluded that combining Reed with Nishida would "require the alteration of the principles of operation of Reed or would render Reed inoperable for its intended purpose." (*Id.*.)

The Board's analysis is similar to that affirmed by this Court in *Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 757–758 (Fed. Cir. 2015), where the Court explained that "combinations that change the 'basic principles under which the [prior art] as designed to operate,' or that render the prior art inoperable for its intended purpose,' may fail to support a conclusion of obviousness." adidas fails to even acknowledge the *Plas-Pak* decision, despite the Board's express reliance on that authority. (*See* Appx39.)

As a second legal error, adidas claims "the Board overlooked evidence presented by adidas in favor of attorney argument." (adiBrief at 59–61.) adidas mischaracterizes the record and the law. adidas' argument is premised on the incorrect assumption that adidas presented a *prima facie* case of invalidity. (*Id.*

(citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) ("The district court held that Apotex had established a prima facie case of obviousness because the patent examiner initially rejected the claims to amlodipine besylate for obviousness").) adidas never asserts it established a *prima facie* case of invalidity, nor does it cite any portion of the Board's decision that would confirm such a showing. To the contrary, the Board outright rejected adidas' evidence as "insufficient and unpersuasive." (Appx38.) Because adidas never made a *prima facie* case of invalidity, *Pfizer* is inapplicable. *See Pfizer*, 480 F.3d at 1360.

adidas also misstates the burden-shifting framework described in *Pfizer*. adidas suggests all inoperability arguments "ha[ve] to be supported by rebuttal evidence." (adiBrief at 59.) But the *Pfizer* court explains otherwise:

> This requirement does not in substance shift the burden of persuasion, because the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation. . . . It does not [] lessen or otherwise affect the burden of proof, nor does it require that unless the patentee introduces evidence . . . to establish non-obviousness, the patent challenger will necessarily prevail.

480 F.3d at 1360 (internal citations and quotations omitted). Thus, even if adidas had made a *prima facie* case of invalidity (which it did not), neither *Pfizer* nor the other cases cited by adidas support its argument that NIKE was required to submit rebuttal evidence to prevail on inoperability. *See id.*

Last, NIKE *did* come forward with evidence of inoperability: the Reed and Nishida references themselves and the testimony of Mr. Holden. (Appx499–502 (including more than 15 citations to the record).) The Board agreed with NIKE and expressly relied on that evidence (Appx39 (citing Appx1335 at 1:58–64; Appx1336 at 3:8–21; Appx1337 at 5:67–6:17; Appx1337 at 6:25–28)); it did not rely on "NIKE's unsupported attorney argument." (adiBrief at 59–61.) Nor did the Board "overlook evidence presented by adidas." (adiBrief at 59.) The Board considered adidas' arguments and found them "contrary to the teachings of Reed and unpersuasive." (Appx41.) As discussed in more detail below, *infra* ARGUMENT II(D)(2), substantial evidence supports the Board's conclusion regarding inoperability. *Plas-Pak*, 600 F. App'x at 757–758.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FACTUAL FINDINGS THAT ADIDAS FAILED TO SHOW WHY AND HOW A POSITA WOULD HAVE COMBINED THE TEACHINGS OF REED AND NISHIDA TO ACHIEVE THE RECITED METHODS OF THE CHALLENGED PATENTS

After removing the façade of "legal error," adidas' appeal is purely a request to revisit the factual determinations underlying the Board's findings that adidas failed to show why and how a POSITA would have combined the teachings of Reed and Nishida. adidas asks this Court to revisit five factual determinations, including: (i) the content disclosed in Reed; (ii) the content disclosed in Nishida; (iii) adidas failure to prove a motivation to combine Reed and Nishida generally; (iv) adidas' failure to prove a motivation to combine Reed and Nishida for

purposes of the Unitary Construction Claims; and (v) the inoperability of combining Reed and Nishida. Each of these factual determinations is grounded in the record and supported by substantial evidence. adidas' request to reweigh the facts should be rejected. *Arctic Cat*, 876 F.3d at 1362.

### A. Substantial evidence supports the Board's determination that Reed does not disclose unseamed embodiments of its invention

The Board determined each embodiment of Reed on which adidas relies is directed to preseamed—not unseamed—embodiments. adidas claims the Board's conclusion stems from an "outright misstatement of the disclosure of Reed" that "ignore[d]" the "unseamed embodiments" disclosed in Reed. (adiBrief at 36–40.)

adidas identifies two sentences from Reed that the Board allegedly "ignore[d]." (*Id.* (citing Appx1336 at 3:61–63, Appx1337 at 6:10–13).)[3] The Board, however, expressly considered and analyzed those portions of Reed. (Appx17 (citing Ex. 1006 at 6:10–17); Appx19 (citing Ex. 1006 at 6:10–17); Appx27–28 (citing Ex. 1006 at 3:61–4:8); Appx39 (citing 5:67–6:17).) The Board concluded those portions of Reed describe preseamed—not unseamed—embodiments. (Appx33 ("each of the embodiments of Reed, relied upon by

---

[3] adidas cites incorrect paragraphs and pages of Mr. Holden's testimony. (*E.g.*, adiBrief at 37 (citing to "Appx1221–1222 ¶122" and "Appx1233 ¶105").) The identified paragraphs of Mr. Holden's testimony cite only these two portions of Reed and the surrounding disclosure: Appx1336, 3:61–63 and Appx1337, 6:10–17. NIKE therefore addresses those portions of Reed.

Petitioner, describes the pre-seaming of garments or sections of garments before their removal from the cylindrical textile structure”).)

Substantial evidence supports the Board’s determination. First, adidas cites to Reed’s disclosure that “if the present process is used to preform an exterior decorative fabric having a lining or innerlining or interfacing attached thereto, *the severed sections must be assembled and seamed by standard practices*.” (adiBrief at 36–37 (quoting Appx1337, 6:10–13) (emphasis added by adidas).) As the very next sentence of Reed explains, these “severed sections” are preseamed:

> By providing the *lining or interfacing already attached to the sections*, a substantial amount of time is saved in measuring, making, and cutting the original fabric and lining or innerlining as well as *stitching them together*.

(Appx1337, 6:13–17 (emphasis added).) The next sentence further confirms the “severed sections” are preseamed:

> From the *preceding* description of the preferred embodiments, it is evident that the objects of the invention are obtained to produce a *preformed and preseamed* fabric on a circular knitting machine so as to reduce time, cost and labor involved in making garments.

(Appx1337, 6:17–22. *See*, *e.g.*, Appx17–18, Appx39, Appx46.)

Second, adidas cites to Reed’s disclosure that “[i]f the two tubes 12 and 14 are knitted of two different fibers, the knitted section may form sections of a garment to be assembled in the regular manner.” (adiBrief at 37 (citing Appx1336,

3:61–63.) Here too, the very next sentences of Reed confirm these "sections of a garment" are preseamed:

> For example, the outside tube 14 may be a normal decorative fabric wherein the inner tube 12 may be formed of material such as lining. By *simultaneously knitting and interknitting the two layers*, a step is saved by *producing a section of garment which is prelined*.

(Appx1336 at 3:63–68 (emphasis added). *See*, *e.g.*, Appx27–28.)

The Board also considered the testimony of adidas' expert, Mr. Holden, when reviewing these portions of Reed. (*E.g.*, Appx29–31, Appx36–39.) The Board found Mr. Holden's testimony "deficient," "insufficient," and "unpersuasive" (Appx37–39), and weighed his testimony accordingly (Appx31). In particular, the Board found Mr. Holden failed to "address[] the fact that each of the relied upon embodiments of Reed teaches pre-seaming." (Appx36.)

In sum, because the Board expressly considered each piece of evidence now reasserted by adidas, and because the Board "analyzed each reference, made detailed and reasoned findings regarding their disclosures, with specific citations to the references and the record, and also addressed, in detail, the expert testimony regarding each reference . . . the Board's factual findings are supported by substantial evidence." *Qualtrics LLC v. OpinionLab, Inc.,* 679 Fed. Appx. 1016, 1021 (Fed. Cir. 2017) (nonprecedential). (Appx32–33.)

### B. Substantial evidence supports the Board's determination that Nishida does not disclose preseamed embodiments of its invention

The Board determined Nishida "do[es] not teach pre-seaming, and instead, teach[es] the seaming of the upper layout *after* its removal from the web of material." (Appx33.) adidas challenges that determination, claiming the Board "ignored Nishida's multi-layer embodiment." (adiBrief at 45.) adidas' argument is apparently that Nishida's "multilayer" layout requires "preseaming" because "the sole part is attached to the layout" and therefore "the layers forming the layout must also be attached." (adiBrief at 45.) adidas' argument has no merit.

As a preliminary matter, adidas waived this argument. adidas never argued to the PTAB that Nishida taught preseaming such that a skilled artisan would be motivated to combine Nishida with Reed. (*See* Appx40 ("Petitioner does not argue that, like Reed, Nishida teaches pre-seamed uppers or sections of uppers"); Appx501 ("Petitioner does not argue in its petition that the layout of Nishida may be preseamed during the production process.").) Because adidas waived this argument, this Court need not address it. *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 450 (Fed. Cir. 2015) ("[I]t is important that the applicant challenging a decision not be permitted to raise arguments on appeal that were not presented to the PTAB . . . we hold Redline's arguments waived and need not address them.").

But even if the Court addresses adidas' waived argument, the Court should reject it. adidas cites two sentences in Nishida, both directed to a layout of multiple layers. (adiBrief at 45 (citing Appx1358 at Abstract and Appx1364 at 3:67–4:1.) The Board expressly considered and analyzed those portions of Nishida. (Appx20 (citing Abstract); Appx21 (quoting 3:66–4:1); Appx28 (citing Abstract); Appx33 (quoting 3:66–4:1 in its entirety).) After doing so, the Board determined Nishida does not teach preseaming. (*E.g.*, Appx33).

Moreover, adidas also fails to explain why it contends Nishida's disclosure of "material that can be woven or knitted in two or more layers or can be especially thick or additionally embroidered" constitutes preseaming. adidas points only to Mr. Holden's testimony for support. (adiBrief at 46–47.) But Mr. Holden's testimony—in addition to being deemed "deficient," "insufficient," and "unpersuasive" (Appx37–38)—actually supports the Board's conclusion. (*E.g.*, Appx2054–2055.) Mr. Holden conceded on cross-examination that Nishida does *not* teach preseaming:

> Q. Great. So point me to . . . where Nishida teaches using a circular knitting machine to preform and preseam a knitted upper for footwear. . . .
>
> WITNESS: Well, I don't see that they have preform and preseam . . . ."

(*Id.*)

For these reasons, substantial evidence supports the Board's determination that Nishida fails to teach preseamed embodiments. *Qualtrics,* 679 Fed. Appx. at 1021.

### C. Substantial evidence supports the Board's determination that adidas failed to demonstrate a motivation to combine

In addition to disputing the subject matter disclosed in Reed and Nishida, adidas also asks this Court to reverse the Board's motivation-to-combine finding for three additional reasons: (i) there exists an "express motivation to combine Reed and Nishida"; (ii) the Board improperly criticized and discounted Mr. Holden's "unrebutted testimony"; and (iii) the "level of skill in the art confirms obviousness." (adiBrief at 40–51.) Each argument fails.

#### 1. Reed and Nishida do not provide an express motivation to combine

adidas asserts Reed and Nishida contain an "express motivation to combine" because "[e]ach reference discusses knitting in multiple layers." (adiBrief at 41.) adidas cites to one sentence from each reference and concludes each reference discloses "almost identical" embodiments. (*Id.* (citing Appx1335 1:58–64; Appx1364, 3:67–4:1).) As discussed above, *supra* STATEMENT OF THE CASE II(E), the Board reached the opposite conclusion: all of Reed's embodiments are fundamentally different from all of Nishida's embodiments. (Appx33–35.) Substantial evidence supports that conclusion. *Supra* ARGUMENT II(A)–(B).

But even if Reed and Nishida did disclose the same general technique of "knitting in multiple layers," adidas provides no legal support for its argument that the references would therefore provide an "express motivation to combine." (*See* adiBrief at 41.) This Court has previously held such similarities insufficient to demonstrate a motivation to combine. *E.g.*, *Microsoft Corp. v. Enfish, LLC*, 662 F. App'x 981, 990 (Fed. Cir. 2016) (affirming finding of insufficient motivation to combine where challenger argued prior art references were directed to the same art or same techniques). adidas' argument fails for the same reasons here. *See id.*

### 2. The Board did not abuse its discretion in finding Mr. Holden's testimony insufficient and unpersuasive

The Board gave discounted weight to Mr. Holden's testimony after concluding Mr. Holden "did not perform the necessary analysis to support his conclusions," and that his testimony was otherwise "deficient," "unpersuasive," and "insufficient." (Appx30–31; Appx37–39). As noted above, *supra* STANDARD OF REVIEW, this Court reviews the Board's weighing of Mr. Holden's testimony for an abuse of discretion. *Bosch*, 878 F.3d at 1037; *Elbit*, 881 F.3d at 1358.

adidas does not allege, let alone demonstrate, that the Board abused its discretion. Instead, adidas generally claims the Board's handling of Mr. Holden's testimony was "improper" and "misplaced," and that the Board "erred by ignoring" the testimony. (adiBrief at 26, 44, 47.) For support, adidas simply regurgitates three arguments Mr. Holden presented to the PTAB. (*Id.* at 42–44.)

First, adidas reasserts Mr. Holden's testimony that it would have been obvious to apply Nishida's footwear teaching to Reed, because Reed's design may be used with "all types of garments," including "footwear items, such as stockings." (adiBrief at 42.) But as Administrative Law Judge Fitzpatrick explained in his concurrence, Reed does not teach knitted shoe uppers:

> Petitioner extrapolates Reed's reference to "stockings" to footwear and then further to an upper of a shoe. However, there is an evidentiary gap jumping from "stockings" to footwear and an additional evidentiary gap subsequently jumping from footwear generally to a shoe's upper specifically. The cited testimony of Petitioner's declarant does not fill those gaps. It is merely repetitive of the arguments block-quoted above. Nor could I fill those gaps if I wanted.

(Appx47–48.) Reed never suggests its invention could be applied to footwear, or anything except for a preseamed, tubular garment. (*Id.*; Appx1335 at 1:58–2:40.) The Board properly found Mr. Holden's testimony on this point insufficient and unpersuasive.

Second, adidas reasserts Mr. Holden's testimony that "the prospect of increased efficiency and less waste provides a further motivation to combine the two references." (adiBrief at 43.) But Mr. Holden's testimony omits a critical fact: the references achieve these benefits through their fundamentally different, incompatible methods. Reed achieves improved efficiency and reduced waste by creating preseamed garments. (Appx1337 at 6:18–22.) Nishida, on the other hand,

achieves improved efficiency and reduced waste by producing an unseamed layout with "parts of the web of material in the necessary, quality, thickness, multilayers, or the like" while "the remaining area of the web of material [*i.e.*, the cutting waste] can consist of a simple, lightweight, or inexpensive materials" rather than "expensive tubular material." (Appx1363 at 2:11–25.)

The fact that Reed and Nishida achieve their stated goals through completely different methods is important, because "knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the particular claimed method." *Metalcraft of Mayville*, 848 F.3d at 1367 (affirming no motivation to combine where both references "sought to solve the problem of transmission of shock loads . . . and specified conventional and telescope-type shock absorbers as methods [for doing so]").

Third, adidas reasserts Mr. Holden's conclusory testimony that both references are "directed to computer controlled knitting methods" and thus "modifying the knitting process to produce a shoe upper is nothing more than changing the machine programming." (adiBrief at 44.) adidas does not explain how a POSITA would "modify the knitting process," nor does adidas explain how Reed and Nishida could be combined. This Court repeatedly admonishes this type of conclusory testimony. For example, in *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, the Court explained:

> The expert failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims. Rather, the expert's testimony on obviousness was essentially a conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions. This is not sufficient and is fraught with hindsight bias."

694 F.3d 1312, 1327 (Fed. Cir. 2012); *see also Securus Tech.*, 701 F. App'x at 977 (a broad characterization of prior art references as falling within the same alleged field, without more, is insufficient to support a motivation to combine). Here too, the mere assertion that both references are "directed to computer controlled knitting methods" (adiBrief at 44) is insufficient to demonstrate a motivation to combine Reed and Nishida. *ActiveVideo*, 694 F.3d at 1327.

The Board also found the entirety of Mr. Holden's testimony insufficient because "none of these reasons or any other reason identified by Petitioner addresses the differences between Reed and Nishida, specifically pre-seaming." (Appx35; *see also* Appx36 ("Neither Petitioner nor its declarant, Mr. Holden, addresses the fact that each of the relied upon embodiments of Reed teaches pre-seaming and that none of the relied upon teachings of Nishida involves pre-seaming.").) Indeed, "Mr. Holden's testimony during cross-examination makes

clear that he did not perform the necessary analysis to support his conclusions." (Appx37).

adidas also argues it was improper for the Board to discount Mr. Holden's testimony after determining he satisfied the threshold level of skill in the art. (adiBrief at 44.) adidas cites no legal authority for this position. (*Id.*) To the contrary, this Court often affirms what the Board did here: giving diminished weight to conclusory or otherwise deficient testimony from a person of ordinary skill in the art. *E.g.*, *ActiveVideo*, 694 F.3d at 1327; *Velander*, 348 F.3d at 1371. (*See* Appx31 ("The issue here is not whether Mr. Holden is a person of ordinary skill in the art, but rather whether his testimony is of value to the panel.").) The Board did not abuse its discretion in finding Mr. Holden's testimony insufficient and unpersuasive.

For all of these reasons, the Board did not abuse its discretion by discounting the weight afforded to Mr. Holden's testimony.

#### 3. The Board did not abuse its discretion by considering Mr. Holden's cross-examination testimony

adidas next asserts the Board's consideration of Mr. Holden's cross-examination testimony is "misplaced." (adiBrief at 47–50.) Once again, instead of alleging or attempting to show an abuse of discretion, adidas makes general claims that the Board's analysis has "multiple flaws," is "deeply flawed," "reflects its apparent confusion over the scope of the Unitary Construction Claims," and

"simply [has] no basis." (*Id.*) In over four pages of argument, adidas provides only one legal citation: yet another case directed to the irrelevant proposition that "a reference must be considered for everything it teaches." (*Id.* at 50 (citing *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1349 (Fed. Cir. 2017)).

adidas alleges the Board took Mr. Holden's testimony out of context, treating the deposition as a "memory test[]," rather than relying strictly on the testimony in Mr. Holden's declaration. (adiBrief at 47–48.) adidas cites no legal authority for the proposition that inconsistent or shaky cross-examination testimony is an improper basis for discounting expert opinions. To the contrary, this Court treats "vigorous cross-examination" as a "traditional and appropriate means of attacking shaky but admissible evidence." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

Moreover, NIKE's cross-examination of Mr. Holden was not a "memory test." adidas' "memory test" argument suggests Mr. Holden provided testimony on an issue in his declaration, but forgot his opinion during cross-examination. But as the Board found, Mr. Holden never explained, in his declaration or elsewhere, how a POSITA could combine Reed's teaching of preseaming garments on a circular double knitting machine with Nishida's teaching of forming unseamed layouts in a preexisting backing material that are then cut-out, folded, and seamed. (Appx36–

37.) adidas has not identified any portion of Mr. Holden's testimony that answers this critical question.

In addition, NIKE provided Mr. Holden a copy of his declaration during cross-examination. (Appx1902 at 2:9.) NIKE frequently directed Mr. Holden to specific paragraphs of his declaration (*e.g.*, Appx1903 at 6:7; Appx1904 at 4:6; Appx1975 at 23:25; Appx1977 at 20:21; Appx1989 at 7:17; Appx2025 at 13:24; Appx2068 at 1:2), and NIKE permitted Mr. Holden to review his declaration in response to questions (Appx2026 at 2:20; Appx2068:1–Appx2069:7). In fact, Mr. Holden reviewed and quoted from some of the same paragraphs adidas now cites as part of his alleged "memory test." (adiBrief at 48 (citing Appx1239–1242, ¶131–138); Appx2068 at 1:25 (quoting Appx1241–1242 at ¶¶134–135).)

adidas next argues the Board erred by considering Mr. Holden's inability to explain how a POSITA would combine the preseaming embodiments of Reed with the unseamed embodiments of Nishida. (adiBrief at 48–50.) adidas argues that Mr. Holden's testimony was unnecessary because "the Board itself found that Reed is not limited to preseamed embodiments." (adiBrief at 49; *see also* adiBrief at 50.) As explained above, *supra* STATEMENT OF THE CASE II(A), the Board determined all embodiments of Reed's invention relied upon by adidas are directed to preseamed garments or garment sections. Thus, the Board did not err by considering Mr. Holden's inability to explain how a POSITA could possibly

combine Reed's preseamed embodiments with the teachings of Nishida. *ActiveVideo*, 694 F.3d at 1327 ("fail[ure] to explain how specific references could be combined rendered testimony "not sufficient and [] fraught with hindsight bias.").

Thus, adidas has not shown the Board abused its discretion by relying on Mr. Holden's cross-examination testimony when finding Mr. Holden "did not perform the necessary analysis to support his conclusions," and that his testimony was "deficient," "insufficient," and "unpersuasive." (*See* Appx37–38.) *Elbit Sys.*, 881 F.3d at 1358.

### D. Substantial evidence supports the Board's additional determinations regarding the Unitary Construction Claims

As noted above, the Board first rejected adidas' invalidity challenge as to all asserted claims for failure to show a motivation to combine Reed and Nishida; and then separately rejected adidas' invalidity challenge of the Unitary Construction Claims based on additional evidence of no motivation to combine and inoperability. (Appx42.) Substantial evidence supports these additional determinations for the Unitary Construction Claims.

#### 1. Substantial evidence supports the Board's determinations of a lack of motivation to combine Reed and Nishida to achieve the methods of the Unitary Construction Claims

The Board found adidas additionally failed to show a motivation to combine Reed and Nishida to achieve the methods of the Unitary Construction Claims

because the "unitary construction" limitation categorically excluded preseaming between the two areas of different texture—and preseaming is present in every embodiment adidas relies on in Reed. (Appx37–38.) The Board reasoned:

> Petitioner's evidence, and, in particular, Mr. Holden's testimony, is deficient with respect to the limitations recited in [the Unitary Construction Claims] in that it fails to offer any explanation why a person of ordinary skill in the art would combine the teachings of Reed and Nishida to achieve a method in which the seams of the kind taught by Reed are apparently prohibited."

(*Id.*) The Board considered adidas' arguments, and explained that neither of the embodiments adidas identified in Reed taught both the "unitary construction" and "different textures" limitations. (*Id.* ("These apparent inconsistencies are not explained.").) If adidas relied on Reed's interknitted stiches (*i.e.*, seams) as the "different texture," then Reed failed the "unitary construction" limitation. (Appx37.) If adidas relied on Reed's teachings of a decorative fabric and inner-lining as "different textures," then Reed also failed the "unitary construction" limitation. (Appx38.)

The Board also considered adidas' argument that Nishida teaches both the "unitary construction" and "different textures" limitations. (Appx38.) Without addressing whether Nishida sufficiently disclosed those limitations, the Board concluded that, regardless, adidas had still failed to explain "how and why this teaching of Nishida is combined with the teachings of the relied upon

embodiments of Reed to achieve the methods recited in [the Unitary Construction Claims].” (Appx38.)

adidas asserts two combinations of Reed and Nishida that allegedly result in a design with a unitary construction. (adiBrief at 52.) The first combination “simply extend[s] Reed’s methods to produce a shoe upper.” (*Id.*) This combination is premised on two incorrect and unsupported factual assertions: (i) that Reed “disclose[s] a textile element of unitary construction” (*i.e.*, an unseamed embodiment); and (ii) that Reed could be modified to produce such textile elements for use in a shoe upper. (*Id.*) As discussed above, *supra* STATEMENT OF THE CASE I(A), Reed discloses only preseamed embodiments of its invention; and, *supra* ARGUMENT II(C), substantial evidence supports the Board’s finding that adidas failed to show why and how a POSITA would modify Reed to produce a shoe upper.

adidas’ second proposed combination “involve[s] using Nishida’s disclosures of unitary construction to produce a shoe upper on Reed’s circular knitting machine.” (adiBrief at 52.) adidas again cites to the embodiment of Reed in which a decorative fabric on the outer layer is connected by interknitted stitches to a lining material on the inner layer. (*Id.* at 52–53.) As the Board found, and the substantial evidence shows, this embodiment of Reed discloses a preseamed garment section. *Supra* ARGUMENT II(A).

Finally, adidas claims that, although the Board adopted its proposed construction of the Unitary Construction Claims, the Board "fundamentally erred in failing to apply this construction" and requiring "an entire shoe upper that is seamless." (adiBrief at 54–56.) The Board never required "an entire shoe upper that is seamless." Instead, as explained above, the Board rejected adidas' argument as to Reed because neither of the two embodiments adidas identified in Reed teach both the "unitary construction" and "different textures" limitations of the Unitary Construction Claims. (Appx37–38.) Then, even if Nishida teaches the additional limitations of the Unitary Construction Claims, the Board held, the added limitation prohibiting seams between the areas of different textures further diminished a skilled artisan's motivation to combine Reed and Nishida. (Appx38.) In other words, adidas' evidentiary showing of motivation to combine was even more lacking with regard to the Unitary Construction Claims. (*Id*.)

In sum, adidas has not shown why and how a POSITA would be motivated to combine Reed and Nishida to achieve the methods claimed in the Unitary Construction Claims, and substantial evidence supports the Board's finding that adidas failed to meet its burden. (*See* Appx37–38.)

#### 2. Substantial evidence supports the Board's determination of inoperability

The Board determined, as a matter of fact, that combining Reed with Nishida would "require the alteration of the principles of operation of Reed or

would render Reed inoperable for its intended purpose." (Appx39–42.) The Board's conclusion is based on two findings: (i) "the fundamental purpose of Reed's methods is to produce pre-seamed, finished garments or sections of garments" (Appx39); (ii) Nishida does not teach preseamed embodiments, a fact that adidas conceded and relied upon when alleging that Nishida satisfied the limitations of the Unitary Construction Claims (Appx33; Appx40).

adidas again alleges, without specificity, that the Board's finding "is error." (adiBrief at 61.) adidas challenges the Board's finding for two reasons. (adiBrief at 61–62.) First, adidas claims the Board's inoperability conclusion is "diametrically opposed to its earlier finding" that Reed discloses conventional methods of creating garments. (adiBrief at 61–62.) But adidas fails to explain how Reed's reference to conventional methods in the "Description of the Prior Art" undermines the Board's finding that "the fundamental purpose of Reed's methods is to produce pre-seamed, finished garments or garment sections." (*See* Appx39.)

Second, adidas alleges that the Board "ignore[d] Reed's explicit teachings of unseamed embodiments." (adiBrief at 62.) As explained above, *supra* STATEMENT OF THE CASE I(A), Reed does not disclose unseamed embodiments of its invention. This argument is therefore meritless.

Finally, adidas reasserts its argument that Reed is operable with Nishida because a POSITA would understand the finished garment or garment sections could be cut from the textile structure *inside* of the seams. (adiBrief at 63–64.) Once cut, adidas argues a POSITA would process and seam the two separate layouts along the edges, as disclosed in Nishida. (adiBrief at 63–64.)

The Board rejected this argument for several reasons. (Appx40–42.) First, the Board found adidas "provides no explanation why a skilled artisan would have reason to seam the garments or garment sections, only to then remove the seams, so that the garment or garment sections could be seamed later." (Appx41.) In addition, while adidas argues that Reed's seams may be used as an outline, the Board held that nothing in the specification taught cutting inside the outline. (Appx41 n.12.) Moreover, the Board reasoned, cutting inside the seams of a finished garment or a seamed garment section would result in an unfinished garment or an unseamed garment section—which is "entirely contrary to the teachings of Reed." (Appx41-42 n.12.)

Taken together, none of adidas' arguments have merit, and adidas' arguments do not detract from the substantial evidence that supports the Board's inoperability finding.

### E. The Board's decision satisfies *Princeton Vanguard*

adidas incorrectly asserts the Board failed to satisfy the evidentiary requirements of Administrative Procedure Act, 5 U.S.C. § 706(2)(E), as applied in *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015). (*E.g.*, adiBrief at 39.) The Board examined the record as a whole, took into account the evidence that justifies and detracts from its opinion, and explained its decisions with sufficient precision, including the underlying fact findings and its rationale. *See Princeton Vanguard*, 786 F.3d at 970. (Appx29 (having "reviewed the entirety of Petitioner's analysis and evidence for both the independent and dependent claims, we highlight the following specific evidence and arguments for emphasis. . . [W]e have reviewed the entirety of Petitioner's analysis and evidence for independent claims 1 and 9, as well for dependent claims 2–8 and 10–13, and the supporting testimony of Mr. Holden."); Appx39 ("[H]aving weighed Petitioner's evidence of reasons to combine the teachings of Reed and Nishida, noting the deficiencies in Mr. Holden's analysis in support of those reasons, we are not persuaded that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art would have had reason to combine the teachings of Reed and Nishida."); Appx42.)

## III. THE COURT SHOULD AFFIRM FOR THE ADDIITONAL REASON THAT THE LEVEL OF SKILL IN THE ART IS LOW

This Court should also affirm the Board's findings of non-obviousness

because the Board failed to account for the low level of skill in the art. As noted above, *supra* STATEMENT OF THE CASE II(D), the Board never found a "high" or "relatively high" level of skill in the art. Instead, the Board declined to determine the level of skill in the art in light of its motivation-to-combine conclusion. (Appx30.)

The Board found a person of ordinary skill in the art will have "a few years of experience," with an "understanding of": (1) the product cycle for bringing a product to market; (2) "milestones" for reviewing upper material designs; (3) the ranges of "typical" construction methods; and (4) the "functional requirements" of footwear and "material choices" available. (Appx9.) Absent from the Board's description is any knitting experience, much less experience using knitting technologies or knitting machines to create knitted footwear uppers. (*Id.*)

Mr. Holden's cross-examination testimony shows that the level of skill is low. Mr. Holden confirmed that a person with just "a few years of experience in the footwear industry" would have no knitting experience. Mr. Holden, who has nearly forty years of experience in the footwear industry and who Petitioner contends has extraordinary skill in the art, testified that even today – thirteen years after the invention of the Challenged Patents – he has no meaningful knitting experience. For example, Mr. Holden admitted that he has never used knitting technologies to design or create knitted footwear uppers. (Appx1954 at 16–22;

Appx1965:22–Appx1967:3; Appx1967:23–Appx1968:14.) He admitted he has never operated or programmed a knitting machine. (Appx1964:19–Appx1965:15.)

Mr. Holden also admitted he has never removed a knitted upper from a web of material and processed it into a shoe. (Appx1967:4–18.) In fact, Mr. Holden testified he never would have been allowed to do any of those things because it would have been too "dangerous." (Appx1965:25–Appx1966:25; Appx1968:3–Appx1969:9.) If it was too "dangerous" for Mr. Holden with his nearly forty years of experience, a person with just a "few years of experience" would not have had any knitting experience, let alone experience using knitting technologies to create uppers.

In sum, the level of skill in the art is low, which increases the burden on adidas to establish obviousness based on Reed and Nishida. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366 (Fed. Cir. 2012). NIKE requests that the Court affirm for this additional reason.

## IV. ALTERNATIVELY, THE COURT SHOULD AFFIRM AS TO ALL CLAIMS OF THE ′749 PATENT BECAUSE THE BOARD INCORRECTLY DETERMINED REED OR NISHIDA DISCLOSE EACH LIMITATION OF THE INDEPENDENT CLAIMS

This Court should also affirm the Board's findings of non-obviousness of all challenged claims of the '749 patent because the Board failed to identify certain differences between the claimed subject matter and the prior art, which would further contribute to a finding of non-obviousness. *Graham v. John Deere Co. of*

*Kansas City*, 383 U.S. 1, 17–18 (1966) ("differences between the prior art and the claims at issue" point in favor of non-obviousness). Specifically, the challenged claims of the '749 patent require simultaneously knitting a textile element with a surrounding textile structure, where the textile element has a texture that differs from a texture in the surrounding textile structure. (Appx2170–2171 at 11:43–14:5.) Neither Reed nor Nishida discloses this limitation.

### A. Reed does not disclose "a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure"

Substantial evidence does not support the Board's finding that Reed discloses "a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure." (Appx75.) The Board does not cite to any portion of Reed that shows the knitted garment of Reed has at least one knitted texture that differs from a knitted texture in the surrounding textile structure. (Appx75 (citing Appx1337 at 5:3–18, 6:10–17; Appx1223–24 at ¶¶ 108–109).) Instead, the Board relies entirely on portions of Reed that explain the inner knitted tub and the outer knitted tube are stitched together with "interknitted" stiches to form the outline and seams of the garment. (*Id.*)

The portions of Reed cited by the Board do not say anything about the texture of the knitted garment or the texture of the surrounding knitted textile structure. (Appx1337 at 5:3–18, 6:10–17.) They do not provide that the knitted

garment has at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure. (*Id*.) They do not describe the texture of an "interknitted" stitch or a "non-interknitted" stitch. (*Id*.) They also do not provide that "interknitted" stitches are only used in the knitted garment and not in the surrounding areas of the knitted structure. (*Id*.) Mr. Holden testified that he could not define or describe an "interknitted" stitch, let alone explain what texture the stitch provides. (Appx1970:8–Appx1975:18.) In short, the Board fails to cite any evidence showing Reed discloses a knitted element that has at least one knitted texture that differs from a knitted texture in a surrounding knitted textile structure.

### B. Nishida does not disclose "simultaneously knitting a textile element with a surrounding structure"

Substantial evidence does not support the Board's finding that Nishida discloses "simultaneously knitting a textile element with a surrounding textile structure." (Appx74–75.) The Board's analysis suffers from the same mistakes initially made by the PTO examiner during prosecution of the '749 patent. There, the examiner initially rejected NIKE's claims as anticipated by Nishida, based on her incorrect belief that Nishida discloses simultaneously knitting a textile element and a surrounding structure. (Appx2408.) The examiner later withdrew that rejection in view of the arguments made by NIKE. As NIKE explained:

> Nishida fails to disclose a knitted textile element *simultaneously* formed with a knitted textile structure during a knitting process. Nishida discloses that layouts 2

> are printed, embroidered, woven, or knitted onto a pre-existing backing material 4. Specifically, Nishida discloses that layouts 2 are produced by "a fabric printing process ... on the web of material and/or by a textile production process inside the web of material." Because Nishida teaches that layouts 2 may be produced by a "fabric printing process ... on the web of material," Nishida necessarily teaches that the backing material for the web of material must be formed prior to the production of the layouts. In other words, the formation of Nishida's backing material must precede the printing of the layouts thereupon.

(Appx2430–2431 (quoting Appx1363 at 2:50–56).)

NIKE further explained that Nishida's description of the backing material—as a "conventionally used . . . lightweight material . . . produced like a gauze or with low to very low warp and/or filling gauge" (Appx1364 at 3:13–15; Appx1365 at 5:45–52)—required that the backing material be formed separately from the layouts themselves. (Appx2430.) NIKE also described how Nishida's disclosure of producing layouts "inside the web of material" and via "embroidery" further indicate that the layouts and the surrounding area are not formed simultaneously. (Appx2430–31 (citing Appx1365 at 5:27–31).) Finally, NIKE explained that "although Nishida discloses that the backing material can be 'a knitted fabric' and that the layouts may be 'knitted,' Nishida fails to disclose that these two processes occur simultaneously." (*Id.* (citing Appx1364 at 3:13–15).)

The examiner thereafter agreed Nishida failed to disclose a textile element and a surrounding structure that are simultaneously knitted. (Appx2449 ("Nishida

may disclose a web of material having different textures, but there is no clear disclosure of the textures differing such that the textile element has a texture which is different than the texture of the surrounding textile structure and that the textile element and the surrounding structure are simultaneously knitted.”); *see* Appx2466–2467).)

For these reasons, substantial evidence does not support the Board’s finding that Nishida discloses “simultaneously knitting a textile element with a surrounding structure.” (*See* Appx74–75.)

### C. Nishida does not disclose “a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure”

Substantial evidence does not support the Board’s finding that Nishida discloses “a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure.” (Appx75.)

Nishida “may disclose a web of material having different textures, but there is no clear disclosure of the textures differing such that the textile element has a texture which is different than the texture of the surrounding textile structure and that the textile element and the surround structure are simultaneously knitted.” (Appx2449.) Furthermore, the examiner during the original prosecution of the ’749 patent also explained that “Nishida does not provide any clear disclosure of where the differing textures are located.” (*Id.*) The Board relies on the same

excerpts of Nishida that the examiner considered and determined do not teach the limitations of claim 1. (Appx75 (citing Appx1363 at 2:12–20; Appx1365 at 5:27–44; Appx1225–1226 at ¶¶ 110–111).)

The portions of Nishida cited by the Board, as well as the remainder of Nishida, say nothing about the layouts being knitted simultaneously with a surrounding knitted textile structure. (Appx1363 at 2:12–20.) They also do not provide that the layouts have at least one *knitted texture* that differs from a *knitted texture* in the surrounding knitted textile structure. (*Id.*) Indeed, when Nishida is read in the context of its entire disclosure, Nishida discloses that its layouts are printed, embroidered, woven, or knitted on or in a preexisting backing material, just as the examiner found during prosecution. (Appx1358–1367.)

For these reasons, substantial evidence does not support the Board's finding that Nishida discloses "a knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure." (*See* Appx75.)

## V. ALTERNATIVELY, THE COURT SHOULD AFFIRM AS TO CLAIM 6 OF THE ′598 PATENT BECAUSE THE BOARD INCORRECTLY DETERMINED NISHIDA DISCLOSES EACH LIMITATION OF THE CLAIM

Claim 6 of the '598 patent recites that "wherein the step of mechanically manipulating includes forming apertures in the textile element." (Appx823 at 12:10–12.) The '598 patent specification discloses two types of "apertures," but

only one type of aperture is formed in the knitted element during the knitting process (i.e., during the step of mechanically manipulating a yarn) as required by claim 6. (Appx822 at 9:46–53, 10:15–18.) The ’598 patent teaches that this type of aperture “may be formed by omitting stitches at specific locations.” (*Id.*)

The only apertures described by Nishida, and thus the only apertures cited by the Board, are formed by piercing holes into the layout, with a separate piece of embroidery serving as a stencil to mark the appropriate locations to be pierced. (Appx26 n.11 (citing Appx1364 at 4:1–5, 4:31–38.)) Thus, Nishida does not teach apertures formed in the knitted element during the knitting process as required by claim 6, nor does the Board appear to rely on Nishida for that limitation. (*Id.*)

Instead, the Board claims that “forming apertures by omitting stiches was a well-known technique.” (Appx26 n.11.) This finding is not supported by substantial evidence. The Board cites two paragraphs in Mr. Holden’s declaration and to three pages in David Spencer’s “Knitting Technology” Guide. (*Id.* (citing Appx1276–1277 at ¶¶ 199, 200; Appx1364 at 4:1–5, 4:31–38; Appx1451; Appx1464; Appx1566).) Mr. Holden’s testimony states, in conclusory fashion, “a skilled person at least as of March 3, 2004 would have understood how a birds eye stitch is formed, and that it forms apertures in the knitted textile by omitting stitches.” (Appx1276. at ¶ 199.)

Nowhere does Mr. Holden or the Board explain why the mere reference to apertures on three of the 413 pages of Spencer render "forming apertures by omitting stiches [] a well-known technique." (Appx26 n.11.) Or why the mere reference to apertures in a general knitting reference like Spencer renders "forming apertures by omitting stiches" in a knitted footwear upper "a well-known technique." (*Id.*) Indeed, Mr. Holden's cross-examination contradicts the conclusory testimony of his declaration. (Appx1970–71 (testifying that he, one allegedly of extraordinary skill in the art, was unfamiliar with the Spencer reference before being hired in connection with these proceedings).)

Accordingly, substantial evidence does not support the Board's finding that "Nishida teaches the formation of apertures and that forming apertures by omitting stiches was a well-known technique." (Appx26 n.11.)

## **CONCLUSION**

Substantial evidence supports the Board's factual findings that adidas failed to show why and how a POSITA would have combined the teachings of Reed and Nishida to achieve the recited methods of the challenged claims. NIKE respectfully requests that this Court affirm.

Dated: April 9, 2018

Respectfully submitted,

/s/ Christopher J. Renk

Christopher J. Renk
Michael J. Harris
Aaron P. Bowling
BANNER & WITCOFF, LTD.
Ten South Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: (312) 463-5000
Email: crenk@bannerwitcoff.com
mharris@bannerwitcoff.com
abowling@bannerwitcoff.com

*Attorneys for Appellee NIKE, Inc.*

# United States Court of Appeals for the Federal Circuit

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on April 12, 2018 by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

Aaron P. Bowling
Name of Counsel

/s/Aaron P. Bowling
Signature of Counsel


| | |
|---|---|
| Law Firm: | Banner & Witcoff, Ltd. |
| Address: | 10 S. Wacker Drive, Suite 3000 |
| City, State, Zip: | Chicago, IL 60606 |
| Telephone Number: | 312.463.5000 |
| Fax Number: | 312.463.5001 |
| E-Mail Address: | abowling@bannerwitcoff.com |

# United States Court of Appeals
# for the Federal Circuit

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

☒ This brief contains __13,960_ words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐ This brief uses a monospaced typeface and contains __________ lines of text, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

2. This brief complies with the typeface requirements of the Federal Rules of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ This brief has been prepared in a proportionally spaced typeface using ____Microsoft Word_____ in __14pt Times New Roman___ font, or

☐ This brief has been prepared in a monospaced typeface using ______________________________ [*state name and version of word processing program*] with ______________________[*state number of characters per inch and name of type style*].

Date: April 12, 2018

_/s/ Aaron P. Bowling___

Aaron P. Bowling
*Attorney for Appellee NIKE, Inc.*