2018-1180; 2018-1181

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

adidas AG,

*Appellant,*

v.

Nike, Inc.

*Appellee.*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
in Nos. IPR2016-00921 and IPR2016-00922

# MOTION BY APPELLANT ADIDAS AG FOR REMAND IN VIEW OF INTERVENING AUTHORITY

Mitchell G. Stockwell
Vaibhav P. Kadaba
Tiffany L. Williams
Michael T. Morlock
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(404) 815-6500
(404) 815-6555
mstockwell@kilpatricktownsend.com
wkadaba@kilpatricktownsend.com
tiwilliams@kilpatricktownsend.com
mmorlock@kilpatricktownsend.com

*Counsel for Appellant*

# CERTIFICATE OF INTEREST

Counsel for adidas AG certifies the following:

1. The full name of every party represented by us is:

**adidas AG**

2. The name of the real party in interest represented by us is:

**Same.**

3. Parent corporations and publicly held companies that own 10% or more of the stock in the party:

**None.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**None.**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

**14-1719 Nike, Inc. v. adidas AG (Chen)**
**IPR2013-00067 adidas AG v. Nike, Inc.**

Date: May 24, 2018

*/s/ Mitchell G. Stockwell*
Mitchell G. Stockwell

## TABLE OF ABBREVIATIONS

| **Abbreviation** | **Explanation** |
|---|---|
| adidas | Appellant adidas AG (Petitioner below) |
| Nike | Appellee Nike, Inc. (Patent Owner below) |
| PTAB or Board | Patent Trial & Appeal Board, United States Patent & Trademark Office |
| The '598 Patent | U.S. Patent No. 7,814,598 to Dua *et al*. |
| The '749 Patent | U.S. Patent No. 8,266,749 to Dua *et al*. |
| The Challenged Patents | The '598 Patent and the '749 Patent |
| Nishida | U.S. Patent No. 5,345,638 to Nishida, Exhibit 1009 below |
| Reed | U.S. Patent No. 3,985,003 to Reed, exhibit 1006 below |
| Castello | U.S. Patent No. 4,038,840 to Castello, Exhibit 1007 below |
| Fujiwara | U.S. Patent No. 6,330,814 to Fujiwara, Exhibit 1008 below |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ....... i

TABLE OF ABBREVIATIONS ....... ii

SUMMARY ....... 1

ARGUMENT ....... 1

I. The Board's Decisions did not Address All Grounds adidas Raised....... 1

II. Intervening Legal Authority Requires Consideration of All Grounds....... 2

A. The Reasoning in *SAS* Applies to All Grounds and All Claims....... 3

B. The Board's Interpretation of *SAS* Also Applies to All Grounds. ....... 4

III. Unless this Court Outright Reverses the Board, it Should Remand to Require the Board to Address the Second Ground adidas Raised. ....... 5

IV. There was an Intervening Change in Law Precluding any Argument that this Issue was Waived. ....... 7

CONCLUSION ....... 10

CERTIFICATE OF CONFERENCE....... 11

CERTIFICATE OF SERVICE ....... 12

CERTIFICATE OF COMPLIANCE....... 13

# TABLE OF AUTHORITIES

## Federal Cases

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008)........................................................6, 8

*Bradley v. School Board*,
416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)..........................................7

*Cuozzo Speed Technologies, LLC v. Lee*,
136 S. Ct. 2131 (2016)........................................................................9

*Forshey v. Principi*,
284 F.3d 1335 (Fed. Cir. 2002)...............................................................9

*Halpern v. Principi*,
384 F.3d 1297 (Fed. Cir. 2004)...............................................................5

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016)...............................................................8

*Harper v. Va. Dep't of Taxation*,
509 U.S. 86 (1993).............................................................................5

*Heartland By-Products, Inc. v. United States*,
568 F.3d 1360 (Fed. Cir. 2009)...............................................................6

*Hormel v. Helvering*,
312 U.S. 552 (1941)............................................................................9

*HP Inc. v. MPHJ Tech. Inv., LLC*,
817 F.3d 1339 (Fed. Cir. 2016)...............................................................8

*In re Micron Tech., Inc.*,
875 F.3d 1091 (Fed. Cir. 2017)..............................................................10

*Los Angeles Cty. v. Humphries*,
562 U.S. 29 (2010).............................................................................6

*Mankes v. Vivid Seats Ltd.*,
822 F. 3d 1302 (Fed. Cir. 2016)..............................................................9

*NLRB v. Food Store Emps. Union, Local, 347*,
417 U.S. 1 (1974) ........................................................................................7

*SAS Institute, Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ........................................................................ passim

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004)...........................................................................6

*Synopsys, Inc. v. Mentor Graphics Corp*.,
814 F.3d 1309 (Fed. Cir. 2016)...........................................................................8

*Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp*.,
75 Fed. App'x 765 (Fed. Cir. 2003).....................................................................6

**State Cases**

Fed. Cir. R. 27(a)(5)........................................................................................11

Fed. Cir. R. 27(e) and (f)...................................................................................8

Fed. Cir. R. 27(g) ..............................................................................................8

**Cases**

28 U.S.C. § 2106...............................................................................................10

35 U.S.C. § 318(a) ..............................................................................................8

## SUMMARY

The Supreme Court's recent decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018), changed the controlling law to require the Board to either institute on all challenged claims or not institute at all. The Supreme Court's reasoning in *SAS* – that the Petition controls the scope of the proceeding – likewise requires that the Board institute on all grounds raised in the Petition.

Here, the Board did not consider every ground adidas raised. Rather the Board provided only cursory statements about Petitioner's second ground and declined to institute on that ground. That is inconsistent both with the Supreme Court's decision in *SAS* and the Patent Office's guidance for how the Board will apply *SAS*. If this Court does not outright reverse the Board's final written decision by finding that all claims are obvious, it should exercise its authority to remand the proceeding to the Board for full consideration of all grounds raised in the Petition, consistent with the Supreme Court's reasoning in *SAS*.

## ARGUMENT

### I. The Board's Decisions did not Address All Grounds adidas Raised.

adidas's Petitions for *inter partes* review identified two distinct grounds for review, Ground 1: Reed combined with Nishida, and Ground 2: the combination of Castello, Fujiwara, and Nishida. Ex. A, Appx348; Ex. B, Appx372. The Board

instituted a proceeding on Ground 1, but did not institute on Ground 2. *Id.* at Appx360-362; Appx385-387.

The Board did not analyze the merits of Ground 2. Rather, the Board suggested that there were too many citations to the three references for each claim element. *Id.* at Appx361; Appx385. It found insufficient "particularity" as to whether adidas had "identifie[d] the limitations of the claim in the prior art" and criticized the Petition for not "articulat[ing] whether it contends that the teachings of Castello and Fujiwara are cumulative of one another, cumulative of Nishida, or both." *Id.* at Appx361; Appx385-386. Based on this criticism, the Board declined to institute on Ground 2. *Id.*

## II. Intervening Legal Authority Requires Consideration of All Grounds.

The Supreme Court recently issued a decision that requires that the Board institute IPR on all challenged claims or not institute at all. *SAS*, 138 S. Ct. at 1354 ("So when § 318(a) says the Board's final written decision 'shall' resolve the patentability of 'any patent claim challenged by the petitioner,' it means the Board *must* address *every* claim the petitioner has challenged." (emphasis original)). The Supreme Court's reasoning is equally applicable to the situation here, where the Board instituted on all claims challenged in the petition, but not on all grounds raised in the petition.

### A. The Reasoning in *SAS* Applies to All Grounds and All Claims.

The Supreme Court's reasoning in *SAS* extends beyond requiring institution on all challenged *claims*, it requires the Board to institute on all challenged *grounds*, or not institute at all. In *SAS* the Supreme Court repeatedly emphasized that the scope of an IPR is controlled by the Petition, and not by the Director's authority. The statute that authorizes IPR "envisions that a petitioner will seek an inter partes review of a particular kind—one guided by a petition describing 'each claim challenged' and 'the grounds on which the challenge to each claim is based.'" *Id.* at 1355 (quoting 35 U.S.C. § 312(a)(3)). "Nothing suggests the Director enjoys a license to depart from the petition and institute a *different* inter partes review of his own design." *Id.* at 1356 (emphasis in original).

The Supreme Court applied this reasoning to find that the Board, acting through authority given by the Director, does not have authority to institute review on only *some* challenged claims, but instead must institute on *all* claims challenged by the Petition. *Id*. at 1354. The same reasoning – that the Petition controls the scope of review – is equally applicable to the proposition that all grounds raised in the Petition must be instituted. The Supreme Court suggested as much by reasoning that the *ex parte* reexamination statute "allows the Director to institute proceedings on a claim-by-claim and ground-by-ground basis. But Congress didn't choose to pursue that known and readily available approach" in the IPR

statute. *Id.* at 1356. Indeed, the Supreme Court explained that the "text [of the statute] says only that the Director can decide 'whether' to institute the requested review—not 'whether and to what extent' review should proceed." *Id*. (quoting 35 U.S.C. § 314(b)). Overall, "the statute tells us that the petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion." *Id.* at 1357.

Under the logic of *SAS*, if the Board chooses to institute a trial, it must do so on all claims challenged, and grounds raised, in the Petition.

### B. The Board's Interpretation of *SAS* Also Applies to All Grounds.

The Board itself has interpreted *SAS* to require institution on all grounds as well as all claims. Shortly after the *SAS* decision, the Patent Office issued new guidance stating that "if the PTAB institutes a trial, the PTAB will institute on all challenges raised in the petition." Guidance on the Impact of *SAS* on AIA Trial Proceedings, April 26, 2008.[1] This guidance extends to pending trials instituted on less than all challenged claims or grounds. Specifically, it states that "for pending trials in which a panel has instituted trial only *on some of the challenges raised in the petition* (*as opposed to all challenges raised in the petition*), the panel may

[1] U.S. PATENT & TRADEMARK OFFICE, (Apr. 26, 2018), *available at*: https://www.uspto.gov/sites/default/files/documents/guidance_on_the_impact_of_sas_on_aia_trial_proceedings_%20%28april_26%2C_2018%29.pdf (last accessed May 24, 2018).

issue an order supplementing the institution decision to institute on all challenges raised in the petition." *Id.* (emphasis added).

Thus, both the Supreme Court's reasoning and the Board's own interpretation of that reasoning require institution on all grounds raised in a petition, or no institution at all.

## III. Unless this Court Outright Reverses the Board, it Should Remand to Require the Board to Address the Second Ground adidas Raised.

adidas's appeal seeks reversal or remand of the Board's decisions. Nike, of course argues for affirmance. But, unless this Court were to outright reverse the Board, this Court should, at minimum, remand this matter for the Board to apply *SAS*. There are multiple reasons for doing so.

First, this matter remains open and, under settled law, *SAS* controls. "When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). Put another way, "where a court announces the meaning of a statute, the court proclaims what the statute has meant since enactment." *Halpern v. Principi*, 384 F.3d 1297, 1302 (Fed. Cir. 2004); *see also Heartland By-Products, Inc. v. United States*, 568 F.3d 1360, 1365

(Fed. Cir. 2009) ("Under general principles of law, judicial decisions are given retroactive effect.").

Moreover, as the Supreme Court itself has explained, "[a] holding, however, can extend through its logic beyond the specific facts of the particular case." *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 38 (2010). That is the case here. Thus, unless this Court outright reverses the Board's decisions, in which case the challenged claims are invalid and the issue is moot, it should remand to the Board to allow it to apply the Supreme Court's reasoning in *SAS* that "the statute tells us that the petitioner's contentions, not the Director's discretion, define the scope of the litigation all the way from institution through to conclusion." *SAS*, 138 S. Ct. at 1357.

Second, this Court has routinely held that remand is appropriate where there is an intervening change in law. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 (Fed. Cir. 2008) (remanding for consideration in view of intervening Supreme Court precedent); *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1368-69 (Fed. Cir. 2004) (remanding where "the district court's *In Limine Order* was, at least in part if not entirely, based on law that has since changed" and "the intervening change in law may have affected Sulzer's rights."); *Transonic Sys., Inc. v. Non-Invasive Med. Techs. Corp.*, 75 Fed. App'x 765, 778-79 (Fed. Cir. 2003) (vacating and remanding so the district court could consider an intervening change in

controlling law). That is the case here and, thus, a remand to the Board to apply the logic of the Supreme Court's reasoning in *SAS* is appropriate.

Finally, as noted, the Board itself has announced new policy guidance that applies *SAS* to existing *inter partes* reviews so as to institute on all challenges raised in the petition. As the Supreme Court has recognized:

> Appellate courts ordinarily apply the law in effect at the time of the appellate decision, *see Bradley v. School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). However, a court reviewing an agency decision following an intervening change of policy by the agency should remand to permit the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act.

*NLRB v. Food Store Emps. Union, Local 347*, 417 U.S. 1, 10 n.10 (1974). Here, the Board's new policy was directly responsive to the change in law *SAS* announced and, thus, remand to allow the Board to implement its policy is even more appropriate.

Thus, if this Court does not reverse the Board's decisions, in which case remand would be unnecessary, it should at the very least include remand instructions in its final opinion instructing the Board to address the additional ground adidas raised.

## IV. There was an Intervening Change in Law Precluding any Argument that this Issue was Waived.

This Court has previously explained that it is "incumbent" on a party "to alert this court that [a] recently-decided case affected its position on appeal or to

explicitly reserve the right to seek retrospective relief" from the injunction on remand." *Amado*, 517 F.3d at 1360. adidas is doing so now through this motion.[2]

Nike cannot argue that adidas has waived the relief sought in this motion. Before the Supreme Court's decision, SAS argued to this Court "that 35 U.S.C. § 318(a) required the Board to decide the patentability of *every* claim SAS challenged in its petition, not just some," but this Court "rejected SAS's argument." *SAS*, 138 S. Ct. at 1354. This Court approved the Board's claim-by-claim practice based on a controlling holding on the issue in *Synopsys, Inc. v. Mentor Graphics Corp*., 814 F.3d 1309 (Fed. Cir. 2016).

Additionally, this Court previously found that the Board's decision to institute on less than all grounds is not appealable. *Harmonic Inc. v. Avid Tech., Inc*., 815 F.3d 1356, 1366 (Fed. Cir. 2016) ("The Board's decision to institute on one prior art ground or another does not raise fundamental questions about the scope of its statutory authority to deem patents unpatentable; it is simply the Board's exercise of its institution authority in a given case. Section 314(d) prohibits our review of such a decision."); *HP Inc. v. MPHJ Tech. Inv., LLC*, 817 F.3d 1339, 1346 (Fed. Cir. 2016) ("we cannot review HP's argument that the

[2] Nike also cannot argue that this issue should have been presented in adidas's recently filed Reply, because this Court's rules prevent this motion from being presented in a Reply. Fed. Cir. R. 27(g) ("Except as provided in Federal Circuit Rule 27(e) and (f), a motion must not be incorporated in a brief.").

Board erred by instituting review on only a subset of grounds, and we conclude that the Board did not err in only addressing the instituted grounds in its final written decision."). *SAS*, of course, appears to have reversed such precedent. It held that SAS could challenge the Director's practice because it was contending "that the Director exceeded his statutory authority by limiting the review to fewer than all of the claims SAS challenged. And nothing in § 314(d) or *Cuozzo* [*Speed Technologies, LLC v. Lee*, 136 S. Ct. 2131 (2016)] withdraws our power to ensure that an inter partes review proceeds in accordance with the law's demands." *SAS*, 138 S. Ct. at 1359. The same holds true in the present case because the logic of *SAS*'s holding clearly extends to "grounds" petitioned upon, but not instituted.

These intervening changes in controlling law allow for remand, even without the issue otherwise being preserved. Resolving "an issue not decided or raised below is permitted when there is a change in the jurisprudence of the reviewing court or the Supreme Court after consideration of the case by the lower court. In other words, an exception exists in 'those [cases] in which there have been judicial interpretations of existing law after decision below and pending appeal—interpretations which if applied might have materially altered the result.'" *Forshey v. Principi*, 284 F.3d 1335, 1356 (Fed. Cir. 2002) (*en banc*), *superseded on other grounds by statute*, quoting *Hormel v. Helvering*, 312 U.S. 552, 558-59 (1941); *see also Mankes v. Vivid Seats Ltd.*, 822 F. 3d 1302, 1310 (Fed. Cir. 2016) ("When the

governing legal standards have changed during an appeal, it may be appropriate, in the exercise of our authority under 28 U.S.C. § 2106, to vacate a determination made under superseded standards and to remand for consideration under the new standards and for any proceedings made necessary and appropriate by the new standards."); *In re Micron Tech., Inc.*, 875 F.3d 1091, 1097 (Fed. Cir. 2017) ("Where controlling law precluded the district court, at the time of the motion, from adopting a defense or objection and on that basis granting the motion, it is natural to say, in this context, that the defense or objection was not 'available' to the movant."); *Id*. 1097-98 (collecting cases).

## CONCLUSION

For the foregoing reasons, if the panel does not outright reverse the Board's findings on non-obviousness, it should remand the decision to the Panel to continue the proceeding based on all grounds raised in the Petitions.

Date: May 24, 2018

Respectfully submitted,

/s/ *Mitchell G. Stockwell*
Mitchell G. Stockwell

## CERTIFICATE OF CONFERENCE

In Accordance with Federal Circuit Rule 27(a)(5) I certify that Appellee represents that it objects and will file a response to this motion.

/s/ *Mitchell G. Stockwell*
Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
(404) 815-6500
mstockwell@kilpatricktownsend.com

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 24th day of May, 2018 by the CM/ECF system and electronic mail.

/s/ *Mitchell G. Stockwell*
Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
(404) 815-6500
mstockwell@kilpatricktownsend.com

## CERTIFICATE OF COMPLIANCE

The undersigned certified that this motion complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A). This brief contains 2,352 words, as counted by the word-processing system used to prepare the brief.

/s/ *Mitchell G. Stockwell*
Mitchell G. Stockwell
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
(404) 815-6500
mstockwell@kilpatricktownsend.com

# EXHIBIT A

Trials@uspto.gov
571-272-7822

Paper 6
Entered: October 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

adidas AG,
Petitioner,

v.

NIKE, Inc.,
Patent Owner.

Case IPR2016-00921
Patent 7,814,598 B2

Before JOSIAH C. COCKS, MICHAEL J. FITZPATRICK, and JAMES B. ARPIN, *Administrative Patent Judges*.

ARPIN, *Administrative Patent Judge*.

# DECISION
## Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

adidas AG ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–19 to institute an *inter partes* review of claims 1–13 of U.S. Patent No. 7,814,598 B2 (Ex. 1001, "the '598 patent").[1] Paper 1 ("Pet."). Nike, Inc. ("Patent Owner") did not file a Preliminary Response.[2] Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we institute an *inter partes* review of claims 1–13 of the '598 patent.

## I. BACKGROUND

### A. *The '598 Patent*

The '598 patent is a divisional of U.S. Patent Application No. 10/791,289, filed on March 3, 2004, now issued as U.S. Patent No. 7,347,011 B2 ("the '011 patent") (Ex. 1001 at (62)) and relates to articles of footwear incorporating an upper that is at least partially formed from a textile material (*id.* at col. 1, ll. 18–21). Conventional articles of athletic footwear may include two primary elements: an upper and a sole structure. *Id.* at col. 1, ll. 23–26. The upper may form a void in the interior of the footwear for receiving a wearer's foot, and the upper may extend over the instep and toe areas, along the medial and lateral sides, and around the heel area of the wearer's foot. *Id.* at col. 1, ll. 41–46.

In particular, the Specification describes articles of footwear having an upper incorporating a knitted textile element and having a sole structure secured to the upper. *Id.* at col. 3, ll. 27–33. Methods for manufacturing an

---

[1] Petitioner identifies adidas International B.V.; adidas North America, Inc.; adidas America, Inc.; and adidas International, Inc., as real parties-in-interest. Pet. 1.

[2] Patent Owner identifies only itself, as a real party-in-interest. Paper 5, 2.

article of footwear include "mechanically-manipulating a yarn with a circular knitting machine, for example, to form a cylindrical textile structure. In addition, the method involves removing at least one textile element from the textile structure, and incorporating the textile element into an upper of the article of footwear." *Id.* at col. 3, ll. 41–46.

Figure 9 of the '598 patent is reproduced below.




Figure 9

Figure 9 depicts textile structure 60 formed on a circular knitting machine. *Id.* at col. 7, ll. 48–51. For example,

> [a] suitable knitting machine for forming textile element 40 is a wide-tube circular knitting machine that is produced in the Lonati Group by Santoni S.p.A. of Italy under the SM8 TOP1 model number. This Santoni S.p.A. wide-tube circular knitting machine may form a textile structure having a diameter that ranges from 10 inches to 20 inches, with 8 feeds for each diameter.

*Id.* at col. 7, ll. 14–20. As discussed below, the types of stitches that form textile structure 60 may be varied to form an outline of one or more textile

elements 40 on textile structure 60. *Id.* at col. 7, l. 65–col. 8, l. 3. In particular, as depicted in Figure 9, the outlines for at least two textile elements 40 maybe formed on textile structure 60. *Id.* at col. 7, ll. 53–54.

Figure 8 of the '598 patent is reproduced below.




Figure 8

Figure 8 depicts an embodiment of an upper according to the '598 patent. *Id.* at col. 5, l. 59–col. 6, l. 64. "Textile element 40 is a single material element that is formed to exhibit a unitary (i.e., one-piece) construction, and textile element 40 is formed or otherwise shaped to extend around the foot." *Id.* at col. 5, ll. 40–43; *see also id.* at Figs. 10 (depicting textile element 40'), 11 (depicting textile element 40"). Consequently, textile element 40 is formed, such that portions of the textile element are not joined together with seams or other connections. *Id.* at col. 5, ll. 40–43. Edges 41a–44d are joined together as shown in Figures 3–5 to form seams

51–54, thereby forming at least a portion of a void for receiving the foot. *Id.* at col. 6, ll. 41–50. In contrast, lateral region 31, medial region 32, instep region 33, lower regions 34, and heel regions 35 together have a unitary construction without seams (*id.* at col. 5, ll. 46–58; col. 6, ll. 47–50).

Figure 11 of the '598 patent is reproduced below.




**Figure 11**

Figure 11 depicts another embodiment of an upper according to the '598 patent. *Id.* at col. 9, l. 29–col. 10, l. 7. Textile element 40″ includes three different areas with three different textures. *Id.* at col. 9, ll. 31–32. First texture 46″ is generally smooth and extends in strips across lateral region 31, medial region 32, and instep region 33 of the upper. *Id.* at col. 9, ll. 32–35. In addition, textile element 40″ includes second texture 47″ and third texture 48″. *Id.* at col. 9, ll. 35–39. Moreover, the Specification of the '598 patent describes that:

> The different textures 46″-48″ are formed *by merely varying the type of stitch formed* by the wide-tube circular knitting machine at each location of textile element 40″. Textures 46″-48″ may exhibit aesthetic differences, or the differences may be structural. . . . The air-permeability of textile element 40″ may also vary in the different areas.

*Id.* at col. 9, ll. 39–47 (emphasis added).

### *B. Illustrative Claim*

Claims 1 and 9 are independent, method claims. Claims 2–8 depend directly or indirectly from claim 1, and claims 10–13 depend directly or indirectly from claim 9. Claim 1 is illustrative of the claims at issue and is reproduced below:

> 1. A method of manufacturing an article of footwear, the method comprising steps of:
>
> mechanically-manipulating a yarn with a circular knitting machine to form a cylindrical textile structure;
>
> removing at least one textile element from the textile structure;
>
> incorporating the textile element into an upper of the article of footwear.

*Id.* at col. 11, ll. 43–50.

### *C. Related Proceedings*

Neither party identifies any related litigation. Pet. 1, Paper 5, 2. As discussed above, the ’598 patent is a divisional of the application that issued as the ’011 patent, which is the subject of IPR2013-00067. Pet. 1. In that case, the Board instituted *inter partes* review of claims 1–46 of the ’011 patent, and Patent Owner requested cancellation of claims 1–46 and proposed substitute claims 47–50 in a Motion to Amend. This panel granted Patent Owner’s request to cancel claims 1–46, but denied Patent Owner’s

request as to the substitute claims. Patent Owner appealed the Board's decision to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit"). The Federal Circuit issued a decision in Patent Owner's appeal on February 11, 2016, which affirmed-in-part and vacated-in-part the Board's decision, and remanded the case to the Board for further proceedings regarding the status of the substitute claims. In addition, Petitioner has requested *inter partes* review of claims of related patents in IPR2016-00920 (U.S. Patent No. 8,042,288 B2) and IPR2016-00922 (U.S. Patent No. 8,266,749 B2). Paper 5, 2.

*D. Applied References and Declaration*

Petitioner relies on the following references and declaration in support of its asserted grounds of unpatentability:

| Exhibit | References and Declaration |
|---|---|
| 1003 | Declaration of Mr. Lenny M. Holden |
| 1006 | U.S. Patent No. 3,985,003 to Reed, issued Oct. 12, 1976 ("Reed") |
| 1007 | U.S. Patent No. 4,038,840 to Castello, issued Aug. 2, 1977 ("Castello") |
| 1008 | U.S. Patent No. 6,330,814 B1 to Fujiwara, issued Dec. 18, 2001 ("Fujiwara") |
| 1009 | U.S. Patent No. 5,345,638 to Nishida, issued Sep. 13, 1994 ("Nishida") |
| 1010 | David J. Spencer, *Knitting technology: a comprehensive handbook and practical guide*, 1–413 (2001) (3rd Ed., Woodhead Publ. Ltd.) ("Spencer") |
| 1012 | International Standard, *Textile machinery — Knitting machines — Nominal diameters of circular machines*, 1–6 (2003) (2nd Ed., ISO 8117:2003(E)) ("ISO 8117") |

Pet. iv.

### *E. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| References | Basis | Challenged Claims |
|---|---|---|
| Reed and Nishida | 35 U.S.C. § 103(a) | 1–13 |
| Castello, Fujiwara, and Nishida | 35 U.S.C. § 103(a) | 1–13 |

Pet. 8.

## II. ANALYSIS

### *A. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are construed according to their broadest reasonable interpretation in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2144–46 (2016). Under that standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art[3] in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). In its Petition, Petitioner proposes constructions for the following two claim terms.

[3] Petitioner argues that a person of ordinary skill in the relevant art would have at least a few years of experience in the footwear industry, a broad understanding of shoemaking, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) the available and varied ranges of typical construction methods within a product cycle; and (4) the functional requirements of footwear and the range of material choices available. Pet. 8–9 (citing Ex. 1003 ¶ 34). For purposes of this Decision and to the extent necessary, we adopt Petitioner's assessment of a person of ordinary skill in the relevant art.

### 1. *"a first area and a second area with a unitary construction" (Claims 4 and 11)*

Petitioner argues that the term "a first area and a second area with a unitary construction" means "a textile element having a unitary construction and having a first area and a second area." Pet. 7. As Petitioner notes, this is the construction that this panel gave to the same term appearing in the substitute claims of the '011 patent. *adidas AG v. Nike, Inc.*, Case IPR2013-00067, 2013 WL 8595550, at *7 (PTAB May 17, 2013) (Paper 60). The '011 patent and the '598 patent share the same Specification, neither party contested our construction of this term in the appeal of our decision in the *inter partes* review of the claims of the '011 patent, and, at this time, Patent Owner does not contest Petitioner's proposed construction of this term in this case. Therefore, on this record and to the extent necessary for this Decision, we adopt Petitioner's proposed construction for this term.

### 2. *"wide-tube circular knitting machine" (Claims 2 and 9)*

Petitioner argues that the term "wide-tube circular knitting machine" means "a circular knitting machine with a nominal diameter of 7 inches or larger." Pet. 7. The Specification of the '598 patent identifies a wide-tube circular knitting machine, such as that produced in the Lonati Group by Santoni S.p.A., Italy, as a suitable example of the wide-tube circular knitting machine recited in the claims. *See* Ex. 1001, col. 7, ll. 12–37. In particular, the Specification of the '598 patent indicates that such knitting machines "may form a textile structure having a diameter that ranges from 10 inches to 20 inches, with 8 feeds for each diameter. The machine exhibits a maximum 140 revolutions per minute for 10 inch diameters, and a maximum 120 revolutions per minute for 13 inch diameters." *Id.* at col. 7, ll. 17–23.

Nevertheless, the Specification does not limit suitable wide-tube circular knitting machines to this particular embodiment or to these particular diameters, and, as Petitioner acknowledges, the Specification "provides no other definition or explanation for what is meant by 'wide-tube circular knitting machine.'" Pet. 7. Instead, the Specification describes a wide-tube circular knitting machine functionally as one capable of knitting "body garment" sized textile tubes. Ex. 1001, col. 7, ll. 6–8.

Citing to the teachings of ISO 8117 (Ex. 1012) and the testimony of Petitioner's declarant, Mr. Holden (Ex. 1003 ¶ 97), Petitioner argues that "any circular knitting machine with a nominal diameter of 178 mm (7 inches) or larger is categorized as *a large (or wide-tube)* circular knitting machine." Pet. 7 (emphasis added). ISO 8117 describes "Large circular knitting machines" as having a nominal diameter of at least 178 mm (7 inches), but does not equate the terms "large" and "wide," or even use the term "wide." Ex. 1012, 6 (Table 1). Although Mr. Holden's testimony that "[t]he skilled person would also have understood that a circular knitting machine having a circumference of at least 22 inches (i.e., a nominal diameter of at least 7 inches) is a wide-tube circular knitting machine" is some evidence that ISO 8117 teaches that a wide-tube circular knitting machine has a nominal diameter of 178 mm (7 inches) or larger, the references relied upon by Petitioner to teach the wide-tube circular knitting machine arguably teach diameters larger even than those of the exemplary machine disclosed in the Specification of the '598 patent. Pet. 17–18 (citing Ex. 1003 ¶ 97); *see* Ex. 1001, col. 7, ll. 12–37.

Nevertheless, for purposes of this Decision, it is not necessary for us to construe this term to define *a minimum diameter* for a wide-tube circular

knitting machine. Therefore, on this record, we construe the term "wide-tube circular knitting machine" to mean "a circular knitting machine forming body garment sized, tubular textile structures, including those having a diameter that ranges from 10 inches to 20 inches."

*3. Other Claim Terms*

For purposes of this Decision, we discern no other claim terms that require express interpretation.

*B. Obviousness over Reed and Nishida*

*1. Overview*

Petitioner argues that claims 1–13 are unpatentable under 35 U.S.C. § 103(a) as obvious over Reed and Nishida. *See supra* Section I.E. To support its arguments, Petitioner provides a detailed mapping of limitations of challenged claims to Reed and Nishida and to Castello, Fujiwara, and Nishida. Pet. 14–29 (Reed and Nishida), 34–47 (Castello, Fujiwara, and Nishida). Petitioner also cites Mr. Holden's Declaration for support. *See* Ex. 1003 ¶¶ 92–130, 145–199.

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3)

the level of skill in the art;[4] and (4) objective evidence of nonobviousness, i.e., secondary considerations.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). On this record and for the reasons set forth below, we are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing in this challenge to claims 1–13 of the '598 patent.

*2. Reed (Ex. 1006)*

Reed is directed to a method of manufacturing a wearable item, which includes, among other things, mechanically manipulating a yarn with a circular-knitting machine to form a cylindrical textile structure (Ex. 1006, col. 2, ll. 22–25), textile elements located in different portions of the textile structure (*id.* at col. 2, ll. 29–31), removing the textile elements from the textile structure ((*id.* at col. 3, ll. 12–19, col. 5, l. 67–col. 6, l. 5), and incorporating the textile element(s) "to form all types of garments worn by men, women and children" (*id.* at col. 1, ll. 33–35, col. 5, ll. 56–58).

Reed's Figure 1 is reproduced below.

---

[4] *See supra* 8 n.3; *see also* Ex. 1003 ¶ 36 ("Based on my experience, I have an understanding of the capabilities of the skilled person in this field, and my opinions are provided from the perspective of such a person.").

[5] The current record lacks evidence of secondary considerations. *See* Pet. 47–49; *Medtronic Inc. v. NuVasive Inc.*, Case IPR2014-00087, at 21 (PTAB Apr. 3, 2015) (Paper 44).




FIG. 1

Figure 1 depicts tubular knitted structure 10, such as that produced by a circular knitting machine. *Id.* at col. 2, l. 66–col. 3, l. 1. Knitted structure 10 comprises inner tube 12 and outer tube 14, and

> [a]round the circumference of the knitted structure 10 are illustrated three garments which, for example, may be skirts 16, 18 and 20.[6] The garments 16, 18 and 20 arc outlined by a plurality of interconnecting knitted stitches 22 and 24. The interconnecting knitting 22 not only forms the outline of the garments 16, 18 and 20, but joins the inner tube 12 to the outer tube 14 so as to create a seam. The interconnecting knitting 24

[6] On this record, we are persuaded that "skirts" are "body garments." *See* Ex. 1003 ¶ 97:

> That fact alone would inform a skilled person at least as of March 3, 2004, that the circumference of the circular knitted tube must be at least large enough to accommodate the width of three skirts, and would certainly require a circumference larger than 22 inches, as each skirt (even sized for a child) would require more than 7 inches of space around the circumference of the knitted tube.

> is merely to define the lower outline of the skirt upon which the pattern may be cut.

*Id.* at col. 3, ll. 1–15.

Reed explains that the use of circular knitting machines in the garment industry was historically limited to making tubular, knitted garments, such as ladies stockings, sweaters, and other garments, wherein the entire knitted fabric was used as a unit to form one surface of a finished garment. Pet. 10–11 (citing Ex. 1006, col. 1, ll. 33–44; Ex. 1003 ¶ 94). Reed teaches that, with the introduction of computer pattern preparation equipment, "an era of unlimited pattern potential began." Ex. 1006, col. 1, ll. 45–48; *see* Ex. 1003 ¶ 95. "Computer electronic knitting brought about the possibilities of making patterns and designs of up to three million stitches (previously approximately 50,000 was maximum). With this system, patterns and designs are possible that before could not be made." Ex. 1006, col. 1, ll. 50–55; *see* Ex. 1003 ¶ 95. Reed further explains that its method uses "an electronic circular double knitting machine" and that an "object of the [Reed] invention is to provide a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Ex. 1006, col. 1, ll. 58–59, col. 2, ll. 23–25; Figs 1–6; *see* Ex. 1003 ¶ 95.

*3. Nishida (Ex. 1009)*

Nishida is directed to the production of a shoe upper by (1) cutting out a layout in the form of the shoe upper from a web of material and (2) shaping the shoe upper by connecting material parts of the layout by the formation of seams. *See generally* Nishida, Abstract. By the disclosed process, such shoe uppers allegedly may be produced efficiently and in

reduced time despite the many individual parts present or to be made visible. *Id.*

Figure 2 of Nishida is reproduced below.




Figure 2 illustrates an embodiment of the upper layout according to Nishida. *Id.* at col. 3, ll. 6–12. Web of material 1 may include one or a plurality of layouts 2. Further, web of material 1 includes backing 4 that may be a knitted material, and different areas of layouts 2 may be formed by knitting different yarns or fibers on backing 4. *Id.* at col. 3, ll. 15–26; col. 5, l. 63–col. 6, l. 2.

Consequently, web of material 1 may be used to produce layouts 2 by different production measures, such as different styles, yarn material, color, material thickness, number of layers of material, or the like, simultaneously with the production of web of material 1. *Id.*; *see id.* at Figs. 1, 2. Each layout 2, including a sole part, may be cut from web of material 1 as a unit

and processed into an upper. *Id.* Nishida describes the manufacture of an article of footwear incorporating such an upper. *Id.* at col. 3, ll. 9–12; Fig. 3.

*4. Limitations of the Challenged Claims*

Petitioner argues that Reed and Nishida teach or suggest all of the limitations of claims 1–13 of the '598 patent. Pet. 9–29. In particular, Petitioner argues that Reed and Nishida teach or suggest all of the limitations of each of independent claims 1 and 9. *Id.* at 9–16 (claim 1), 19–20 (claim 9). Although Petitioner appears to identify a disclosure from Nishida in its claim chart (*id.* at 14–16) as teaching each of the limitations of claim 1, Petitioner does not assert expressly that Nishida *alone* renders claim 1 or claim 9 unpatentable. Further, because we determine that the identified disclosure of Nishida fails to teach or suggest at least one of the limitations of claims 1 and 9, to the extent that Petitioner argues that Nishida alone renders claim 1 or claim 9 unpatentable, we disagree.

*a. Independent Claims 1 and 9*

Initially, independent claim 1 recites "[a] method of manufacturing an article of footwear." Ex. 1001, col. 11, l. 43; *see also id.* at col. 12, l. 21 (claim 9). Reed teaches that its circular knitting methods may be used to manufacture "all types of garments." Ex. 1006, col. 5, ll. 56–57. Although Reed specifically identifies stockings and hosiery (*id.* at col. 1, ll. 33–35, col. 5, ll. 57–58) as garments manufactured by circular kitting, Reed does not describe shoes as "garments." Nevertheless, Nishida teaches that the web of material depicted in its Figures 1 and 2 are "produced by a *conventional* textile process." Ex. 1009, col. 3, ll. 6–7 (emphasis added). Thus, on this record, we are persuaded that Petitioner has shown that Reed

and Nishida teach or suggest a method of manufacturing an article of footwear.

The method of claim 1 further comprises the step of "mechanically-manipulating a yarn with a circular knitting machine to form a cylindrical textile structure." Ex. 1001, col. 11, ll. 45–46; *see also id.* at col. 12, ll. 23–25 (claim 9 reciting "a *wide-tube* circular knitting machine" (emphasis added)). Reed clearly teaches the use of circular knitting machines, including such machines that can produce body garments, such as skirts (*see id.* at Fig. 2), shirts and pants (*see id.* at Fig. 3), and dresses (*see id.* at Fig. 6), for men, women, and children (*id.* at col. 5, ll. 56–57). In view of our construction of the term "a wide-tube circular knitting machine" above (*see supra* Section II.A.2; *see also* Ex. 1001, col. 7, ll. 6–8 (describing circular knitting machine capable of producing textile structures large enough for manufacturing "body garment[s]")), we are persuaded that Reed teaches not only a circular knitting machine, but a wide-tube circular knitting machine. *See* Pet. 18 (claim 2 recites a "wide-tube circular knitting machine" and Petitioner relies solely on Reed to teach this limitation); Ex. 1003 ¶ 97.

Nevertheless, Petitioner also argues that Nishida discloses a circular knitting machine. Pet. 15–16 (claim 1).[7] In particular, Petitioner notes that Nishida discloses that producing a web of material "by a conventional textile process, *[for] example, by weaving and/or knitting and/or embroidering.*" Ex. 1009, col. 3, ll. 6–9 (emphasis added). Further, Nishida teaches that "the use of program-controlled, particularly computer-controlled, production

[7] As with claim 2 discussed above, Petitioner relies on Reed and Nishida to teach or suggest the "wide-tube circular knitting machine" of independent claim 9. Pet. 19–20.

devices is advantageous, so that style, color, design, size or the like *can be varied at will*." *Id.* at col. 4, ll. 12–18 (emphasis added); *see* Ex. 1003 ¶¶ 100–102. Although Nishida teaches that various knitting machines may be used to produce a web of material including one or more layouts, we are not persuaded, on this record, that Nishida teaches or suggests the use of a *circular* knitting machine. Thus, we determine that only Reed supplies this limitation of independent claims 1 and 9.

The method of claim 1 further comprises the step of "removing at least one textile element from the textile structure." Ex. 1001, col. 11, ll. 47–48; *see also id.* at col. 12, l. 26 (claim 9 recites "removing a textile element from the textile structure"). Unlike with respect to the previous limitation, we are persuaded that Petitioner has shown that either Reed or Nishida teaches or suggests this limitation of the independent claims. Pet. 16 (claim 1; citing, e.g., Ex. 1006, col. 3, ll. 12–19; Ex. 1009, col. 1, ll. 10–18); *id.* at 20 (claim 9); *see* Ex. 1003 ¶¶ 103–104.

Finally, the method of claim 1 further comprises the step of "incorporating the textile element into an upper of the article of footwear." Ex. 1001, col. 11, ll. 49–50; *see id.* at col. 12, ll. 27–28 (claim 9). Petitioner relies solely on Nishida to supply this limitation, and we are persuaded, on this record, that Petitioner has shown that Nishida teaches or suggested this limitation of the independent claims. Pet. 16 (claim 1), 20 (claim 9); *see* Ex. 1003 ¶¶ 124–125.

Petitioner argues that a person of ordinary skill in the art would have had reason to combine the identified teachings of Reed and Nishida to achieve the methods recited in independent claims 1 and 9. Pet. 12–14. In particular, Petitioner argues that, because Reed teaches that its methods are

applicable to "*all* types of garments" (Ex. 1006, col. 5, ll. 56–57 (emphasis added); *see* Ex. 1003 ¶ 131), a person of ordinary skill in the art would have had reason to apply the teachings of Reed to the processes and shoe parts of Nishida. Pet. 13 (citing Ex. 1003 ¶ 133). Further, Petitioner argues that, because both Reed and Nishida teach the advantages of reducing cost through the use of computer-controlled knitting machines, a person of ordinary skill in the art would have had reason to combine their teachings. Pet. 13 (citing Ex. 1003 ¶¶ 134–135). Finally, Petitioner argues that a person of ordinary skill in the art would have had reason to apply Reed's methods for producing textile elements, from which to produce garments, to produce Nishida's shoe upper patterns. *Id.* at 13–14; *see KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."). Thus, we are persuaded that Petitioner has set forth sufficient reason at this initial stage of the proceeding for a person of ordinary skill in the relevant art to have combined the teachings of Reed and Nishida to achieve the recited methods of manufacturing an article of footwear.

*b. Dependent Claims 2–8 and 10–13*

Petitioner argues that Reed teaches or suggests the additional limitations recited in claim 2 (Pet. 17–18; *see supra* Section II.A.2.); that Nishida teaches or suggests the additional limitations recited in claims 7, 8, 12, and 13 (*id.* at 28–29); and that that Reed and/or Nishida teaches or suggests the additional limitations recited in claims 3–6, 10, and 11 (*id.* at 18–28; *see supra* Section II.A.1.). Petitioner provides a detailed mapping of

the limitations of each of these dependent claims onto the teachings of Reed and/or Nishida. We find these mappings persuasive. Moreover, we are persuaded that, on this record, a person of ordinary skill in the relevant art would have had at least the same reason to combine the teachings of Reed and Nishida to achieve the methods recited in these dependent claims, as that given for combining the teachings of Reed and Nishida to achieve the recited methods of the independent claims. *See id.* at 12–14.

Although we have highlighted specific evidence and arguments for emphasis, we have reviewed the entirety of Petitioner's analysis for independent claims 1 and 9, as well as the supporting testimony of Mr. Holden. Based on our review of the arguments and evidence, we conclude that Petitioner has established a reasonable likelihood of prevailing on its challenge to independent claims 1 and 9 as rendered obvious by Reed and Nishida. Moreover, because Petitioner's arguments for the obviousness of dependent claims 2–8 and 10–13 over Reed and Nishida, rely on the arguments and evidence presented with respect to independent claims 1 and 9, we also conclude that Petitioner has established a reasonable likelihood of prevailing on its challenge to the dependent claims.

*5. Obviousness over Castello, Fujiwara, and Nishida*

Petitioner argues that claims 1–13 are unpatentable under 35 U.S.C. § 103(a) as obvious over Castello, Fujiwara and Nishida. *See supra* Section I.E. In this asserted ground, Castello and Fujiwara, apparently, are cited together in lieu of the teachings of Reed. Pursuant to 35 U.S.C. § 312(a)(3), a petition only may be considered if it "identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the

challenge to each claim." Here, the fault in the Petition lies in its failure to identify "with particularity" the grounds and evidence that form the underlying basis for Petitioner's patentability challenge. For instance, with respect to claim 1, the claim chart offered to point out where the features of the claim are present in the prior art spans four pages and constitutes bulk citation to portions of Castello, Fujiwara, and Nishida. *See* Pet. 34–37. Such an approach does not provide meaningful "particularity" sufficient for the panel to ascertain where, specifically, Petitioner identifies the limitations of the claim in the prior art.

Furthermore, again in connection with claim 1, the Petition cites to portions of Castello and Fujiwara for the same features of that claim, and also submits parallel citation in some cases to portions of Nishida. Nevertheless, Petitioner does not articulate whether it contends that the teachings of Castello and Fujiwara are cumulative of one another, cumulative of Nishida, or both.[8] It is not evident from the Petition what features Petitioner argues are absent from Castello that it must rely on content of Fujiwara to supply. As noted above, the Supreme Court has instructed us that the obviousness analysis includes describing (1) the scope and content of the prior art and (2) any differences between the claimed subject matter and the prior art. *Graham*, 383 U.S. at 17–18. At least with respect to Castello and Fujiwara, Petitioner has failed to do so here. We are

---

[8] With the exception of characterizing Castello as directed to "shirts" and Fujiwara as directed to "garments," Petitioner uses virtually identical language to describe the teachings of these references. *Compare* Pet. 29–30 (Castello: "incorporating the textile element(s) into *shirts* worn by men, women, and children" (emphasis added)), *with id.* at 31 (Fujiwara: "incorporating the textile element(s) into *garments* worn by men, women, and children" (emphasis added)).

left to guess what limitations Petitioner seeks to supply from the teachings of each of those references. Petitioner's arguments, citations, and claim charts fail to provide appropriate guidance as to where limitations of the challenged claims are found with particularity and are not sufficient, here, to support the institution of *inter partes* review on this second ground.[9]

Therefore, we *deny* this second ground and do not institute *inter partes* review based on it.

## III. SUMMARY

We are persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on its challenge to claims 1–13 of the '598 patent as obvious over Reed and Nishida. We are not persuaded, however, that Petitioner has demonstrated a reasonable likelihood of prevailing on its challenge to claims 1–13 of the '598 patent as obvious over Castello, Fujiwara, and Nishida. At this stage of the proceeding, we have not made a final determination as to the patentability of any of these challenged claims or the construction of any claim term.

## IV. ORDER

It is, therefore,

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '598 patent is instituted on the grounds of obviousness of claims 1–13 over Reed and Nishida;

---

[9] This second asserted ground addresses *all* of the challenged claims upon which we have instituted *inter partes* review based on Reed and Nishida, but Petitioner does not provide argument or evidence clearly favoring institution on one of the two asserted grounds over the other. *See* Pet. 29–47. Regardless, it would be within our discretion under 37 C.F.R. § 42.108(a) to deny institution on the additional ground.

FURTHER ORDERED that *inter partes* review is not authorized based on any other proposed ground of unpatentability; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this Decision.

PETITIONER:

Mitchell G. Stockwell
Vaibhav P. Kadaba
Tiffany L. Williams
KILPATRICK TOWNSEND & STOCKTON LLP
mstockwell@kilpatricktownsend.com
wkadaba@kilpatricktownsend.com
tiwilliams@kilpatricktownsend.com

PATENT OWNER:

Christopher J. Renk
Michael J. Harris
BANNER & WITCOFF, LTD
crenk@bannerwitcoff.com
mharris@bannerwitcoff.com
bwlitdocket@bannerwitcoff.com

# EXHIBIT B

Trials@uspto.gov
571-272-7822

Paper 6
Entered: October 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

adidas AG,
Petitioner,

v.

NIKE, Inc.,
Patent Owner.

---

Case IPR2016-00922
Patent 8,266,749 B2

---

Before JOSIAH C. COCKS, MICHAEL J. FITZPATRICK, and JAMES B. ARPIN, *Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

adidas AG ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–19 to institute an *inter partes* review of claims 1–9, 11–19, and 21of U.S. Patent No. 8,266,749 B2 (Ex. 1001, "the '749 patent").[1] Paper 2 ("Pet."). Nike, Inc. ("Patent Owner") did not file a Preliminary Response.[2] Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we institute an *inter partes* review of claims 1–9, 11–19, and 21 of the '749 patent.

## I. BACKGROUND

### A. *The '749 Patent*

The '749 patent claims priority from U.S. Patent Application No. 10/791,289, filed on March 3, 2004, now issued as U.S. Patent No. 7,347,011 B2 ("the '011 patent") (Ex. 1001 at (60)) and relates to articles of footwear incorporating an upper that is at least partially formed from a textile material (*id.* at col. 1, ll. 20–23). Conventional articles of athletic footwear may include two primary elements: an upper and a sole structure. *Id.* at col. 1, ll. 25–28. The upper may form a void in the interior of the footwear for receiving a wearer's foot, and the upper may extend over the instep and toe areas, along the medial and lateral sides, and around the heel area of the wearer's foot. *Id.* at col. 1, ll. 42–47.

In particular, the Specification describes articles of footwear having an upper incorporating a knitted textile element and having a sole structure secured to the upper. *Id.* at col. 3, ll. 27–33. Methods for manufacturing an

---

[1] Petitioner identifies adidas International B.V.; adidas North America, Inc.; adidas America, Inc.; and adidas International, Inc., as real parties-in-interest. Pet. 1.

[2] Patent Owner identifies only itself, as a real party-in-interest. Paper 5, 2.

article of footwear include "mechanically-manipulating a yarn with a circular knitting machine, for example, to form a cylindrical textile structure. In addition, the method involves removing at least one textile element from the textile structure, and incorporating the textile element into an upper of the article of footwear." *Id.* at col. 3, ll. 41–46.

Figure 9 of the '749 patent is reproduced below.




Figure 9

Figure 9 depicts textile structure 60 formed on a circular knitting machine. *Id.* at col. 7, ll. 38–39. For example,

> [a] suitable knitting machine for forming textile element 40 is a wide-tube circular knitting machine that is produced in the Lonati Group by Santoni S.p.A. of Italy under the SM8 TOP1 model number. This Santoni S.p.A. wide-tube circular knitting machine may form a textile structure having a diameter that ranges from 10 inches to 20 inches, with 8 feeds for each diameter.

*Id.* at col. 7, ll. 14–20. As discussed below, the types of stitches that form textile structure 60 may be varied to form an outline of one or more textile

elements 40 on textile structure 60. *Id.* at col. 7, l. 64–col. 8, l. 3. In particular, as depicted in Figure 9, the outlines for at least two textile elements 40 maybe formed on textile structure 60. *Id.* at col. 7, ll. 53–54.

Figure 8 of the ’749 patent is reproduced below.




Figure 8

Figure 8 depicts an embodiment of an upper according to the ’749 patent. *Id.* at col. 5, l. 59–col. 6, l. 64. “Textile element 40 is a single material element that is formed to exhibit a unitary (i.e., one-piece) construction, and textile element 40 is formed or otherwise shaped to extend around the foot.” *Id.* at col. 5, ll. 40–43; *see also id.* at Figs. 10 (depicting textile element 40′), 11 (depicting textile element 40″). Consequently, textile element 40 is formed, such that portions of the textile element are not joined together with seams or other connections. *Id.* at col. 5, ll. 40–43. Edges 41a–44d are joined together as shown in Figures 3–5 to form seams

51–54, thereby forming at least a portion of a void for receiving the foot. *Id.* at col. 6, ll. 41–50. In contrast, lateral region 31, medial region 32, instep region 33, lower regions 34, and heel regions 35 together have a unitary construction without seams (*id.* at col. 5, ll. 46–58; col. 6, ll. 47–50).

Figure 11 of the ’749 patent is reproduced below.




**Figure 11**

Figure 11 depicts another embodiment of an upper according to the ’749 patent. *Id.* at col. 9, l. 29–col. 10, l. 7. Textile element 40″ includes three different areas with three different textures. *Id.* at col. 9, ll. 31–32. First texture 46″ is generally smooth and extends in strips across lateral region 31, medial region 32, and instep region 33 of the upper. *Id.* at col. 9, ll. 32–35. In addition, textile element 40″ includes second texture 47″ and third texture 48″. *Id.* at col. 9, ll. 35–39. Moreover, the Specification of the ’749 patent describes that:

> The different textures 46″-48″ are formed *by merely varying the type of stitch formed* by the wide-tube circular knitting machine at each location of textile element 40″. Textures 46″-48″ may exhibit aesthetic differences, or the differences may be structural. . . . The air-permeability of textile element 40″ may also vary in the different areas.

*Id.* at col. 9, ll. 39–47 (emphasis added).

### *B. Illustrative Claim*

Claims 1 and 13 are independent, method claims. Claims 2–9, 11, and 12 depend directly or indirectly from claim 1, and claims 14–19 and 21 depend directly or indirectly from claim 13. Claim 1 is illustrative of the claims at issue and is reproduced below:

> 1. A method of manufacturing an article of footwear, the method comprising:
>
> simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure;
>
> removing the knitted textile element from the surrounding knitted textile structure;
>
> incorporating the knitted textile element into the article of footwear.

*Id.* at col. 11, ll. 43–52.

### *C. Related Proceedings*

Neither party identifies any related litigation. Pet. 1, Paper 5, 2. As discussed above, the ’749 patent claims priority from the application that issued as the ’011 patent, which is the subject of IPR2013-00067. Pet. 1. In that case, the Board instituted *inter partes* review of claims 1–46 of the ’011 patent, and Patent Owner requested cancellation of claims 1–46 and

proposed substitute claims 47–50 in a Motion to Amend. This panel granted Patent Owner's request to cancel claims 1–46, but denied Patent Owner's request as to the substitute claims. Patent Owner appealed the Board's decision to the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit"). The Federal Circuit issued a decision in Patent Owner's appeal on February 11, 2016, which affirmed-in-part and vacated-in-part the Board's decision, and remanded the case to the Board for further proceedings regarding the status of the substitute claims. In addition, Petitioner has requested *inter partes* review of claims of related patents in IPR2016-00920 (U.S. Patent No. 8,042,288 B2) and IPR2016-00921 (U.S. Patent No. 7,814,598 B2). Paper 5, 2.

*D. Applied References and Declaration*

Petitioner relies on the following references and declaration in support of its asserted grounds of unpatentability:

| Exhibit | References and Declaration |
|---|---|
| 1003 | Declaration of Mr. Lenny M. Holden |
| 1006 | U.S. Patent No. 3,985,003 to Reed, issued Oct. 12, 1976 ("Reed") |
| 1007 | U.S. Patent No. 4,038,840 to Castello, issued Aug. 2, 1977 ("Castello") |
| 1008 | U.S. Patent No. 6,330,814 B1 to Fujiwara, issued Dec. 18, 2001 ("Fujiwara") |
| 1009 | U.S. Patent No. 5,345,638 to Nishida, issued Sep. 13, 1994 ("Nishida") |
| 1010 | David J. Spencer, *Knitting technology: a comprehensive handbook and practical guide*, 1–413 (2001) (3rd Ed., Woodhead Publ. Ltd.) ("Spencer") |
| 1012 | International Standard, *Textile machinery — Knitting machines — Nominal diameters of circular machines*, 1–6 (2003) (2nd Ed., ISO 8117:2003(E)) ("ISO 8117") |

Pet. iv.

### *E. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| References | Basis | Challenged Claims |
|---|---|---|
| Reed and Nishida | 35 U.S.C. § 103(a) | 1–9, 11–19, and 21 |
| Castello, Fujiwara, and Nishida | 35 U.S.C. § 103(a) | 1–9, 11–19, and 21 |

Pet. 7.

## II. ANALYSIS

### *A. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are construed according to their broadest reasonable interpretation in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2144–46 (2016). Under that standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art[3] in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). In its Petition, Petitioner proposes constructions for the following two claim terms.

[3] Petitioner argues that a person of ordinary skill in the relevant art would have at least a few years of experience in the footwear industry, a broad understanding of shoemaking, and an understanding of (1) the product cycle for the process of designing, developing and bringing a new product to market; (2) milestones for reviewing upper material designs; (3) the available and varied ranges of typical construction methods within a product cycle; and (4) the functional requirements of footwear and the range of material choices available. Pet. 8 (citing Ex. 1003 ¶ 34). For purposes of this Decision and to the extent necessary, we adopt Petitioner's assessment of a person of ordinary skill in the relevant art.

*1. "a first area and a second area with a unitary construction" (Claims 11 and 21)*

Petitioner argues that the term "a first area and a second area with a unitary construction" means "a textile element having a unitary construction and having a first area and a second area." Pet. 6. As Petitioner notes, this is the construction that this panel gave to the same term appearing in the substitute claims of the '011 patent. *adidas AG v. Nike, Inc.,* Case IPR2013-00067, 2013 WL 8595550, at *7 (PTAB May 17, 2013) (Paper 60). The '011 patent and the '749 patent share the same Specification, neither party contested our construction of this term in the appeal of our decision in the *inter partes* review of the claims of the '011 patent, and, at this time, Patent Owner does not contest Petitioner's proposed construction of this term in this case. Therefore, on this record and to the extent necessary for this Decision, we adopt Petitioner's proposed construction for this term.

*2. "wide-tube circular knitting machine" (Claims 9 and 19)*

Petitioner argues that the term "wide-tube circular knitting machine" means "a circular knitting machine with a nominal diameter of 7 inches or larger." Pet. 6. The Specification of the '749 patent identifies a wide-tube circular knitting machine, such as that produced in the Lonati Group by Santoni S.p.A., Italy, as a suitable example of the wide-tube circular knitting machine recited in the claims. *See* Ex. 1001, col. 7, ll. 12–37. In particular, the Specification of the '749 patent indicates that such knitting machines "may form a textile structure having a diameter that ranges from 10 inches to 20 inches, with 8 feeds for each diameter. The machine exhibits a maximum 140 revolutions per minute for 10 inch diameters, and a maximum 120 revolutions per minute for 13 inch diameters." *Id.* at col. 7, ll. 17–23.

Nevertheless, the Specification does not limit suitable, wide-tube circular knitting machines to this particular embodiment or to these particular diameters, and, as Petitioner acknowledges, the Specification "provides no other definition or explanation for what is meant by 'wide-tube circular knitting machine.'" Pet. 6. Instead, the Specification describes a wide-tube circular knitting machine functionally as one capable of knitting "body garment" sized textile tubes. Ex. 1001, col. 7, ll. 6–8.

Citing to the teachings of ISO 8117 (Ex. 1012) and the testimony of Petitioner's declarant, Mr. Holden (Ex. 1003 ¶ 97), Petitioner argues that "any circular knitting machine with a nominal diameter of 178 mm (7 inches) or larger is categorized as *a large (or wide-tube)* circular knitting machine." Pet. 6–7 (emphasis added). ISO 8117 describes "Large circular knitting machines" as having a nominal diameter of at least 178 mm (7 inches), but does not equate the terms "large" and "wide," or even use the term "wide." Ex. 1012, 6 (Table 1). Although Mr. Holden's testimony that "[t]he skilled person would also have understood that a circular knitting machine having a circumference of at least 22 inches (i.e., a nominal diameter of at least 7 inches) is a wide-tube circular knitting machine" is some evidence that ISO 8117 teaches that a wide-tube circular knitting machine has a nominal diameter of 178 mm (7 inches) or larger, the references relied upon by Petitioner to teach the wide-tube circular knitting machine arguably teach diameters larger even than those of the exemplary machine disclosed in the Specification of the '749 patent. Pet. 29–31 (citing Ex. 1003 ¶ 97); *see* Ex. 1001, col. 7, ll. 12–37.

Nevertheless, for purposes of this Decision, it is not necessary for us to construe this term to define *a minimum diameter* for a wide-tube circular

knitting machine. Therefore, on this record, we construe the term "wide-tube circular knitting machine" to mean "a circular knitting machine forming body garment sized, tubular textile structures, including those having a diameter that ranges from 10 inches to 20 inches."

### 3. *Other Claim Terms*

For purposes of this Decision, we discern no other claim terms that require express interpretation.

## B. *Obviousness over Reed and Nishida*

### 1. *Overview*

Petitioner argues that claims 1–9, 11–19, and 21 are unpatentable under 35 U.S.C. § 103(a) as obvious over Reed and Nishida. *See supra* Section I.E. To support its arguments, Petitioner provides a detailed mapping of limitations of challenged claims to Reed and Nishida and to Castello, Fujiwara, and Nishida. Pet. 9–32 (Reed and Nishida), 33–56 (Castello, Fujiwara, and Nishida). Petitioner also cites Mr. Holden's Declaration for support. *See* Ex. 1003 ¶¶ 92–130, 145–200.

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3)

the level of skill in the art;[4] and (4) objective evidence of nonobviousness, i.e., secondary considerations.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). On this record and for the reasons set forth below, we are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing in this challenge to claims 1–13 of the ’749 patent.

*2. Reed (Ex. 1006)*

Reed is directed to a method of manufacturing a wearable item, which includes, among other things, mechanically manipulating a yarn with a circular-knitting machine to form a cylindrical textile structure (Ex. 1006, col. 2, ll. 22–25), textile elements located in different portions of the textile structure (*id.* at col. 2, ll. 29–31), removing the textile elements from the textile structure ((*id.* at col. 3, ll. 12–19, col. 5, l. 67–col. 6, l. 5), and incorporating the textile element(s) “to form all types of garments worn by men, women and children” (*id.* at col. 1, ll. 33–35, col. 5, ll. 56–58).

Reed’s Figure 1 is reproduced below.

[4] *See supra* 8 n.3; *see also* Ex. 1003 ¶ 36 (“Based on my experience, I have an understanding of the capabilities of the skilled person in this field, and my opinions are provided from the perspective of such a person.”).
[5] The current record lacks evidence of secondary considerations. *See* Pet. 47–49; *Medtronic Inc. v. NuVasive Inc.*, Case IPR2014-00087, at 21 (PTAB Apr. 3, 2015) (Paper 44).




FIG. 1

Figure 1 depicts tubular knitted structure 10, such as that produced by a circular knitting machine. *Id.* at col. 2, l. 66–col. 3, l. 1. Knitted structure 10 comprises inner tube 12 and outer tube 14, and

> [a]round the circumference of the knitted structure 10 are illustrated three garments which, for example, may be skirts 16, 18 and 20.[6] The garments 16, 18 and 20 arc outlined by a plurality of interconnecting knitted stitches 22 and 24. The interconnecting knitting 22 not only forms the outline of the garments 16, 18 and 20, but joins the inner tube 12 to the outer tube 14 so as to create a seam. The interconnecting knitting 24

---

[6] On this record, we are persuaded that "skirts" are "body garments." *See* Ex. 1003 ¶ 97:

> That fact alone would inform a skilled person at least as of March 3, 2004, that the circumference of the circular knitted tube must be at least large enough to accommodate the width of three skirts, and would certainly require a circumference larger than 22 inches, as each skirt (even sized for a child) would require more than 7 inches of space around the circumference of the knitted tube.

> is merely to define the lower outline of the skirt upon which the pattern may be cut.

*Id.* at col. 3, ll. 1–15.

Reed explains that the use of circular knitting machines in the garment industry was historically limited to making tubular, knitted garments, such as ladies stockings, sweaters, and other garments, wherein the entire knitted fabric was used as a unit to form one surface of a finished garment. Pet. 10–11 (citing Ex. 1006, col. 1, ll. 33–44; Ex. 1003 ¶ 94). Reed teaches that, with the introduction of computer pattern preparation equipment, "an era of unlimited pattern potential began." Ex. 1006, col. 1, ll. 45–48; *see* Ex. 1003 ¶ 95. "Computer electronic knitting brought about the possibilities of making patterns and designs of up to three million stitches (previously approximately 50,000 was maximum). With this system, patterns and designs are possible that before could not be made." Ex. 1006, col. 1, ll. 50–55; *see* Ex. 1003 ¶ 95. Reed further explains that its method uses "an electronic circular double knitting machine" and that an "object of the [Reed] invention is to provide a method of reducing the cost of manufacturing of garments by using the versatility of a computerized electronic knitting machine." Ex. 1006, col. 1, ll. 58–59, col. 2, ll. 23–25; Figs 1–6; *see* Ex. 1003 ¶ 95.

*3. Nishida (Ex. 1009)*

Nishida is directed to the production of a shoe upper by (1) cutting out a layout in the form of the shoe upper from a web of material and (2) shaping the shoe upper by connecting material parts of the layout by the formation of seams. *See generally* Nishida, Abstract. By the disclosed process, such shoe uppers allegedly may be produced efficiently and in

reduced time despite the many individual parts present or to be made visible. *Id.*

Figure 2 of Nishida is reproduced below.




Figure 2 illustrates an embodiment of the upper layout according to Nishida. *Id.* at col. 3, ll. 6–12. Web of material 1 may include one or a plurality of layouts 2. Further, web of material 1 includes backing 4 that may be a knitted material, and different areas of layouts 2 may be formed by knitting different yarns or fibers on backing 4. *Id.* at col. 3, ll. 15–26; col. 5, l. 63–col. 6, l. 2.

Consequently, web of material 1 may be used to produce layouts 2 by different production measures, such as different styles, yarn material, color, material thickness, number of layers of material, or the like, simultaneously with the production of web of material 1. *Id.*; *see id.* at Figs. 1, 2. Each layout 2, including a sole part, may be cut from web of material 1 as a unit

and processed into an upper. *Id.* Nishida describes the manufacture of an article of footwear incorporating such an upper. *Id.* at col. 3, ll. 9–12; Fig. 3.

*4. Limitations of the Challenged Claims*

Petitioner argues that Reed and Nishida teaches or suggests all of the limitations of claims 1–9, 11–19, and 21 of the ’749 patent. Pet. 9–32. In particular, Petitioner argues that Reed and Nishida teaches or suggests all of the limitations of each of independent claims 1 and 13. *Id.* at 13–19 (claim 1), 20–21 (claim 13). Although Petitioner appears to identify a disclosure from Nishida in its claim charts (*id.* at 13–21) as teaching each of the limitations of claims 1 and 13, Petitioner does not assert expressly that Nishida *alone* renders claim 1 or claim 13 unpatentable. Therefore, although Petitioner may argue and present evidence that Nishida alone renders claim 1 or claim 13 unpatentable, we decline to institute grounds not expressly asserted by Petitioner. *See supra* Section I.E.

*a. Independent Claims 1 and 13*

Initially, independent claim 1 recites “[a] method of manufacturing an article of footwear.” Ex. 1001, col. 11, l. 43; *see also id.* at col. 12, l. 27 (claim 13). Reed teaches that its circular knitting methods may be used to manufacture “all types of garments.” Ex. 1006, col. 5, ll. 56–57. Although Reed specifically identifies stockings and hosiery (*id.* at col. 1, ll. 33–35, col. 5, ll. 57–58) as garments manufactured by circular kitting, Reed does not describe shoes as “garments.” Nevertheless, Nishida teaches that the web of material depicted in its Figures 1 and 2 is “produced by a *conventional* textile process.” Ex. 1009, col. 3, ll. 6–7 (emphasis added). Thus, on this record, we are persuaded that Petitioner has shown that Reed

and Nishida teach or suggest a method of manufacturing an article of footwear.

The method of claim 1 further comprises the step of "simultaneously knitting a textile element with a surrounding textile structure, the knitted textile element having at least one knitted texture that differs from a knitted texture in the surrounding knitted textile structure." Ex. 1001, col. 11, ll. 45–48; *see also id.* at col. 12, ll. 29–39 (claim 13 reciting "the first knitted textile element located within a first portion of the knitted textile structure, the second knitted textile element located within a second portion of the knitted textile structure, varying at least one of the types of stitches or the types of yarns in the knitted textile structure to impart a texture to the first and second knitted textile elements different from a texture of the knitted textile structure extending between the first and second portions"). Reed clearly teaches simultaneously knitting a textile element, including producing body garments, such as skirts (*see id.* at Fig. 2), shirts and pants (*see id.* at Fig. 3), and dresses (*see id.* at Fig. 6), for men, women, and children (*id.* at col. 5, ll. 56–57) with a surrounding textile structure. Nishida also clearly supplies this limitation. Pet. 14–15. Nishida's Figure 2, reproduced above (*see supra* Section II.B.3.) depicts textile elements, such as layouts 2, with a surrounding textile structure, such as web of material 1. Pet. 15–16: *see* Ex. 1009, col. 3, ll. 15–26. Thus, we determine that either Reed or Nishida teaches or suggests "simultaneously knitting a textile element with a surrounding textile structure" and "the first knitted textile element located within a first portion of the knitted textile structure," as recited in independent claims 1 and 13, respectively.

With regard to the second part of this limitation of claims 1 and 13, which Petitioner refers to as limitations 1C and 13C, Petitioner argues that

> Reed describes using different types of stitches or yarns to impart a knitted texture to the textile element(s) that is different from a knitted texture in the surrounding textile structure. For example, Reed describes that the edges of the garments 16, 18, 20 are formed by interknitted stitches, whereas the remainder of the garments 16, 18, 20 are formed by non-interknitted stitches. . . . *Because the interknitted stitches are part of the garments 16, 18, 20, they form a texture in the garments that is different from the texture in the surrounding textile structure.*

Pet. 16 (emphasis added; citing Ex. 1006, col. 5, ll. 3–18; Ex. 1003 ¶¶ 108, 109). Similarly, Petitioner argues that Nishida teaches that

> "*only just those parts of the web of material are produced in the necessary quality, thickness, multilayers or the like which correspond to the pattern or to an area of a pattern of the shoe upper or the related shoe part.* The remaining area of the web of material in contrast can consist of a simple, lightweight or inexpensive material quality, which holds together only the patterns or areas of such patterns in the web of material after their completion."

*Id.* at 17 (emphasis added; quoting Ex. 1009, col. 2, ll. 12–20; citing Ex. 1003 ¶¶ 110–111). Thus, on this record, we determine that either Reed or Nishida supplies this limitation of independent claims 1 and 13.

The method of claim 1 further comprises the step of "removing the knitted textile element from the surrounding knitted textile structure." Ex. 1001, col. 11, ll. 49–50; *see also id.* at col. 12, ll. 40–41 (claim 13 recites "removing the first and second knitted textile element from the knitted textile structure"). Like with respect to the previous limitation, we are persuaded that Petitioner has shown that either Reed or Nishida teaches or

suggests this limitation of the independent claims. Pet. 18 (claim 1; citing, e.g., Ex. 1006, col. 3, ll. 12–19; Ex. 1009, col. 1, ll. 10–18); *id.* at 21 (claim 13); *see* Ex. 1003 ¶¶ 103–104.

Finally, the method of claim 1 further comprises the step of "incorporating the textile element into an upper of the article of footwear." Ex. 1001, col. 11, ll. 51–52; *see also id.* at col. 12, ll. 42–43 (claim 13). Petitioner relies solely on Nishida to supply this limitation, and we are persuaded, on this record, that Petitioner has shown that Nishida teaches or suggested this limitation of the independent claims. Pet. 16 (claim 1), 20 (claim 13); *see* Ex. 1003 ¶ 126.

Petitioner argues that a person of ordinary skill in the art would have had reason to combine the identified teachings of Reed and Nishida to achieve the methods recited in independent claims 1 and 13. Pet. 11–13. In particular, Petitioner argues that, because Reed teaches that its methods are applicable to "*all* types of garments" (Ex. 1006, col. 5, ll. 56–57 (emphasis added); *see* Ex. 1003 ¶ 131), a person of ordinary skill in the art would have had reason to apply the teachings of Reed to the processes and shoe parts of Nishida. Pet. 13 (citing Ex. 1003 ¶ 133). Further, Petitioner argues that, because both Reed and Nishida teach the advantages of reducing cost through the use of computer-controlled knitting machines, a person of ordinary skill in the art would have had reason to combine their teachings. Pet. 13 (citing Ex. 1003 ¶¶ 134–135). Finally, Petitioner argues that a person of ordinary skill in the art would have had reason to apply Reed's methods for producing textile elements, from which to produce garments, to produce Nishida's shoe upper patterns. *Id.*; *see KSR*, 550 U.S. at 417 ("[I]f a technique has been used to improve one device, and a person of ordinary

skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.”). Thus, we are persuaded that Petitioner has set forth sufficient reason at this initial stage of the proceeding for a person of ordinary skill in the relevant art to have combined the teachings of Reed and Nishida to achieve the recited methods of manufacturing an article of footwear.

*b. Dependent Claims 2–9, 11, 12, 14–19, and 21*

Petitioner argues that Reed teaches or suggests the additional limitations recited in claims 9 and 19 (*id.* at 29–31; *see supra* Section II.A.2.); that Nishida teaches or suggests the additional limitations recited in claims 7, 12, 17, and 18 (Pet. 25, 31–32); and that that Reed and/or Nishida teaches or suggests the additional limitations recited in claims 2–6, 8, 11, 14–16, and 21 (*id.* at 19, 21–29, 31; *see supra* Section II.A.1.). Petitioner provides a detailed mapping of the limitations of each of these dependent claims onto the teachings of Reed and/or Nishida. We find these mappings persuasive. Moreover, we are persuaded that, on this record, a person of ordinary skill in the relevant art would have had at least the same reason to combine the teachings of Reed and Nishida to achieve the methods recited in these dependent claims, as that given for combining the teachings of Reed and Nishida to achieve the recited methods of the independent claims. *See id.* at 11–13.

Although we have highlighted specific evidence and arguments for emphasis, we have reviewed the entirety of Petitioner’s analysis for independent claims 1 and 13, as well as the supporting testimony of Mr. Holden. Based on our review of the arguments and evidence, we conclude

that Petitioner has established a reasonable likelihood of prevailing on its challenge to independent claims 1 and 13 as rendered obvious by Reed and Nishida. Moreover, because Petitioner's arguments for the obviousness of dependent claims 2–9, 11, 12, 14–19, and 21 over Reed and Nishida, rely on the arguments and evidence presented with respect to independent claims 1 and 13, we also conclude that Petitioner has established a reasonable likelihood of prevailing on its challenge to the dependent claims.

*5. Obviousness over Castello, Fujiwara, and Nishida*

Petitioner argues that claims 1–9, 11–19, and 21 are unpatentable under 35 U.S.C. § 103(a) as obvious over Castello, Fujiwara, and Nishida. *See supra* Section I.E. In this asserted ground, Castello and Fujiwara, apparently, are cited together in lieu of the teachings of Reed. *See supra* Section I.E. Pursuant to 35 U.S.C. § 312(a)(3), a petition only may be considered if it "identifies, in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." Here, the fault in the Petition lies in its failure to identify "with particularity" the grounds and evidence that form the underlying basis for Petitioner's patentability challenge. For instance, with respect to claim 1, the claim chart offered to point out where the features of the claim are present in the prior art spans eight pages and constitutes bulk citation to portions of Castello, Fujiwara, and Nishida. *See* Pet. 37–44. Such an approach does not provide meaningful "particularity" sufficient for the panel to ascertain where, specifically, Petitioner identifies the limitations of the claim in the prior art.

Furthermore, again in connection with claim 1, the Petition cites to portions of Castello and Fujiwara for the same features of that claim, and

also submits parallel citation in some cases to portions of Nishida. Nevertheless, Petitioner does not articulate whether it contends that the teachings of Castello and Fujiwara are cumulative of one another, cumulative of Nishida, or both.[7] It is not evident from the Petition what features Petitioner argues are absent from Castello that it must rely on content of Fujiwara to supply. As noted above, the Supreme Court has instructed us that the obviousness analysis includes describing (1) the scope and content of the prior art and (2) any differences between the claimed subject matter and the prior art. *Graham*, 383 U.S. at 17–18. At least with respect to Castello and Fujiwara, Petitioner has failed to do so here. We are left to guess what limitations Petitioner seeks to supply from the teachings of each of those references. Petitioner's arguments, citations, and claim charts fail to provide appropriate guidance as to where limitations of the challenged claims are found with particularity and are not sufficient, here, to support the institution of *inter partes* review on this second ground.[8]

[7] With the exception of characterizing Castello as directed to "shirts" and Fujiwara as directed to "garments," Petitioner uses virtually identical language to describe the teachings of these references. *Compare* Pet. 33 (Castello: "incorporating the textile element(s) into *shirts* worn by men, women, and children" (emphasis added)), *with id.* at 34 (Fujiwara: "incorporating the textile element(s) into *garments* worn by men, women, and children" (emphasis added)).

[8] This second asserted ground addresses *all* of the challenged claims upon which we have instituted *inter partes* review based on Reed and Nishida, but Petitioner does not provide argument or evidence clearly favoring institution on one of the two asserted grounds over the other. *See* Pet. 57–58. Regardless, it would be within our discretion under 37 C.F.R. § 42.108(a) to deny institution on the additional ground.

Therefore, we *deny* this second ground and do not institute *inter partes* review based on it.

## III. SUMMARY

We are persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on its challenge to claims 1–9, 11–19, and 21 of the ’749 patent as obvious over Reed and Nishida. We are not persuaded, however, that Petitioner has demonstrated a reasonable likelihood of prevailing on its challenge to claims 1–9, 11–19, and 21 of the ’749 patent as obvious over Castello, Fujiwara, and Nishida. At this stage of the proceeding, we have not made a final determination as to the patentability of any of these challenged claims or the construction of any claim term.

## IV. ORDER

It is, therefore,

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the ’749 patent is instituted on the grounds of obviousness of claims 1–9, 11–19, and 21 over Reed and Nishida;

FURTHER ORDERED that *inter partes* review is not authorized based on any other proposed ground of unpatentability; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this Decision.

PETITIONER:

Mitchell G. Stockwell
Vaibhav P. Kadaba
Tiffany L. Williams
KILPATRICK TOWNSEND & STOCKTON LLP
mstockwell@kilpatricktownsend.com
wkadaba@kilpatricktownsend.com
tiwilliams@kilpatricktownsend.com

PATENT OWNER:

Christopher J. Renk
Michael J. Harris
BANNER & WITCOFF, LTD
crenk@bannerwitcoff.com
mharris@bannerwitcoff.com
bwlitdocket@bannerwitcoff.com